FILED BY _____ *cur* _____ D.C.

MAR 10 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

David Morris Clayman, Harmless Hands, Pro se

# UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| David Clayman, Harmless Hands, | CASE |
|---|---|
| Plaintiffs, | |
| vs. | **INITIAL COMPLAINT AND MOTION TO EXPEDITE DUE TO NATIONAL EMERGENCY** |
| United States, Defendant | |

## INITIAL COMPLAINT SEEKING TO SECURE ETHICAL

## LIVING AND IRONCLAD DECEASED ORGAN AND TISSUE DONOR

## FINANCIAL INCENTIVES  DESPITE THE NATIONAL ORGAN TRANSPLANT

## ACT (NOTA) AND SIMILAR LAWS & REGULATIONS

`v1.0.0`

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

**DAVID MORRIS CLAYMAN**, as an individual, and **HARMLESS HANDS**, a nascent political party dedicated to preserving life and death and ordering and reordering liberty harmlessly, Plaintiffs,

vs.

**UNITED STATES**, Defendant

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MOTION TO EXPEDITE**

# INTRODUCTION

This action is brought under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., the Takings Clause of the Fifth Amendment, and the Free Speech Clause of the First Amendment to the U.S. Constitution. Plaintiffs seek declaratory and injunctive relief to ensure that individuals and organizations can offer and receive reasonable incentives for organ donation without interference from laws such as the National Organ Transplant Act ("NOTA"), 42 U.S.C. § 274e, and its state equivalents, which prohibit compensation for organ donations.

Over 104,000 individuals in the United States are currently on the organ transplant waiting list. Approximately 17 people just in our United States die each day waiting for a transplant. The current system relies almost entirely on altruistic donation, which has proven insufficient to meet demand.

The Plaintiffs assert that blanket prohibitions on reasonable donor incentives substantially burden religious exercise under both American civic religion and sectarian religion, including Plaintiff Clayman's American Judaism, by preventing religiously ethical individuals from coordinating effectively in economic markets to fulfill their deeply held religious commitments to save human lives. Additionally, these prohibitions constitute an unconstitutional restriction on free speech under Citizens United v. Federal Election Commission, 558 U.S. 310 (2010), if cash is considered a protected form of speech.

Motion

2

## Cash as Speech vs Cash as Steric Hindrance

## and the First Amendment

Under Citizens United, this Court must recognize that if cash contributions are considered protected political speech, then prohibiting all cash incentives from all entities for organ donation also constitutes a restriction on First Amendment-protected expression. Plaintiff argues that prohibiting financial incentives for organ donation while permitting financial incentives for political contributions is an arbitrary and unconstitutional restriction on speech.

Plaintiff, however, fiercely disagrees and argues elsewhere with the Citizens United rationale, arguing instead that "cash is steric hindrance," a principle recognizing the economic friction, inefficiencies, and hindering reactive selectivity of cash contributions. Nevertheless, if this Court currently maintains Citizens United's holding that cash constitutes protected speech, then the federal prohibition on offering financial incentives for organ donation must be considered an unconstitutional restriction on free speech, as it impedes efforts by qualified and ethical regulated healthcare, organ procurement, and organ transplant advocacy organizations to advocate for and encourage lifesaving acts within ethical guidelines.

The Inability of Pure Speech to Solve the Organ CrisisPersuading individuals to undergo major surgery solely through verbal encouragement has proven inadequate to address the urgent need for organ donors. Without the ability to offer financial recognition, human beings in adequate numbers do not challenge themselves ethically to valuably consider organ donation without reciprocal valuable consideration, leading to a religious coordination failure to  commit and contract in a timely way in adequate numbers in major surgery for living organ donations. Notably the only country that has eliminated their recipient waiting list is Iran, which exceptionally allows financial incentives for living organ donors.

Notably, no United States President has ever volunteered to donate a kidney or liver segment to a fellow American in need. As far as Plaintiff can determine, no U.S. Senator or Congressional Representative has ever made an undirected organ donation to a stranger. The only instance of a U.S. legislator donating an organ that Plaintiff could identify is Senator Jake Garn's kidney donation to his daughter in 1986. By contrast, some rare state legislators[1], including Oregon State Representative Tiffiny Mitchell, Pennsylvania State Representative Tarah Toohil, and Illinois State Representative Deb Conroy, have demonstrated extraordinary altruism by donating kidneys. Yet, such cases remain exceedingly rare even among legislators pregnantly aware of and responsible for the missing market incentives in this crisis, reinforcing the argument that speech alone is insufficient to motivate mass participation in organ donation.

A key goal of establishing **living donor incentives** is to help **Make Americans Think Harder (MATH)**[2] about the importance of **taking social and personal responsibility and accountability** for completely eliminating the **organ recipient active waiting list waiting over 30 days for transplant**. The current paradigm, where recipients **languish on waitlists**, must be replaced with a system where a **large surplus of well-matched, pretested living donors stands ready to donate** when a perfect or near-perfect tissue match arises. The ultimate objective is to **reverse the existing dynamic** so that **donors are waiting for eligible recipients, rather than recipients waiting—often in vain—for eligible donors**. This transformation would lead to **more successful transplants, reduced patient mortality rates**, and **timely lifesaving organ transplants**.

## Social Isolation and the Decline of Community Ties

---

[1] State legislators who have donated kidneys stand up to protect living donors. American Kidney Fund. 15 January, 02020. https://www.kidneyfund.org/article/state-legislators-who-have-donated-kidneys-stand-protect-living-donors

[2] MATH: Make Americans Think Harder is an awesome campaign slogan from Andrew Yang, a former unconventional Democratic Presidential Candidate with cross-cutting appeal and now a Presidential Candidate of the Forward Party. Plaintiff Clayman is a fan of Andrew Yang and also wants to make Americans think harder.

- America is facing an epidemic of social isolation and loneliness, exacerbated by declining membership in community organizations and weakening social networks.

- Studies show that Americans have fewer close friendships and weaker community ties than in previous decades, making it increasingly difficult to rely on "strong ties" (e.g., family and close friends) to meet the demand for organ donations.

- In this context, it is mathematically and morally insufficient to depend on altruism within small, close-knit circles. A broader, more systemic solution is needed to address the organ shortage crisis.

## Violation of the Takings Clause

The Plaintiffs argue that by prohibiting financial incentives for organ donation under NOTA and similar state and territorial laws while knowingly compelling individuals to donate under religious or moral obligation, the government effectively executes a "public use taking" directly or through denying proxies and partners, healthcare organizations and organ procurement organizations (OPOs), the capacity to contract with just compensation while remaining on the right side of the law free of the terror of prosecution, violating the Fifth Amendment. But for government laws like NOTA, this market would have spun up an ethical and attractive well-experimented and well-designed incentives market to encourage adequate religious supply for those who are dying.

The government's prohibition on compensation collapses the market for living and deceased donor incentives, forcing a systematic failure that results in avoidable deaths. Plaintiff and others like him are compelled by religious duty to donate organs, yet the government and its partners exploit this compulsion without providing fair compensation, mirroring the economic inefficiencies of outdated communist policies that suppress market incentives.

The Plaintiff argues that living organ donation is strongly indicated by American religion and the Jewish religion, but many forms of religious service are not performed by ascetic altruists but instead need to be compensated. Priests, rabbis, imams, and popes all get paid for their exhaustive and exhausting performance of religious services. The notion that all religious or nonprofit action or that this particular religious or nonprofit action needs to be completely uncompensated as a deadly corner of state-regulated communism ignores the actual reality of how religious organizations and services grow by means of enormous quantities of recompensated but altruistically-motivated religious volunteer service.

## Violation of the Religious Freedom and Restoration Act (RFRA)

NOTA's prohibition on donor incentives substantially burdens the religious exercise of Plaintiffs and others who are compelled by their American (and for Plaintiff Clayman, Jewish) faith to save lives through organ donation.

NOTA prohibits any form of compensation for organ donation, creating a significant disincentive and hurdle for potential religious donors Plaintiff Clayman could coordinate with or lead by example who are inclined but not religiously hardcore about living organ donation to strangers to valuably consider this priceless religious service, or have a family or friend network that passively or actively resists their choice of giving and undergoing major surgery at such extraordinarily high levels of uncompensated altruistic self-sacrifice within this NOTA-enforced communistic system without receiving valuable consideration in exchange for their religiously ethical service.

Plaintiff Clayman himself and Harmless Hands will have to forgo valuable consideration and go uncompensated for his / their religiously compelled donation if these aspects of NOTA and similar laws are not overturned or suspended by the RFRA.

The government has no compelling interest in maintaining a blanket prohibition on incentives, particularly when such incentives could save thousands of lives each year through eliminating and reversing the organ transplant waiting lists.

The prohibition on effective financial donor incentives under NOTA and similar laws is not the least restrictive means of achieving any legitimate government interest.

## Exemplary Recipient Financial Incentives

Plaintiffs propose a structured, ethically regulated system of donor incentives designed by a team of economic ethics market designers to balance supply and demand while protecting the integrity of the consent process with extraordinarily healthy consent to ensure that  organ donation reflects conscientious and mathematically moral well-informed religious altruism, driven principally by American civic religion and/or sectarian branch religious belief. Some critical exemplary elements of such an incentives system for living donors undergoing major surgery, risk similar to pregnancy maternal mortality, and roughly 6+ week recovery that the Plaintiff proposes might include the following guideposts:

1.  A national cap of $18,000, adjusted for inflation, with possible promotional increases to $36,000 or $54,000 in multiples of 18 (numerologically symbolic for life) to clear and reverse the backlog, comparable to medical birth surrogacy compensation.

2.  Proportionality: A personalized ceiling of no more than 10% of the donor's net worth or 20% of donor's annual income, still subject to the national cap, ensuring incentives remain proportional and non-coercive.

3.  Equity: A baseline incentive for donors with little or no net worth or little or no annual salary, ensuring equitable access to compensation.

4.   The option to earmark your incentive to your favorite charity or mix of charities, as long as it checks out ethically (ex: doesn't involve any self-dealing or unusual donor rewards)

Examples

- A living kidney or liver donor with a net worth of $200,000 would qualify for the full $18,000 incentive.

- A living kidney or liver donor with a net worth of $50,000 and an annual salary of $60,000 would qualify for $12,000 at the 20% cap of their annual salary.

- A living kidney or liver donor with no net worth or meaningful annual income would still receive a baseline incentive.

- The median net worth of Americans is roughly $176,000, which means that the average American donor would qualify for nearly the full $18,000 incentive under a 10% net asset test rule.

In the first three to six months of such a program, as donor recruitment, testing, and consent systems adjust, we should be able to see if the kidney donor funnel can clear and reverse the backlog at these lifesaving incentive levels, or if the incentives (caps, net worth testing, and baseline) need to be tuned by an Act of Congress or Court supervision to clear and reverse the recipient backlog with the consent ethics of high-road healthy consent.

The Plaintiff would qualify for any of these national caps under net worth proportionality testing. His net worth fluctuates with the stock market but as of Sunday, 9 March 02025 was roughly $1,645,330 USD (synonymously CALM or QALM). Even if the incentive were ramped up someday to $54K for others to promote living donation further, such a high birth-surrogate-level incentive would only constitute 3.3% of his net worth. The Plaintiff is currently self- and socially employed as a social entrepreneur after recently separating from his last employer. The wage replacement provisions of NOTA do not match his income expectations or expected cash flow

over the next six months, and even if they did the Plaintiff would argue for this additional religious incentives contract payment beyond the hygiene payments of a steady and uninterrupted salary.

The Plaintiff would appreciate the opportunity to earmark any incentives he earns, up to $18,000, to self-finance to the maximum ethical level a systempunkt campaign for Harmless Hands to win the Presidency for one Lifesaving Referendum Year in 02029, to further lock into place this and other life and death preserving and liberty expanding and reordering programs that the major duopoly parties, the elephants and donkeys, have not been willing,  able, or interested to handle on their own. The initially proposed platform for Harmless Hands: Project 02029 can be found and reviewed at https://www.harmlesshands.org/platform. There are 26 Sprints of policy proposals that aren't on the politically prioritized map of established major or minor parties, including:

☐ Banning nicotine and tobacco products into perpetuity for the next generations and persons who aren't already addicted and thereby permitted today.

☐ Making sure that 13.0-year-olds and felons (whether enslaved or free) can vote under RFRA and voting law, deliberating over whether the voting age should be a lifelong right and further dropped to the third trimester or birth.

☐ Building a muscular decade-bound industrial transition policy from 02025 - 02035 or worst case 02029 - 02039 to convert to crashless cars from our current manual crashmore cars.

☐ Establishing a worldwide maximum age limit in Our United States and allied nations for the next 500 years of miraculous but demographically disruptive age-freezing and age-reversing medical progress.

☐ And much more, as documented at https://www.harmlesshands.org/platform.

The Plaintiff is hoping that many of the 26 policy sprints in Project 02029 will be absorbed and put into effect at faster rates with even better thermodynamic overwhelmingly popular stability by other current, emerging, or future parties, whether "major", "mid-tier", or "minor", and implemented immediately or imminently, but the Plaintiff lacks proof of that diffusion, and some starting capitol from this organ donation would help make it possible for anyone with a spare kidney or a willingness to gift and regrow their liver like Prometheus to bootstrap and self-finance a similar max donation to their own party Presidential campaign to assist in the process of planning, taking over, and stewarding national capitol. The Plaintiff argues that taking over the Presidency for a Referendum Year should not need to cost individual precedential candidacies of sufficient quality more than $18,000 USD / CALM and a self-imposed steric hindrance contribution limit of $13.00 USD / CALM for civic religious campaign donations from supporters, a campaign donor amount affordable from weekly allowance for 13 year old voters. Please note of course that the Plaintiff Clayman's efforts to donate kidney and liver may yet fail at the stage of screening, medical clearance, or religious ethics consent, but the Plaintiff is doing everything in his power to make sure that doesn't happen and this organ donation can move forward without hesitation. These financial recognition models aim to establish a sustainable donor pipeline, reversing the organ transplant waiting list backlog.

The Plaintiff does not argue for the allowance of direct or uncapped payments from persons on the organ recipient waiting list to potential donors, especially not for the purpose of "skipping the line" of UNOS' (United Network for Organ Sharing) prioritized list of medical need. The recent New York Times investigation of classes of persons skipping the UNOS waiting list reduced the Plaintiff to tears. The Plaintiff wishes for further, more strict enforcement of the priority order of the waiting list, and the Plaintiff further does not want this incentive system to have the unintended side effect of sparking or growing an illicit or unethical side market in Our United States.

The Plaintiff is hoping to donate a major portion of his liver and/or his second kidney to an extremely well tissue-matched stranger directly or through a long paired donor chain matching as much as possible at the very very front of the UNOS priority line and is working assiduously to stay within the boundaries of a well-regulated, religiously ethical market under Court supervision until adequate and complete Congressional regulation and sufficient experimental market design spins up and falls into place.

## Wishful Frustrated vs Ironclad Deceased Organ Donors

Currently, many registered donors are more wishful than real, for their wishes are not actually honored at the time of death if their manner of death is appropriate  for organ donation due to medical staff embarrassment or discomfort asking for the process of tissue and organ harvesting to begin or last-minute baseless family "interventions" in the deceased's intent to give organs and tissue that medical systems currently feel they need to legally heed over the  donor's wishes on their driver's licenses.

The Plaintiff has repeatedly instructed his family to honor his wishes to donate all his usable tissue and organs at time of death, but enforcing that after death is currently beyond the Plaintiff's powers. And there is no law or Court order compelling all physicians and advanced practice providers to forcefully follow-through with "organ donor" (deceased 1% donor) consent, deceased family consent or harvesting as ethically required or face consequences for neglecting their ethical duties. If there were modest but valuable consideration like a $10 or $18 discount offered at the time of driver's license or state ID registration in exchange for an ironclad and enforceable deceased 1% organ donor contract, the conversion and yield rate of deceased donation may double or triple from 1% to 2% or 3%, subject to more competent and better researched study quantification, testing, and verification with the leisure of greater research time. Ironclad Donor Consent can be optional, an additional commitment beyond the wishful 1% organ

donor thinking that Bureaus of Motor Vehicles misleadingly and fraudulently sell as full "organ donor" status.

Increasing deceased donor commitment to "ironclad" rates from 1% to 2-3% could significantly alleviate the transplant backlog, stopping negligence and inaction on the part of medical staff and forbidding organ with a "duty to harvest" whenever medically possible and nipping in the bud tissue wasting surrogate decisioning on the part of family, healthcare surrogates, and executors who don't share the contracted ironclad altruist's donor values in this domain.

## Much Clearer and Better Public Health Warnings on Alcohol Use Could Reduce the Need for Living Donor Kidneys, Liver

The Plaintiff must also point out here that some of the reason we have such a severe kidney and liver recipient backlog is because of poor, self-abusive health choices like alcohol addiction. Even so-called "moderate" alcohol consumption is irreversibly poisonous and damaging to our organs and tissues with no safe level existing of moderate drinking; the Plaintiff argues that science now demonstrates clearly that alcohol should only be consumed in extremely limited quantities and always better none at all; the advisability of total alcohol abstention is well-indicated now by medical sciences. The Government should do more to dissuade and warn Americans away from carcinogenic alcohol consumption and its effects on conditions like liver cirrhosis, let alone its other intolerable routine side effects like DUI deadly vehicle crashes that plague our residents and visitors and the Courts.

As a simple but direct measure, the Plaintiff asks the Government, through this Court or through the Legislature, to mandate large format and graphically effective carcinogen, cirrhosis,

and brain damage warning banners to be affixed to every bar serving ethanol alcohol in Our United States. The specific cautionary content could be decided by the Congress or the Surgeon General, as long as it's consistent with the "Church, Synagogue, Mosque, and Temple of What Works" that persons like the Plaintiffs religiously worship at to save quality adjusted life months (QALM) and quality adjusted life years (QALY). Doing so will help Make Americans Think Harder about their choices groupishly, socially, and individually and how their choice to consume an objective plant poison statistically affects lifelong organ and tissue health. Declines in alcohol abuse through such a mechanism would alleviate the unnecessary alcohol-abuse-associated burden placed on the Plaintiffs in their religious duty to preserve life and clear and reverse the organ and tissue recipient backlog. The Plaintiff has Standing to ask for this, for as an aspiring undirected kidney donor his kidney has around a 40% chance of going to a pretransplant alcohol drinker[3].

## Motion to Expedite

The Plaintiffs respectfully request expedited proceedings due to the emergency need for more living donor candidates and the need to establish ironclad enforceable contracts for deceased donor commitments.

## Proposed Incentives Contract Attached

The Plaintiff has drafted a proposed incentives contract that he hopes University Hospitals Cleveland will revise and agree to. Because the Plaintiff is rushing to file this case on an emergency basis since 17 patients per day are dying for lack of organ donor match, the Plaintiff can not afford to wait to negotiate and finalize this incentives contract with University Hospitals

---

[3] https://pmc.ncbi.nlm.nih.gov/articles/PMC9189664/

before filing this civil pleading in District Court. If and when such a contingent incentives contract is agreed and executed between Plaintiff Clayman and University Hospitals Cleveland or another healthcare organization, Plaintiff Clayman will file such executed contract with the Court. Please accept   the drafted contract and Plaintiff Clayman's started contract negotiation attempt in Appendix 1 as further evidence of  particularized monetary harm Standing that NOTA frustrates and Courts traditionally recognize. Plaintiff Clayman's shows this contract draft v0.1.0 to show that his effort to negotiate for better living donor incentives is sincere, ethical, and above board. Plaintiff Clayman anticipates the support of University Hospitals Cleveland, given adequate time for University Hospitals to deliberate over the proposed contract, but If University Hospitals Cleveland instead declines to negotiate or sign, please take it and interpret it as presumptive evidence in the absence of any other statement that NOTA's prohibitions on organ donation are making healthcare systems "gun shy" and nervous about ethical incentives contract negotiation in this priceless and deadly regulated market collapse NOTA reigns over, interfering substantially with reasonably compensated religious expression.

# Prayers for Relief

**WHEREFORE, Plaintiffs respectfully request that this Court:**

**A.** Declare in a nationwide order that national, state, and territorial blanket prohibitions on organ donation incentives nationwide as applied to religiously motivated individuals violates RFRA and the First Amendment.

**B.** Enjoin the federal and all state and territorial governments and political subdivisions from enforcing blanket prohibitions on organ donation incentives for deceased and living donors and instead swiftly develop experimental plans for a regulated and supervised incentives market that ensures healthy consent and adequately fulfills demand.

**C.** Order the implementation of a court-supervised regulated starting living donor incentive program, permitting percentage-of-net-worth compensation up to at least $18,000, adjusted for inflation, supporting a healthy living donor incentives market, financing donor families, earmarked charities, and start-up financing capitol for political and precedential campaigns, like this Harmless Hands precedential case and the Harmless Hands 02028 Presidential / Commander-and-Slaveholder-in-Chief Transcend registration and campaign to pole-vault over and beyond the existing parties into a lifesaving Overton window for one year, with second through fourth year (02030 - 02032) step-down 25th Amendment succession to the next most popular established party serving in the Vice Presidency (a civil case to argue for and enable this electoral choice under RFRA is coming).

**D.** Declare that the current classification of deceased donors as "organ donors" without informing deceased donors of the extremely low percentage rate of organ harvesting and without providing the option of legally binding "ironclad" commitment is highly misleading to altruistic organ donors, granting motivated altruists a false impression of the strength and certainty of their designation promoting charitable complacency in the midst of a national emergency, and require states to adopt more accurate and clear classifications that don't hide the truth, like "Wishful 1% Donor" or "Organ Donor?" with an open question mark on whether the intent will be honored by family at time-of-death and fulfilled, versus the alternative choice of "Ironclad 2% Organ Donor!" where organ and tissue harvesting must begin after brain death with, without, or even against the wishes of family or next-of-kin.

**E.**

    1.  Declare that State and Territorial governments and governmental entities can offer deceased donor incentives like, as an example, $10 or $18 valuable consideration on driver's license or state ID issuance, renewal, or replacement with proper patient and clear ethical

healthy consent to form an "ironclad deceased donor commitment" that medical institutions and Organ Procurement Organizations can legally rely on and dutifully execute and enforce without seeking further family, executor, or surrogate consent, unless revoked with the ironclad incentive payment returned.

2.   In the preferred alternative to E (1), declare in a nationwide order that any and all identification documents directly or indirectly commonly necessary for the purposes of securing Real ID or other voter identification must be issued for free by Federal, State, and Local government entities to avoid the imposition of a poll tax unconstitutional under the 24th Amendment. This includes everything needed for any commonly  accepted voter ID path, from Certificates of Naturalization (original issuance: $760, replacement: $555) or Certificates of Citizenship (original issuance: $1,385) to US birth certificates (Plaintiff Clayman's Ohio birth certificate costs $21.50 to order) and US passports ($130 for adults). The whole fee-based voter ID documentation stack must be provided by Territorial, State, and Federal Government free under the 24th Amendment so as not to dissuade or deter anyone in any State or Territory, whether a citizen at birth or naturalized, from voting.

a.   Still issue the suggested bonus incentive of $10 or $18 every time a driver's license or state ID is reissued or once every 5 or 8 variable years to contractually motivate consideration and enforceable religious  lock-in by a huge population of ironclad organ donors, or find another moment or mechanism to contractually lock-in religiously motivated "ironclad deceased X% donors".

F. Declare that the Proposed Incentives Contract enclosed in Appendix 1 contracting an $18,000 incentives payment on completion of living kidney and/or liver donor transplant surgery is legal and kosher under review of the RFRA, a review of the 5th Amendment's Takings Clause, and/or

Citizens United in the context of invalidating aspects of NOTA and analogous state, territorial, and local laws prohibiting well-regulated deceased and living donor incentives, and provide further Court supervision and judicial ethics guidance as needed until this or a similar or successor revised contract is executed, cancelled, unconscionably forbidden, or fulfilled.

**G.** Expedite proceedings in this matter as much as judiciously possible to ensure immediate relief and prevent unnecessary deaths.

**H.** Please allow the Plaintiff's case to proceed with Standing for the sake of all other potential living donors and deceased ironclad donors in this national emergency even if the Plaintiff for any reason fails a step of medical or consent prescreening. The Plaintiff expects to pass all such screening with flying colors, but this safety orange emergency case for living donor and deceased ironclad donor incentives is far too important for national health and patient safety for it to be abandoned and denied callously because the Plaintiff's medical clearance falters or fails, or because medical staff get shy about clearing Plaintiff Clayman over his grandfather's end stage renal disease  death or another medical history cause. If really necessary, the Plaintiff can change and restructure the contract proposal to ask for staged incentive payments contingent on legal success to strengthen his Standing on all core claims even if he fails to achieve full medical clearance. The Plaintiff finds such Standing games artificial and asks the Court to simply protect and defend his Standing rather than forcing the Plaintiff to tamper with this results-oriented v0.1.0 draft, creating a more process-oriented version to protect his Standing from this case going moot on clearance failure.

**I.** Grant such other relief as this Court deems just and proper.

# Conclusion

The Plaintiffs urge this Court to recognize that financial incentives for living organ donors are a moral, religious, and economic necessity.  In a society increasingly marked by social isolation and weakened community ties, it is no longer sufficient to rely on altruism within small, close-knit circles. By allowing a structured, ethical donor incentive market, this Court can help eliminate and reverse the organ recipient waiting list and ensure timely, lifesaving, extremely well-matched organ and tissue transplants.

The Plaintiff recognizes that this Pleading is imperfect and lacks some degree of scientific and legal rigor that more drafting time and more professional and expensive legal help and support would contribute to this effort. The Plaintiff would love to spend another week or month reading through and citing medical research on all known challenging aspects of the donor and recipient consent and recruitment systems, but the 17 people dying every day in United States for lack of an organ donor match can not wait for Plaintiff Clayman's or this Court's curiosity to run its full course. Better to start the process of incentives now on an imperfect but rapidly improving understanding of market design than to naval gaze for another month while 510 patients die at an average of 17 Americans recipients die daily. Like the old saying, "Curiosity kills the cat", goes excessive naval-gazing or excessive research and judicial curiosity risks and kills the transplant patients at the head of the waiting list. Please don't hesitate for any more than necessary to perform these declaratory and injunctive acts.

The Plaintiff is rushing this case forward for the Defendant's and Court's first reading rather than attempting to perfect it relentlessly. There will surely be some imperfections in these claims, but none, the Plaintiff argues, that can't be fixed and worked out through compassionate and cooperative inquiry and discussion. Please work with the Plaintiff to get the Plaintiff and Defendant United States to an Emergency Judicial Hearing as expeditiously as possible with the speed that fixing this national religious incentive market failure deserves, so we can hash out

any confusions or concerns you might have about declaring, enjoining, or issuing responsive orders on any of the Prayers for Relief proposed.

Harmlessly respectfully submitted,

**David Morris Clayman, Pro Se Plaintiff / Harmless Hands Party founder,**

7930 Palacio Del Mar Drive

Boca Raton, FL 33433-4148

+1 (321) 252 - 9626

david@harmlesshands.org

s/Plaintiff David Clayman, *Pro se*
For the Proposed Center Forward Party of
Harmless Hands

Note: LLM Asssisted, by ChatGPT 4o, Gemini 2.0 Flash, and DeepSeek-V3. All three do a surprisingly great job supporting legal argument composition. DeepSeek was used with the deliberate intention of spreading "Bury Me Twice" Buddhist burial and "Bury Me Twice" tattoo or digital marker argumentation to Chinese citizens for review, as their organ donor recruitment crises are in some ways even worse.

# Appendix 1: Proposed Contract

## CONTRACT PROPOSAL FOR LIVING ORGAN DONOR INCENTIVE CONTINGENT UPON LEGAL SUCCESS

### v0.1.0

**This Agreement** is made and entered into this _____ day of _____, 02025 CE (the "Effective Date"), by and between **David Morris Clayman** ("Donor"), formerly named **Adam David Clayman,** an individual residing at 7930 Palacio Del Mar Drive, Boca Raton, FL 33433-4148, and **University Hospitals of Cleveland** ("Hospital"), a nonprofit medical institution located at 11100 Euclid Avenue, Cleveland, OH 44106.

**WHEREAS:**

1.  The Donor wishes to voluntarily undergo a non-directed, altruistic living kidney and/or liver donation procedure at Hospital, as religiously compelled by his understanding of American civic religion and Jewish sectarian religion in the presence of the current deadly organ donor shortage;

2.  Hospital recognizes the life-saving impact of living kidney and living liver donations and acknowledges the potential benefit of incentives to increase donation rates;

3.  The Donor intends to initiate legal action to seek a declaratory judgment and injunctive relief from the United States Federal Courts to suspend and invalidate any and all blanket prohibitions on financial incentives for organ donation, including but not limited to provisions of the National Organ Transplant Act (NOTA) (42 U.S.C. § 274e) and state and territorial equivalents nationwide, and at the least in the States of Florida and Ohio where this action will commence as well as the States and Territories governed by the Religious Freedom and Restoration Act (RFRA – 42 U.S.C. § 2000bb through 42 U.S.C. § 2000bb-4) or equivalents;

4.  Hospital is willing to provide an incentive payment to the Donor contingent upon the successful outcome of the aforementioned legal action;

5.  The parties desire to set forth their agreement regarding the terms and conditions of such an incentive payment;

6.  Hospital accepts and agrees to support that the Donor files and brings said litigation in a Federal District Court located within the State of Florida, close to the Donor's residence, with the legal jurisdiction and capacity to issue cross-state or nationwide injunctive and declaratory judgment and relief applicable to University Hospitals Cleveland and all other United States organ transplant centers.

7.  The Donor agrees to proceed with all possible due haste to complete all necessary medical evaluations, testing, and clearance procedures required to be approved as a living kidney and/or liver donor and to schedule and complete the donation surgery at the earliest feasible opportunity, without awaiting the final determination of the Courts on the legal permissibility of the agreed "sterically hindering" incentive payment under the RFRA, the 5th Amendment's Takings Clause, or Citizens United v. Federal Election Commission, 558 U.S. 310 (2010) and subsequent law.

**NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:**

## 1. CONTINGENT INCENTIVE PAYMENT

1.1. **Incentive Amount:** Hospital agrees to pay Donor a one-time incentive of **Eighteen Thousand ("Ten Eight Thou") U.S. Dollars ($18,000.00 USD)** (the "Incentive Payment") or as much as is permissible thereof upon fulfillment of the conditions set forth in Section 1.2. The Donor strongly prefers that this payment be labeled synonymously in the morally retitled (by national renaming contest) backronymed currency of ☑18,000 CALM or ☑18,000 QALM, which the Donor asserts more closely matches and reflects the aim and nature of basically priceless lifesaving donor exchange.

1.2. **Conditions Precedent to Payment:** The Incentive Payment shall only be due and payable if:

a. Donor successfully undergoes and completes the living kidney and/or liver donation surgery at Hospital;

b. Donor initiates and successfully litigates a case in Federal Court resulting in a final, non-appealable judicial order or ruling suspending or invalidating the blanket prohibition on

financial incentives for organ donation, thereby legalizing the payment of such incentives;

c. The ruling explicitly permits payment from private institutions, including hospitals, to living organ and tissue donors in exchange for organ or tissue donation;

d. The ruling is applicable to the jurisdiction under which Hospital operates, allowing it to lawfully execute the payment without legal repercussions;

e. Donor seeks and secures legal permission for Hospital to seek reimbursement for the Incentive Payment from payers such as insurance companies, donor advocacy organizations, or government entities.

## 2. PAYMENT TERMS

2.1. **Timing of Payment:** Upon satisfaction of all conditions in Section 1.2, Hospital shall remit the Incentive Payment to Donor within thirty (30) days of the final legal determination.

2.2. **Method of Payment:** Payment shall be made via certified check, direct deposit, or any other mutually agreed-upon electronic method, recognizing that the Donor can not religiously accept cash payment.

## 3. NO GUARANTEE OR LIABILITY

3.1. **Hospital Neutrality:** Hospital does not guarantee or take any position on the likelihood of legal success by Donor and shall not be held liable for any legal costs, damages, or consequences resulting from the litigation undertaken by Donor.

3.2. **No Advance Payment:** Donor acknowledges and agrees that Hospital shall have no obligation to provide any portion of the Incentive Payment prior to the satisfaction of all conditions in Section 1.2.

## 4. MISCELLANEOUS

4.1. **Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts of law principles.

4.2. **Entire Agreement:** This Agreement constitutes the entire understanding between the parties and supersedes any prior or contemporaneous agreements, written or oral, regarding the subject matter herein.

**4.3. Severability:** If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall continue in full force and effect except for the required bundled satisfaction of all conditions in Section 1.2 precedent to payment which must be completed for the agreed incentive payment in this Agreement to be valid and enforceable.

**4.4. Amendments:** No modification or amendment to this Agreement shall be valid unless in writing and signed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**DONOR:**

Signature: _____

Printed Name: **David Morris Clayman**

Title: Human Being / Triple Citizen / Harmless Hands Test Case Precedent

Date: _____

**UNIVERSITY HOSPITALS OF CLEVELAND:**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

# Appendix 2:

# Essay on Living Organ Donor Motivation

## What motivated me to be a living donor?

The overwhelming need for organ transplants and the shortage of living donors have motivated me to take action. There is a vast gap between the number of patients on the transplant waiting list and our society's ability to encourage and support organ donation. Unfortunately, organ procurement organizations and transplant centers often impose unnecessary obstacles on altruistic, non-directed organ donations, making the process more difficult than it should be.

I strongly believe that living donors should have a smoother experience and that better incentives should be in place—not only to encourage donations but also to help potential donors explain their decision to hesitant family members. The Family Voucher Program is a great step in this direction, but more can be done to align the number of donors with the urgent needs of patients awaiting transplants. The success of Iran's kidney donation system, which has virtually eliminated its waiting list through a regulated incentives model, demonstrates that we can do better.

My commitment to organ donation is not new. I have been trying for over a decade to donate a kidney and for nearly as long to donate a portion of my liver. Just this morning, I came across a New York Times article detailing the unnecessary deaths of patients on the waiting list, and it moved me to tears:
🔗 NYT Article on Organ Transplant Crisis[4]

These deaths are preventable, particularly with better donor chains and well-structured incentives.

## A Policy Perspective on Living Donation

From a policy standpoint, I believe the U.S. should rethink its approach to organ donation. Many people assume that registering as a deceased organ donor at the DMV is enough, but only about 1% of registered donors actually have their organs recovered after death. The public needs clearer communication: living donors are essential to closing this gap.

As part of my broader advocacy efforts, I am working to establish a political movement called **Harmless Hands**, focused on ethical life-saving initiatives. One of its goals is to eliminate the kidney transplant waiting list in the U.S., following the example set by Iran, and to achieve a similar breakthrough for liver donation.

---

[4]https://www.nytimes.com/interactive/2025/02/26/us/organ-transplants-waiting-lst-skipped-patients.html

I also have strong religious beliefs about organ donation. In Judaism, **pikuach nefesh** (the duty to save a life) takes precedence over almost all other religious laws. Under the **Religious Freedom and Restoration Act (RFRA)**, I believe barriers to organ donation should be reconsidered, especially if they impose an unnecessary burden on those willing to donate. A system that offers well-regulated financial incentives—such as a fixed percentage of net worth, capped at a reasonable amount—could encourage more people to step forward while maintaining ethical integrity.

## A Broader Call to Action

If necessary, I believe organ donation should even be considered as part of national service. The impact of living donation is profound, and in some ways, it carries a higher long-term payoff than many military operations. As long as participation is voluntary, there is no reason why service members shouldn't be encouraged to undergo evaluation for kidney or liver donation. Those who donate should be granted lifetime VA benefits, recognizing their sacrifice for the national good.

I believe the kidney and liver transplant shortage is a solvable problem—one that could be addressed in just a few months with the right policy changes and public attention. I would love to see prominent leaders, including presidential candidates, step up by becoming living donors themselves to set an example.

While I don't know exactly what the future holds, I am seriously considering running for public office in the coming years, potentially in the 2029 presidential election, with a platform focused on life-saving reforms. But regardless of where my advocacy leads, I am committed to doing my part—starting with my long-standing intent to become a living donor myself.

At its core, my motivation is simple: **I believe that saving a life is one of the highest moral obligations we have.** This is a personal and deeply ethical decision for me, and I hope my experience can help inspire others to consider doing the same.

Additionally, I wish to have the **University Hospitals Transplant Program**'s support in pursuing a **religious freedom-based lawsuit** that would serve as a test case for financial incentives in organ donation. I believe that under the **Religious Freedom and Restoration Act (RFRA)**, it is legally and ethically justifiable to implement a structured incentive system that encourages living donation while maintaining strong ethical safeguards. This case could help clear the way for a **regulated, ethical, and transparent organ donor market**, ensuring that more patients receive life-saving transplants in time. With the right legal backing and institutional support, we can create a donation system that aligns with both **moral imperatives and responsible capitalist principles**, setting a new global standard for ethical organ donation.

LLM revised.

# Appendix 3:

# Additional Argumentation for Durable Particular Standing and Reasonability of $18,000 Ask

## Regarding Durable Standing

The Plaintiff, a potential living kidney donor actively undergoing prescreening and consent, presents a unique and compelling case for standing in challenging the existing prohibition on financial incentives for organ donation. The Plaintiff's family medical history includes End-Stage Renal Disease (ESRD) and Chronic Kidney Disease (CKD), conditions that may place him at a statistically significant risk of requiring a kidney transplant in the future. Given this risk, medical professionals may question whether it is advisable for the Plaintiff to proceed with altruistic donation when the possibility exists that he may later require a kidney himself.

While the United Network for Organ Sharing (UNOS) has implemented a priority allocation policy for former living donors since 1996, granting them significant ethical priority on the waiting list in the event they develop kidney disease, this safeguard remains insufficient in practice. Despite the priority status, former living donors who develop ESRD often endure prolonged periods on dialysis before receiving a transplant, a condition widely recognized as medically harmful and life-threatening.

This delay is not due to inefficiencies in the priority system itself but rather to a fundamental shortage of living and deceased kidney donors, particularly undirected altruistic living donors. Current policies, which fail to adequately incentivize such donations, have resulted in a stagnant and dangerously insufficient supply—yielding only approximately 300 undirected altruistic living kidney donors per year. The consequences of this shortfall are grave, leading to extended

waiting times even for those with priority status, directly undermining the safety and well-being of former donors who later need a transplant.

The Plaintiff asserts that his safety in undergoing living kidney donation is materially diminished by the inadequate supply of kidneys available for transplant, particularly for former donors who should, in principle, experience minimal delays in obtaining a life-saving organ. The absence of sufficient incentives has created a structural deficiency in the organ donation system, directly impacting not only current ESRD patients but also those like the Plaintiff, who face a real and statistically meaningful risk of needing a future transplant.

**Special Standing Justification**

1. **Personal Risk of Harm:** The Plaintiff faces a **direct, non-speculative injury** stemming from the risk of developing ESRD and the foreseeable delay in obtaining a transplant due to an inadequate donor pool. This harm is not abstract but an **imminent, calculable risk** grounded in family medical history and current transplant system deficiencies.

2. **Causal Link to the Policy Challenge:** The Plaintiff's potential harm is directly **traceable to the government's prohibition on financial incentives for organ donation** under the National Organ Transplant Act (NOTA). If proper incentives existed, an increased donor supply would significantly reduce the waiting period for transplants, mitigating the risk of dialysis-related harm to former donors like the Plaintiff.

3. **Redressability:** A favorable court ruling lifting the prohibition on financial incentives would lead to an increase in living and deceased donor availability, directly reducing wait times and ensuring that the Plaintiff, if he ever requires a kidney, can receive one promptly—potentially within 30 days rather than enduring months or years of medically dangerous dialysis.

4. **Broader Policy Impact:** The Plaintiff's challenge is not solely personal but seeks a systemic remedy to clear the waiting list backlog and reverse the prevailing donor deficit. By ensuring a **robust and sustainable living donor pipeline**, the Plaintiff's claim advances the interests of all potential kidney recipients while uniquely addressing the vulnerabilities faced by former living donors.

**Conclusion**

Given the **foreseeable harm, direct causation, and clear redressability**, the Plaintiff has **special standing** to seek judicial intervention in reforming organ donation incentives. The unconstitutional burden imposed by the current prohibition not only deters willing donors but also places past and future donors—including the Plaintiff—at heightened medical risk. To uphold both public health and fundamental rights, the Court should recognize the Plaintiff's durable standing and grant relief by allowing the establishment of ethically regulated donor incentives.

# Reasonable Compensation for a Living Kidney Donor:
# The $18,000 Benchmark

The Plaintiff contends that **$18,000 USD / CALM** is a reasonable and justified compensation amount for a living kidney donor starting experimental national cap, aligning with existing compensation models in ethically and legally comparable areas. This figure is neither excessive nor coercive but instead reflects **fair market value for the physical, financial, and personal burdens associated with living organ donation.**

Please note that in the attached economics research article, a clearing incentives rate of $45,000 USD / CALM is suggested instead in some form or another, including for instance a $10,000 refundable tax credit spread over five years as in the *End Kidney Deaths Act* (118th

Congress, H.R. 9275), and that or even greater incentives levels may prove more correct and appropriate with adequate ethical safeguards for motivating sufficient and sustained undirected living donor kidney donation in the long-term.

**1. Used Car Market Benchmark: The Cost of a Reliable Vehicle**

One of the most **accessible and widely understood financial benchmarks** is the cost of a **safe and reliable used car, which can be compared to the gift of a used organ.**

- The **average cost of a used vehicle in the U.S.** hovers around **$18,000 to $20,000 USD** as of recent market evaluations.
- In many states, a functioning, dependable vehicle is necessary for employment, medical appointments, and daily life.
- While a vehicle provides access to essential services and opportunities, the donation of a used kidney is even more of a **lifesaving intervention**—a resource far more critical to an individual's health and well-being than reliable transportation.

Thus, it is rational to **peg national cap compensation for a living organ donor's national service to at least the cost of an used car asset universally acknowledged as critical (at least in many US locales) for economic and personal stability.**

The Plaintiff's own almost three-year-old Toyota Corolla Hybrid is currently priced at a Carvana instant offer price of $19,800 USD. It is absurd to the Plaintiff for the Government to argue that his used car should remain valued substantially more highly than his artificially forcibly unvalued gift of his second used kidney to a patient-and-medical-payer in desperate need of arranging kidney transplant. The Plaintiff's kidney is a million dollars more valuable to the patient, the government, and the medical system.

While the Plaintiff repeats that he is religiously compelled to give in undirected fashion to a

stranger even without just and fair compensation, the Plaintiff does not think that his religious service or that of other altruistic donors (directed or undirected) like him should go uncompensated, just as Congressional Representatives, Rabbis, Priests, Imams, and other religiously observant figures (whether of American civic or sectarian religion) in general do not perform their exhaustive altruistic religious service without adequate due compensation. As a thought experiment, please imagine how many Congressional Representatives would still dutifully perform their jobs in civic religion if their emoluments including salary and benefits were taken away from them. Some like me would still serve for a stretch, just for the immense social impact national service at that level may bring, but most reasonable civically minded people would expect most reasonable civic religious Congressional Representatives currently in Office to quit or use every ounce of their leverage to restore substantial hygiene incentives to the market for civic religious national service.

It is also worth mentioning that part of market incentives design might be offering an additional bonus incentive to altruistic undirected donors willing to give a kidney or liver segment to a total stranger in greatest priority need. The Plaintiff can easily imagine an extra $5,000 or $10,000 incentive payment to those signed up for and completing a "best possible" paired or unpaired undirected living kidney or liver donation.

**2. Surrogacy Compensation: Carrying Life for Another**

The **paid surrogacy industry** provides a **direct parallel** to kidney donation in that it compensates an individual for undergoing **significant physical strain and medical risk** for the benefit of another.

- The average compensation for a **gestational surrogate** in the U.S. ranges from **$30,000 to $50,000**, excluding medical expenses and insurance coverage.

- Like a kidney donor, a surrogate **undergoes medical procedures and a recovery period** for the sole purpose of assisting another individual in need.

- If society recognizes a surrogate's right to financial compensation for **temporary** use of their body to facilitate another's life, then compensating a living kidney donor—who is **permanently sacrificing an organ**—at a lower but comparable rate is both logical and equitable.

### 3. Compensation in High-Risk Clinical Trials

Participants in **Phase 1 clinical trials**—which test new drugs on healthy volunteers—are often **compensated thousands of dollars** for assuming potential medical risks, even when the likelihood of long-term harm is minimal.

- Clinical trial participants receive between **$2,000 and $15,000 per study**, depending on the duration, invasiveness, and level of risk.

- Unlike kidney donation, clinical trials typically **do not involve permanent organ loss** or long-term lifestyle changes.

- Given that donors accept **greater physical sacrifice and medical risks than a typical trial participant**, an **$18,000 compensation figure is conservative** in comparison.

### 4. Workers' Compensation for Medical Impairment

Many state workers' compensation laws provide **financial awards** for injuries that result in the loss of bodily function.

- For instance, in **Illinois**, the **loss of a kidney due to a workplace injury** entitles a worker to **162 weeks of compensation**, which could amount to **over $100,000** in lost wages.

- This suggests that **an $18,000 incentive for a voluntary, life-saving donation** is not excessive compared to amounts legally awarded for **accidental** kidney loss.

**5. Economic Value of a Kidney in Existing Markets**

While **black market** kidney prices are not an ethical or legal benchmark, they **highlight the demand-driven economic valuation of a kidney** in unregulated settings.

- In countries where organ sales occur illegally, a **kidney's price** often exceeds $100,000—demonstrating its **immense value to those in need**.
- Economic analysis of the kidney market in the enclosed research article places the economic value of a living kidney donation **at approximately $1.3 million USD**.
- A **regulated, transparent, and ethical system** offering a **standardized compensation of $18,000** would eliminate exploitation while ensuring donors are fairly compensated.

---

## Conclusion: $18,000 as a Rational and Justifiable Compensation Amount

The Plaintiff argues that **$18,000 is a reasonable and ethical amount for compensating living kidney donors**, supported by real-world financial comparisons:

1. **Comparable to the cost of a used car**, an essential asset for economic participation.
2. **Significantly lower than surrogacy compensation**, despite kidney donation involving permanent sacrifice.
3. **Consistent with high-risk clinical trial compensation**, even though donation involves greater bodily impact.
4. **Lower than workers' compensation for kidney loss**, which recognizes the economic impact of losing an organ.
5. **Far below black-market kidney prices**, proving that demand exists and that ethical compensation is necessary to counteract exploitation.

The **prohibition on financial incentives for kidney donors** is both medically and economically **irrational**—it suppresses supply, prolongs suffering, and increases costs for the healthcare system. A compensation of **$18,000 ensures fairness, incentivizes donation, and reduces waiting list deaths without being coercive or exploitative.**

The Court should therefore recognize the **legitimacy of this compensation structure** and permit ethical, **regulated incentives** to resolve the kidney donor shortage in a manner consistent with **existing compensation models** across various domains.

American Journal of Transplantation 2016; 16: 877–885
Wiley Periodicals Inc.

© 2015 The Authors. American Journal of Transplantation published
by Wiley Periodicals, Inc. on behalf of American Society of
Transplant Surgeons

doi: 10.1111/ajt.13490

# A Cost-Benefit Analysis of Government Compensation of Kidney Donors

P. J. Held[1,*,†], F. McCormick[2,†], A. Ojo[3]
and J. P. Roberts[4]

[1]Department of Nephrology, Stanford University,
Stanford, CA
[2]U.S. Economic and Financial Research, Bank of America,
San Francisco, CA (retired)
[3]Department of Nephrology, University of Michigan
Health Systems, Ann Arbor, MI
[4]Department of Surgery, University of California San
Francisco Transplant Service, San Francisco, CA
*Corresponding author: Philip J. Held, esrd00@gmail.com
†Authors Held and McCormick are co-first authors on this
work.

This is an open access article under the terms of the
Creative Commons Attribution-NonCommercial-NoDerivs
License, which permits use and distribution in any
medium, provided the original work is properly cited, the
use is non-commercial and no modifications or adaptations
are made.

**From 5000 to 10 000 kidney patients die prematurely in
the United States each year, and about 100 000 more
suffer the debilitating effects of dialysis, because of a
shortage of transplant kidneys. To reduce this shortage,
many advocate having the government compensate
kidney donors. This paper presents a comprehensive
cost-benefit analysis of such a change. It considers not
only the substantial savings to society because kidney
recipients would no longer need expensive dialysis
treatments—$1.45 million per kidney recipient—but also
estimates the monetary value of the longer and healthier
lives that kidney recipients enjoy—about $1.3 million per
recipient. These numbers dwarf the proposed $45 000-
per-kidney compensation that might be needed to end
the kidney shortage and eliminate the kidney transplant
waiting list. From the viewpoint of society, the net
benefit from saving thousands of lives each year and
reducing the suffering of 100 000 more receiving dialysis
would be about $46 billion per year, with the benefits
exceeding the costs by a factor of 3. In addition, it would
save taxpayers about $12 billion each year.**

**Abbreviations: ESRD, end-stage renal disease; NOTA,
National Organ Transplant Act; QALY, quality-adjusted
life-year; SRTR, Scientific Registry of Transplant
Recipients; USRDS, US Renal Data System**

**Received 03 May 2015, revised 10 August 2015 and
accepted for publication 10 August 2015**

## Introduction

In June 2014, the American Society of Transplantation and
the American Society of Transplant Surgeons held the joint
Workshop on Increasing Organ Donation in the United
States. They recently released a meeting report (1) on the
workshop that concluded, "...we should be working
together along the arc of change to remove remaining
disincentives, explore opportunities to either change or
modify NOTA (National Organ Transplant Act (2)), and lay
the groundwork for the next steps with our professional
colleagues, experts in economics, law and ethics, our
partners in Congress and agencies responsible for US
health policy and the American public."

This paper is a response to that invitation. It provides a
comprehensive cost-benefit analysis of a proposed change
to NOTA, that is, moving from our current kidney
procurement system in which compensation of donors is
legally prohibited to one in which the government (not
private individuals) compensates living kidney donors
$45 000, and deceased donors $10 000. Such compensa-
tion would be considered an expression of appreciation by
society for someone who has given the gift of life to
another. It could include an insurance policy against any
health problems that might develop in the future as a result
of the donation, including disability and death. Compensa-
tion for living donors could be paid in a delayed form, such
as tax credits or health insurance, so people who are
desperate for cash would not be tempted to sell a kidney.
Compensation for *deceased* donors would be paid to their
estate. All other aspects of the kidney procurement and
allocation process would continue exactly as they are under
the current system. In particular, living donors would
continue to be carefully screened and informed of possible
hazards associated with kidney donation. Kidneys would be
allocated as the organs from deceased donors are now—by
the federally funded and managed Organ Procurement and
Transplant Network (currently administered under contract
by United Network for Organ Sharing). (Satel (3) and Beard
et al. (4) have made similar proposals for government
compensation of donors.)

A program of government compensation of kidney donors
would provide the following benefits:

1. Transplant kidneys would be readily available to all
   patients who had a medical need for them, which would

877

Held and McCormick et al

prevent 5000 to 10 000 premature deaths each year and significantly reduce the suffering of 100 000 more receiving dialysis.

2. This would be particularly beneficial to patients who are poor and African American because they are considerably overrepresented on the transplant waiting list. Indeed, it would be a boon to poor kidney recipients because it would enable them to reap the great benefits of transplantation at very little expense to themselves.

3. Because transplant candidates would no longer have to spend almost 5 years receiving dialysis while waiting for a transplant kidney, they would be younger and healthier when they receive their transplant, increasing the chances of a successful transplantation.

4. With a large number of transplant kidneys available, it would be much easier to ensure the medical compatibility of donors and recipients, which would increase the success rate of transplantation.

5. When a first kidney graft fails, the patient would be readily able to obtain a second transplant kidney. (Other considerations might delay a second transplant but not a shortage of transplant kidneys.)

**Table 1:** Key estimates and calculations

| | | | More Detail in Indicated Supplement (S) |
|---|---|---|---|
| Monetary Value of a Year of Perfect Health | $200,000 | | Item 1 in S1; Sensitivity test in Item 2 of S8 |
| Real Interest Rate (i.e., nominal interest rate minus inflation) Used to Discount Future Costs and Benefits | 3% | | Item 8 in S1 |
| Quality of Life Compared to Perfect Health | While On Dialysis | 0.52 | Item 2 in S1; Sensitivity test in Item 3 of S8 |
| | After Transplant | 0.75 | |
| Government Compensation Paid to Living Donors per Kidney | $45,000 | | Items 9 and 10 in S1; Sensitivity test in Item 1 of S8 |
| Government Compensation Paid to Estate of Deceased Donors | $10,000 | | Item 10 in S1 |
| Percent of All Costs Paid by Taxpayers (federal and state) | 75% | | S5 |
| Patients Obligation (co-pays): Differ by Medicare A, B, D | Percent of Medicare Paid Claims | Dialysis: 21% | Average percent for all ESRD: 20% S5 |
| | | Transplant: 16% | |
| **Costs Below Include Patient Obligations (co-pays)** | | | |
| Cost of All Medical Care While on Dialysis per Year | $121,000 | | S5 |
| Cost of a Transplant Procedure (including OAC) per Event | $145,000 | | S5 |
| Cost of All Medical Care for a Functioning Graft (including drugs) per Year | $32,000 | | S5 |
| Cost of Kidney Graft Failure per Event | $88,000 | | S5 |
| | | | |
| **Statistical Methods** | | | |
| **Model, Objectives, and Statistical Methodology** | Trace treatment path of median dialysis and transplant patients, using half-lives for survival and means for costs | | Simple binary measures; Markov assumptions not needed S12 |
| | Donor Compensation | No in Current Period | Sample size for costs: 497,000; Half-lives were validated. S5 and S12 |
| | | Yes in Transition & Steady State | |
| | Data: near census from national registries | USRDS, SRTR, Medicare | |

*American Journal of Transplantation* 2016; 16: 877–885

6. Taxpayers would save about $12 billion each year. Dialysis is not only an inferior therapy for end-stage renal disease (ESRD), it is also almost 4 times as expensive per quality-adjusted life-year (QALY) gained as a transplant.

7. The incentive for Americans to participate in transplant tourism or the black market for kidneys would virtually cease.

8. The overall proficiency of kidney transplantation would increase as the number of transplants increases. Currently, the typical kidney transplant center performs only two transplantations a month.

Given the controversial nature of the subject matter of this paper, we have written 12 supplements to explain, justify, and document our key estimates and calculations (which are summarized in Table 1).

This paper updates and expands the path-breaking work of Matas and Schnitzler (6). The major differences are that this study (a) uses cost-benefit rather than cost-effectiveness analysis, (b) uses a consensus monetary value of the extra years of life gained from a transplant, (c) includes patient obligations (copays) in the costs, (d) uses consensus values of the quality of life before and after transplantation, (e) analyzes compensation of deceased donors as well as living donors, (f) uses more recent data on outcomes from dialysis and transplantation, and (g) is more transparent in methodology (Supplement 4 provides a detailed comparison of the two papers.)

## Methods

Cost-benefit analysis is a tool for analyzing public policy issues. It helps clarify who wins and who loses from a given policy, by how much they win or lose, and whether the policy makes society as a whole better or worse off. The costs and benefits are conceived of in the broadest possible sense and include the value of the longer and higher-quality lives that kidney transplant recipients enjoy. These costs and benefits are calculated in greater detail in Supplement 2. As is standard in cost-benefit analysis, costs and benefits in the future are discounted back to the present. A consensus real (i.e. zero inflation) interest rate of 3% per annum is used.

This analysis focuses on average (median) ESRD patients. It traces their years of life after starting dialysis or receiving a kidney transplant (see Supplement 12). The median lifetime (half-life) for a patient group is the time it takes for 50% of them to die, and for kidney grafts, the time it takes for 50% to fail. The median is a good representative statistic for right-skewed distributions such as survival. Our half-life estimates are based on 10-year survival statistics. Our cost estimates are based on the costs of the median dialysis patient and the median transplant patient.

### Data

Whenever the literature provided a range of estimates of a variable, the midpoint was used (which we will refer to as the consensus estimate). Our own estimates deliberately err on the side of conservatism; i.e. they tend to reduce the net benefits from having the government compensate kidney donors. (If we had made more realistic estimates, the net benefits from the government compensating kidney donors would have been even greater.)

All statistics on survival and costs originated with Medicare, which provides this information through both the US Renal Data System (USRDS) (7) and the Scientific Registry of Transplant Recipients (SRTR) (8). Our half-life estimates were validated by comparison with published information and actual survival statistics. (See Supplements 5 and 12 for details on our cost estimates.)

We use a consensus estimate of the value of a year of life of $200 000. (See Item 1 of Supplement 1 [3,11,13]. See also Item 2 of Supplement 8, which provides a sensitivity analysis using $100 000 and $300 000 per year of life.) We follow Whiting (12) in concluding the quality of life—on a scale of 0.0 for death to 1.0 for perfect health—of a dialysis patient is about 0.52 before a transplant and about 0.75 afterward (see Item 2 in Supplement 1).

Table 1 summarizes key estimates and calculations and points toward the supplements where more detail can be found. Table 1 also discusses our statistical methods.

## Results

### Costs and benefits at the current time when compensating donors is prohibited
(Note: The analysis of costs and benefits presented in this section is abbreviated; greater detail is provided in Supplement 2.) The left column of Table 2 shows

**Table 2:** Increase in life years from receiving a transplant compared with remaining on dialysis on waiting list

| | | No donor compensation (current situation) (2015) | If donors are compensated (steady state after first 5 years) (2020) |
|---|---|---|---|
| Expected remaining lifetime (half-life in years) | If remain on dialysis on waiting list | 12.3 | 15.0 |
| | If receive a transplant | 19.3 | 24.9 |
| Increase in life years from receiving a transplant (vs remaining on dialysis on waiting list) | Increase in life years (unadjusted) | 7.0 | 9.9* |
| | Increase in discounted QALYs | 4.7 | 6.7 |
| Half-life of transplant kidney graft | | 12.6* | 15.7 |

In the current situation, when the graft fails in 12.6 years, 86% of the patients go back on dialysis. In the steady state case, when the first graft fails, most patients will be readily able to obtain a second transplant kidney.
*Based on only 14% receiving a second transplant. In the steady state case, the percentage may approach 100%; hence the number (9.9) may approach 12 years.
Sources: USRDS 2013 annual data report (7); SRTR (2012) (8); Laupacis et al (1996) (14); Russell et al (1992) (15); Hirth et al (2000) (11).

**Held and McCormick et al**

statistics for the current situation when donors are not compensated. The top row indicates a typical patient receiving dialysis can expect to live 12.3 years, while the second row shows he or she can expect to live 19.3 years if the patient receives a kidney transplant. (The latter half-life is the weighted average of the half-lives of patients who have received kidneys from deceased and living donors, as explained in detail in Supplement 12, particularly Figure S12-5.) The third row shows the difference (i.e. the transplant recipient can expect to live an additional 7.0 years).

Since (as discussed above) the quality of life of a dialysis patient is 0.52 before a transplant and 0.75 afterward, the gain in QALYs for a typical kidney transplant recipient is 0.75 times the life expectancy after receiving a transplant minus 0.52 times the life expectancy if the recipient had remained on dialysis.

After discounting, this yields a gain of 4.7 discounted QALYs as a result of the transplant (row 4 of the left column of Table 2). And valuing each of these years at the consensus estimate of $200 000 produces a lifetime welfare gain of $937 000 per kidney recipient (top row of the left column of Table 3). It is well known that kidney recipients benefit greatly from receiving a transplant, and this puts a credible monetary value on it.

A second benefit of kidney transplants is the savings from kidney recipients no longer requiring dialysis and other medical treatments, which cost about $121 000 per patient-year and would have continued for the 12.3-year expected life of a dialysis patient on the waiting list. But the half-life of a kidney transplant is only 12.6 years (bottom row of left column of Table 2), after which a typical kidney transplant recipient has to return to dialysis for their remaining 6.7 years of life. Consequently, the lifetime net savings from temporarily stopping dialysis would be $735 000 (row 2 of the left column of Table 3).

Turning to the other side of the ledger, the cost of the transplant itself (i.e. payments at the time of the transplant to all parties except the kidney donor) is about $145 000 (row 3 of the left column of Table 3). And compensation to kidney donors is zero because it is currently legally prohibited (row 4).

Medical costs following a transplant are about $32 000 per year for the 12.6-year expected life of the kidney graft, plus an additional $88 000 when the graft of the typical patient fails in 12.6 years. Thus, the lifetime total costs are $395 000, as shown in the fifth row of the left column of Table 3.

The net welfare gain for society over the lifetime of a kidney recipient (row 6 of the left column of Table 3) is just the net of the rows above it, or $1 132 000.

The bottom row of the left column of Table 3 shows taxpayer savings over the lifetime of the kidney recipient. Because taxpayers currently bear about 75% of the cost of both dialysis and kidney transplants (see Supplement 5), taxpayers would reap 75% of the benefits from patients stopping dialysis after receiving a transplant. Specifically, taxpayer savings are equal to 75% of the savings from stopping dialysis, minus: (a) the cost of the transplant, (b) compensation to donors (when allowed), and (c) medical costs after the transplant. This comes to $146 000 per kidney recipient.

Aggregating the per-recipient costs and benefits of the left column of Table 3 over all of the kidney recipients in a given year yields the left column of Table 4 (the top seven rows of which have the same arrangement as Table 3). For example, if the $146 000 taxpayer savings per kidney recipient (from the bottom row of the left column of Table 3) is multiplied by a conservatively high estimate of 17 500 kidney recipients each year, the result is the total taxpayer saving from all kidney recipients each year,

**Table 3:** Present value of benefits and costs over a kidney recipient's lifetime (per kidney recipient)

|  | No donor compensation (current situation) | If donors are compensated (steady state after first 5 years) |
|---|---|---|
| Benefits |  |  |
| Welfare gain for kidney recipient (over a lifetime) | $937 000 | $1 335 000 |
| Savings from stopping dialysis (over a lifetime) | $735 000 | $1 454 000 |
| Costs |  |  |
| Cost of transplant (everything at time of transplant except compensation to donors) | $145 000 | $236 000 |
| Compensation to donors | $0 | $73 000 |
| Medical costs after transplant (including cost of kidney graft failure) | $395 000 | $607 000 |
| Net welfare gain for society per kidney recipient | $1 132 000 | $1 873 000 |
| Addendum |  |  |
| Taxpayer savings per kidney recipient | $146 000 | $403 000 |

Sources: USRDS 2013 annual data report (7); SRTR (2012) (8); Laupacis et al (1996) (14); Russell et al (1992) (15); Hirth et al (2000) (11).

**Table 4:** Present value of benefits and costs for all kidney recipients in a given year (per year)

| | No donor compensation (current situation) | If donors are compensated (steady state after first 5 years) |
|---|---|---|
| | 17 500 kidney recipients per year | 35 000 kidney recipients per year |
| Benefits | | |
| Welfare gain for all kidney recipients in a given year | $16.4 billion/y | $46.7 billion/y |
| Savings from stopping dialysis for all kidney recipients in a given year | $12.9 billion/y | $50.9 billion/y |
| Costs | | |
| Costs of transplants for all kidney recipients in a given year (everything at time of transplant except compensation to donors) | $2.5 billion/y | $8.3 billion/y |
| Compensation to donors for all kidney recipients in a given year | 0 | $2.6 billion/y |
| Medical costs after transplant for all kidney recipients in a given year (including cost of kidney graft failure) | $6.9 billion/y | $21.2 billion/y |
| Net welfare gain for society from all transplant recipients in a given year | $19.8 billion/y | $65.6 billion/y |
| Addendum | | |
| Taxpayer savings from all transplant recipients in a given year | $2.6 billion/y | $14.1 billion/y |
| Benefit-cost ratio for society | 3.0 | |
| Benefit-cost ratio for taxpayers | 1.7 | |

Sources: USRDS 2013 annual data report (7); SRTR (2012) (8); Laupacis et al (1996) (14); Russell et al (1992) (15); Hirth et al (2000) (11).

which is $2.6 billion per year (row 7 of the left column of Table 4).

### Life expectancies when donors are compensated

Now consider two subperiods *after* the government begins compensating kidney donors: (a) the first 5 years, during which we estimate the 94 000-patient waiting list for kidneys will be gradually eliminated, and (b) the subsequent "steady state" situation that will obtain after the waiting list has been ended. We will first estimate life expectancies and then use them to estimate the costs and benefits of the government compensating kidney donors.

We assume compensation of $45 000 per kidney will be sufficient to elicit an adequate supply of kidneys from living donors, which, together with some additional kidneys from deceased donors, will end the kidney shortage and eliminate the waiting list in 5 years (see Item 9 of Supplement 1). Thus, during the 5-year transition period, the number of kidney recipients will increase to about 43 000 per year. This is the sum of the 31 000 patients currently being added to the waiting list each year, plus an additional 12 000 transplants per year needed to reduce the waiting list to zero in 5 years (see Supplement 11 for a discussion of the current capacity of the transplant community).

To simplify comparisons of the current situation with the postcompensation period, we will focus on the steady-state case after the waiting list has been eliminated. Because the supply of transplant kidneys will now be sufficient to meet the demand, transplant candidates will no longer have to wait about 5 years for a kidney. This has two important implications. First, the average age of kidney recipients will fall from 50 to 45 years. Second, kidney recipients will now be far healthier because they will no

longer have to suffer the debilitating effects of several years of dialysis. We estimate these considerations will increase the life expectancy of the typical kidney recipient to about 24.9 years in the steady-state case from 19.3 years in the current situation (shown in the second row of Table 2 and discussed in Supplement 12). In contrast, if the kidney patient had remained on dialysis, their life expectancy would have been only 15.0 years (top row of the right column of Table 2). This can also be seen in Figure 1, which shows the two treatment paths ESRD patients can take in steady state: dialysis or transplant. Note that the typical kidney recipient in steady state will receive a second transplant after the first graft fails in 15.7 years.

### Costs and benefits in the steady-state case

With these life expectancies, we can calculate the increase in discounted QALYs—and the benefits and costs of receiving a kidney transplant—in the steady-state case, using the same methodology we used in the current situation case.

A kidney recipient in this steady-state case gains an additional 9.9 years of life from receiving a kidney transplant (row 3 of the right column of Table 2), which translates into 6.7 discounted QALYs (row 4). When this is multiplied by the consensus estimate of the value of a year of life, the result is a lifetime welfare gain of $1 335 000 per recipient (top row of right column of Table 3).

The savings from stopping dialysis is again found by multiplying the expected life of a dialysis patient by the yearly medical cost of dialysis, which yields a lifetime gain of $1 454 000 (row 2 of Table 3). Note that this savings is almost twice that in the current situation case because the typical kidney recipient, instead of going back on dialysis after the first graft fails, will, because of the greater



**Figure 1:** Two treatment paths for ESRD: dialysis or transplant (with donor compensation, steady state, 2020). ESRD, end-stage renal disease.

availability of transplant kidneys, soon receive a second transplant.

The cost of the first transplant is, again, $145 000. The cost of the second transplant is the same, and after discounting for a delay of 15.7 years, this raises the total to $236 000 (row 3).

The fourth row of the right column of Table 3 includes the two $45 000 government payments to kidney donors. The first will occur at the time of the initial transplant, and the second occurs 15.7 years later for a typical patient, for a total cost of $73 000. Note that this number is much smaller than the other costs and benefits in Table 3, especially the huge welfare gain for kidney recipients and the savings from stopping dialysis. One of the most surprising and important results of this paper is how small the cost of compensating donors would be compared with the very large welfare gains for society that would result. Note also that it is conservatively assumed that all donors will be paid $45 000 per kidney, including those who previously were willing to donate their kidneys for free. If some of the latter are still willing to donate for free, that will just reduce the costs and increase the net benefits from compensating kidney donors. But if some now decline to donate at all, the cost of replacing their donations with kidneys from compensated donors is already included in the above calculation. This conservative $45 000 estimate also covers the small possibility that—after the government starts compensating kidney donors—all kidneys might come from living donors and none from deceased donors.

The fifth row of the right column of Table 3 shows the lifetime medical costs after a transplant. The 24.9-year life

expectancy of a transplant recipient (from row 2 of the right column of Table 2) is multiplied by the yearly medical expenses. To this is added the $88 000 expense when the kidney graft fails in 15.7 years, bringing the total to $607 000. This is higher than in the current situation because the typical transplant recipient will receive a second transplant with its associated costs.

The net welfare gain for society over a kidney recipient's lifetime will be $1 873 000 (row 6 of the right column of Table 3). This is much larger than in the current situation case because of the longer life expectancy of the kidney recipient and the greater savings from stopping dialysis (because the typical patient will not return to dialysis very long after the first fails). The value of these benefits would greatly exceed the additional costs of the second transplant.

The bottom row of the right column of Table 3 shows how much taxpayers would save over the kidney recipient's lifetime, which is $403 000. This is more than twice as much as in the current situation because the additional savings from ending dialysis is much greater than the additional costs of the second transplant.

Aggregating these costs and benefits per kidney recipient in the right column of Table 3 over an estimated 35 000 transplant recipients per year during the steady state period, results in the right column of Table 4. Note in particular that – with a successful donor compensation program – the net welfare gain for society (row 6 of Table 4) would more than triple to $65.6 billion per year from $19.8 billion per year currently. Note also that the savings

for taxpayers would increase to $14.1 billion per year from $2.6 billion per year (row 7 of Table 4). Finally, note in the bottom two rows of Table 4 that—moving from the current situation in which compensation of kidney donors is prohibited to one in which the government compensates donors—the benefit-cost ratio would be a large 3.0 for society as a whole and 1.7 for taxpayers considered alone.

## Discussion

### Would government compensation of kidney donors exploit the poor?

One of the major arguments of those who oppose compensating kidney donors is that poor people would be more likely to become living donors than would rich people, and, therefore, rich people would wind up buying kidneys from poor people, thereby "exploiting" them. So, it is argued, poor people would be worse off if kidney donors were compensated than they are under the present system.

Our cost-benefit framework reveals that this line of reasoning is exactly backward. As explained in detail in Supplement 3, the present system, in which compensation of kidney donors is legally prohibited, has resulted in a huge shortage of transplant kidneys that seriously harms all transplant candidates—especially the poor, and especially poor African Americans, because they are considerably overrepresented on the kidney waiting list due to the generally worse state of their health. In contrast, if the government compensated kidney donors, it would greatly increase the availability of transplant kidneys, making all transplant candidates, especially the poor, much better off. Indeed, the poor would enjoy the greatest net benefit because they would gain the $1.3 million value of a longer and healthier life, but almost all of the costs of transplantation for the poor person would be borne by the taxpayer through Medicare and Medicaid.

So the current prohibition on compensating kidney donors, which is supposedly intended to keep the poor from being exploited, is in fact seriously harming them. And having the government compensate kidney donors would be an enormous boon for the poor.

## Key Innovations

One of the key innovations of this paper is using a consensus estimate of the monetary value of a QALY, which enables us to employ cost-benefit analysis to determine the net benefit to society from having the government compensate kidney donors. Our value of $200 000 per QALY is based on a careful review of the literature (see Item 1 in Supplement 1). Moreover, sensitivity tests of $100 000 and $300 000 per QALY were performed (see Item 2 in Supplement 8) and revealed

that even for QALY values as low as $100 000, the net welfare gain for society per recipient in steady state would still be a large $1.2 million (vs $1.9 million using the consensus QALY of $200 000).

On the other hand, our proposed donor compensation of $45 000 per kidney is very conservative. It is three times the estimate made by Becker and Elías (5), which is the only serious attempt to estimate this parameter. Sensitivity tests of $25 000 and $65 000 per kidney were performed and had very little effect on our results because donor compensation is very small compared with the other magnitudes in this analysis (see Item 1 of Supplement 8). Indeed, donor compensation could be increased to $375 000 per kidney before taxpayers would no longer save money by paying for kidney transplantation instead of dialysis. And compensation could be increased all the way to $1 200 000 per kidney before society would no longer enjoy a net welfare gain from transplantation.

### Cost-effectiveness

Although the central focus of this paper is a cost-benefit analysis of the government compensation of kidney donors, it also provides as a side benefit a comparison of the cost-effectiveness of dialysis and transplantation (see Supplement 10). In steady state, the cost of a QALY obtained through dialysis is $186 000, while the cost of a QALY obtained through transplantation is only $49 000, less than a third as much. Transplantation is clearly the more cost-effective treatment for ESRD, as has been shown by other studies (e.g. Matas and Schnitzler (6)).

## Conclusions

The main conclusions of this analysis are that if the government successfully implements a kidney donor compensation program, the following would occur.

1. The lifetime value of a kidney transplant to a recipient would be very large—about $1.3 million per recipient. And the savings from stopping dialysis would be even larger—about $1.45 million per recipient.
2. In contrast, even a conservatively high $45 000-per-kidney cost of compensating kidney donors would be very small compared with the other costs and benefits. Indeed, the total cost of compensating all donors in a given year would be only about $2.6 billion per year. Yet this small cost is the key to unlocking the great welfare gains for transplant recipients and society, as well as the savings for the taxpayer.
3. The net welfare gain for society each year from kidney transplants would more than triple from $20 billion per year currently to $66 billion per year. This means the transplant community would be able to do three times as much good for society as it is currently doing. The

Held and McCormick et al

ratio of benefits to costs for society would be a very large 3.0.

4. Having the government compensate kidney donors would even be a good deal for taxpayers considered alone. Because they currently bear most of the cost of both dialysis and kidney transplants, they would reap most of the benefits from more patients stopping expensive dialysis treatments after receiving a transplant. Taxpayers would save $403 000 for every dialysis patient who receives a kidney transplant. The aggregate savings for taxpayers would increase from $2.6 billion per year currently to $14.1 billion per year, and the benefit-cost ratio for taxpayers would be a healthy 1.7.

5. It would also be an especially good deal for poor people considered alone because poor kidney recipients would gain the $1.3 million value of a longer and healthier life, but almost all of the costs of transplantation would be borne by the taxpayer through Medicare and Medicaid.

6. The bottom line of this analysis is that if the government compensated kidney donors, it would not only prevent 5000 to 10 000 premature deaths each year in the United States and substantially increase the quality of life for almost 100 000 patients on dialysis, but the benefits would greatly exceed the costs for both society in general and taxpayers and the poor in particular. One of the most surprising and important results of this paper is how large the welfare gain for society would be compared with the very small cost of compensating kidney donors.

7. We believe the estimates used in this paper are solidly based in the literature. But these are matters about which reasonable people can differ, so we invite others to offer their own numbers. Because the benefits of the government compensating kidney donors are so large and the cost of compensating donors is so small, we are confident that any reasonable estimates of these numbers will arrive at the same conclusion we did—that the benefits greatly exceed the costs.

8. Finally, we encourage those who oppose compensating kidney donors to place a monetary value on their concerns and to show how they outweigh the very large net benefits demonstrated by this paper. If they do, they may discover—as we did in Supplement 6—that many of the arguments usually made against compensation of kidney donors turn out instead to be arguments in favor.

## Acknowledgments

The authors want to thank Robert Heller, PhD, and Heywood Fleisig, PhD, who provided a careful reading of the paper at an early stage. Two editors and two reviewers of the *American Journal of Transplantation* supplied useful and thorough comments that greatly strengthened this work. Any remaining errors are the responsibility of the authors. The data and statistics reported here have been supplied by the USRDS and the SRTR. The interpretation and reporting of these data are the responsibility of the authors and in no way should be seen as an official policy or interpretation of the US government.

## Disclosure

The authors of this manuscript have no conflicts of interest to disclose as described by the *American Journal of Transplantation*.

## References

1. Salomon DR, Langnas AN, Reed AI, et al; for the AST/ASTS Incentives Workshop Group (IWG). Meeting report, AST/ASTS Workshop on Increasing Organ Donation in the United States: creating an "arc of change" from removing disincentives to testing incentives. Am J Transplant 2015; 5: 1600–6143.

2. Public Law 1984 Oct 19. Public Law 98-507 NOTA.

3. Huang ES, Thakur N, Meltzer DO. The cost-effectiveness of renal transplantation. In Satel S, editor. *When altruism isn't enough: the case for compensating kidney donors*. Washington, DC: American Enterprise Institute for Public Policy Research; 2008.

4. Beard TR, Kaserman DL, Osterkamp R. *The global organ shortage*. Stanford University Press; 2013.

5. Becker GS, Elías JJ. Introducing incentives in the market for live and cadaveric organ donations. Journal of Economic Perspectives 2007; 21: 3–24.

6. Matas AJ, Schnitzler M. Payment for living donor (vendor) kidneys: a cost-effectiveness analysis. Am J Transplant 2003; 4: 216–221.

7. US Renal Data System. USRDS 2013 annual data report: atlas of chronic kidney disease and end-stage renal disease in the United States. Bethesda, MD: National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases; 2013.

8. Scientific Registry of Transplant Recipients (SRTR). Annual data report, I. Kidney. Washington, DC: US Department of Health and Human Services, HRSA; 2012.

9. Viscusi WK, Aldy JE. The value of a statistical life: a critical review of market estimates throughout the world. J Risk Uncertainty 2003; 27: 1, 5–76.

10. Schold JD, Srinivas TR, Kayler LK, Meier-Kriesche HU. The overlapping risk profile between dialysis patients listed and not listed for renal transplantation. Am J Transplant 2008; 8: 58–68.

11. Hirth RA, Chernew ME, Miller E, Fendrick AM, Weissert WG. Willingness to pay for a quality-adjusted life-year: in search of a standard. Med Decis Making 2000; 20: 332–342.

12. Whiting JF; for the Transplant Outcomes Research Group. Standards for economic and quality of life studies in transplantation. Transplantation 2000; 70: 1115–1121.

13. Tolley G, Kenkel D, Fabian R, editors. Valuing health for policy: an economic approach. Chicago: University of Chicago Press; 1994.

14. Laupacis A, Keown P, Pus N, et al. A study of the quality of life and cost-utility of renal transplantation. Kidney Int 1996; 50: 235–242.

15. Russell JD, Beecroft ML, Ludwin D, Churchill DN. The quality of life in renal transplantation: a prospective study. Transplantation 1992; 54: 656–660.

16. Hornberger JC, Best JH, Garrison LP Jr. Cost-effectiveness of repeat medical procedures: kidney transplantation as an example. Med Decis Making 1997; 17: 363–372.

17. Tanriover B, Stone PW, Mohan S, Cohen DJ, Gaston RS. Future of Medicare immunosuppressive drug coverage of kidney transplant recipients in the United States. Clin J Am Soc Nephrol 2013 April 4. doi:10.2215/CJN.09440912

18. Englesbe MJ, Ads Y, Cohn JA, et al. The effects of donor and recipient practices on transplant center finances. Am J Transplant 2008; 8: 586–592.

**884**

**Cost-Benefit: Gov. Compensation Kidney Donors**

19. Wolfe RA, McCullough KP, Schaubel DE, et al. Calculating life years from transplant (LYFT): methods for kidney and kidney-pancreas candidates. Am J Transplant 2008; 8(Pt 2): 997–1011.

20. Cook PJ, Krawiec K. A primer on kidney transplantation: anatomy of the shortage. Law Contemp Probl 2014; 77: 16–19.

21. Muzaale AD, Massie AB, Wang MC, et al. Risk of end-stage renal disease following live kidney donation. JAMA 2014; 311: 579–586.

22. Hall MJ, Levant S, DeFrances CJ. Trends in inpatient hospital deaths: National Hospital Discharge Survey, 2000–2010. NCHS Data Brief No. 118, March 2013.

23. Lee CP, Chertow GM, Zenios SA. An empiric estimate of the value of life: Updating the Renal Dialysis Cost-Effectiveness Standard. Value in Health 2008; 12: 80–87.

24. DaVita Health Care Partners Inc. Form 10K filed with the U.S. Security and Exchange Commission for fiscal year ended 12 31 2012. Washington, DC: DaVita Health Care Partners Inc; 2012.

25. Fresenius Medical Care AG & Co. Form 20-F Securities and Exchange Commission, Washington, D.C. 20549 and 2012 continuity corporate report. Bad Homburg, Germany: Fresenius Medical Care AG & Co; 2012.

26. Ghods AJ, Savaj S. Iranian model of paid and regulated living-unrelated kidney donation. Clin J Am Soc Nephrol 2006; 1: 1136–1145.

27. Mahdavi-Mazdeh M. The Iranian model of living renal transplantation. Kidney Int 2012; 82: 627–634.

28. Rana A, Gruessner A, Agopian VG, et al. Survival benefit of solid-organ transplant in the United States. JAMA Surg 2015; 150: 3.

29. Limou S, Nelson GW, Kopp JB, Winkler CA. APOL1 kidney risk alleles: population genetics and disease associations. Adv Chronic Kidney Dis 2014; 21: 426–433.

30. Meier-Kriesche HU, Port FK, et al. Effect of waiting time on renal transplant outcome. Kidney Int 2000; 58: 1311–1317.

31. Wetmore JB, Rigler SK, Mahnken JD, Mukhopadhyay P, Shireman TI. Considering health insurance: how do dialysis initiates with Medicaid coverage differ from persons without Medicaid coverage? Nephrol Dialysis Transplant 2010; 25: 198–205.

32. Leighton T, Gustafson S, Snyder J, Israni A, Kasiske B. Changes in Medicare coverage after kidney transplant. Am J Transplant 2014; 14(Suppl 3): 848–849. Abstract D2750.

## Supporting Information

Additional Supporting Information may be found in the online version of this article.

Index of Supplements for: A Cost-Benefit Analysis of Government Compensation of Kidney Donors

| No. | Name | Pg. No. |
|---|---|---|
| 1 | Important Footnotes for Main Text | 2–11 |
| 2 | Detailed Calculations of Costs and Benefits | 12–18 |
| 3 | Compensating Kidney Donors Would Be a Boon for the Poor | 19–21 |
| 4 | Comparison of Matas and Schnitzler with Held and McCormick et al. (this paper) | 22–23 |
| 5 | Estimates of Transplant and Dialysis Costs | 24–32 |
| 6 | Some Arguments Against Compensating Kidney Donors | 33–35 |
| 7 | Conservative Assumptions | 36–38 |
| 8 | Sensitivity Analyses<br>   1. Compensation<br>   2. Value of a QALY<br>   3. Quality of Life | 39–44 |
| 9 | Living vs. Deceased Donors Under a Donor Compensation Program | 45–46 |
| 10 | Cost of a Quality Adjusted Life Year: Dialysis vs. Transplantation | 47–48 |
| 11 | Capacity of U.S. Kidney Transplant Centers | 49 |
| 12 | Estimating Half-Lives of Dialysis Patients, Transplant Patients, and Kidney Grafts | 50–66 |