David Morris Clayman, Harmless Hands, Pro se

# UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.C.

MAR 1 8 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| | |
|---|---|
| David Clayman, Harmless Hands, | CASE 25-CV-60447-DSL |
| Plaintiffs, | MOTION WITH UPDATED, REVISED INCENTIVE REQUEST ON NATIONAL COMMUNITY SERVICE GROUNDS AND UPDATED, REVISED PROPOSED CONTRACT |
| vs. | |
| United States, Defendant | |

**MOTION WITH UPDATED INCENTIVE REQUEST ON NATIONAL**

**COMMUNITY SERVICE GROUNDS AND**

**UPDATED PROPOSED CONTRACT**

Plaintiffs, DAVID MORRIS CLAYMAN and HARMLESS HANDS, wish to increase the precedential donor incentive the Plaintiff is asking for to fully match the suggested market-clearing incentive value from the *American Journal of Transplantation* article previously enclosed in this case titled "A Cost-Benefit Analysis of Government Compensation of Kidney Donors" (August 2015), as adjusted for roughly ten years of CPI-U inflation as of February 02025. In doing so, the Plaintiff hopes to secure a "shot heard 'round the world" on kidney and

liver donation ethical and well-regulated religious market incentives, with a compensatory number high enough to draw the comprehensive attention of the press and the public toward this lifesaving surgical operation. This increased compensation request will help cover the small and real risk of death for living organ donors (roughly 3 in 10,000) under loss aversion, the increased risk of End Stage Renal Disease in our present system of kidney care (roughly a 75 in 10,000 increase), and support family acceptance of a living donor's decision to altruistically give and protect life in this form.

The Plaintiff still believes firmly in setting up well-regulated ethical safeguards to prevent those who are desperate from debt or poverty from hyperbolically discounting the value of their giveable lifesaving organs and regretting their decision later in life. The Plaintiff asks this Court to supervise this precedential transaction in limited abrogation of Title III of the National Organ Transplant Act (NOTA) and order Congress to set up well-regulated ethical safeguards and supervision for future Donors and donor market incentives under the governance and supervision of the Religious Freedom and Restoration Act.

The Plaintiff further suggests to this Court that this religious civic and sectarian duty to give lifesaving transplantable organs to persons in need as a living donor may be more heavily concentrated or exclusively morally concentrated on our male population, as males never suffer the mortality and morbidity risk of lifegiving pregnancy that women routinely shoulder. It would only be fair for males to generally assume the responsibility for kidney and liver donation given that the women in our lives bear the risk and responsibility for bringing all of us humans to life under the similar mortality and morbidity risk of pregnancy, often in over 30% of United States pregnancies under major and more invasive Caesarean section surgery.

There would have been a roughly estimated 1,200,000 Caesarean births in United States in the year 02024. If men just "man up" and undergo living kidney and liver donor surgery, we can save somewhere between 300,000 - 450,000 years of healthy life for organ transplant

recipients, at the cost of 10 dead donors. By comparison, mothers are dying right and left to give birth to the next generation and keep us all alive. In 02023, the most recent year for which final statistics are available, there were 669 mothers in United States who died from childbirth, and childbirth collectively produced 3,596,017 live births, and given current lagging average life expectancy of 77.43 years that would sum to 280,000,000 million years of life given by mothers to their children in 02023, at a ratio of 420,000 years of life for every dead mother. Living organ donation by comparison would yield 3,000 - 4,500 years of added healthy life for every expected dead living donor.

If the Plaintiffs were in charge, for instance, of those serving in the US military for a year, the Plaintiff would consider and propose this as an extremely valuable National Service Mission for male soldiers to volunteer to undergo, with adequate compensation awarded, lifelong veteran status benefits, and a Purple Kidney or Purple Liver Service Medal for anyone who gave to bring a fellow American back to life.  It is rare for a military operation to yield this much life payoff so clearly in a nonconfrontational, harmonious, mostly non-lethal context. The Plaintiffs find it shocking that the over 2 million active-duty and reserve military service members are not approached with this proposition of giving life to dying Americans in need. The Plaintiff suspects that at least 50,000 soldiers are so service-oriented and committed to the American People that they would volunteer outright yesterday under the service recognition conditions that the Plaintiff proposes, and that an adequate number of **civilian and military living donors in partnership would be drawn to this type of national service to keep the recipient backlog down to a sub-30 day transplant queue into perpetuity**.

The Plaintiff finally wishes to emphasize that altruistic undirected living organ donation just like military service should be explained and promoted principally as a mode and means of national community service and not principally as a means of gaining remuneration or emoluments. We have much experience in behavioral economics of how radically differently

populations of people respond to opportunities based on whether they are framed as dutiful service opportunities or as opportunities for rapid economic gain. The Plaintiffs find it appropriate that the Courts, the Congress, and any future regulatory bodies overseeing organ donor incentives introspect on the motives of each donor to determine if they are driven by religious citizenship duty, civic/secular or sectarian, as embodied in community/national service motive, or chiefly by the prospect of rapid mercenary financial gain. The Plaintiffs accept and ask for ethical safeguards such as live, in-person, recorded, Court- and Congress-auditable potential living donor interviews (protected by HIPAA privacy standards of course) to selectively and fractionally distill the former type of donor from the latter, and discourage those who are financially desperate from escaping regrettable destitution through regrettable living organ donation. The Plaintiff just insists that assuring that a living donor is fractionally motivated by religious or national community service over monetary gain is achievable without neglecting proper and just compensation for this extremely important and sacrificial service that should be met with a negotiable compensatory reward somewhere between $10,000 and $60,250 CALM (USD), depending on the situation, as for instance whether the living donation is toward a total stranger or to a friend or family member, how strong of a tissue match the donor is for someone with high priority and need on the UNOS waiting list, and whether the organ matching market requires more or less incentive amperage to overcome, clear, and reverse the resistance on meeting the moral voltage requirement on the kidney and liver transplant recipient backlog.

The Plaintiffs now argue in the attached revised Proposed Contract for the maximum incentive of $54,000 - $60,250 CALM (inflation adjusted) for Clayman's volunteered donation of kidney or liver to secure the full range of negotiability and jumpstart this collapsed and arrested communistic market with religiously motivated market-driven civic/sectarian religious capitalism driven by the exchange of moral and religious sentiments that always accompanies Adam

Smith's invisible hand[1], which the Plaintiffs (Clayman and Harmless Hands) here aim to empower and render harmless, or at least harm less.

---

[1] As more plainly evident with CALM currency synonymization (with its plurality of expressive backronyms).

## APPENDIX B

## CONTRACT PROPOSAL FOR LIVING ORGAN DONOR INCENTIVE CONTINGENT UPON LEGAL SUCCESS

### v0.2.1

**This Agreement** is made and entered into this ____ day of _____, 02025 CE (the "Effective Date"), by and between **David Morris Clayman** ("Donor"), formerly named **Adam David Clayman,** an individual residing at 7930 Palacio Del Mar Drive, Boca Raton, FL 33433-4148, and **University Hospitals of Cleveland** ("Hospital"), a nonprofit medical institution located at 11100 Euclid Avenue, Cleveland, OH 44106.

**I. Purpose**

This agreement establishes the terms of a financial incentive for the Donor's voluntary and ethical contribution **as a live donor of a kidney or a significant portion of the Donor's liver** under the framework of an incentive-based living donor model that aligns with empirical economic assessments and religious principles valuing regulated free exchange.

**WHEREAS:**

1. The Donor wishes to voluntarily undergo a non-directed, altruistic living kidney and/or liver donation procedure at Hospital, as religiously compelled by his understanding of American civic religion and Jewish sectarian religion in the presence of the current deadly organ donor shortage;

2. Hospital recognizes the life-saving impact of living kidney and living liver donations and acknowledges the potential benefit of incentives to increase donation rates;

3. The Donor intends to initiate legal action to seek a declaratory judgment and injunctive relief from the United States Federal Courts to suspend and invalidate any and all blanket prohibitions on financial incentives for organ donation, including but not limited to provisions of the National Organ Transplant Act (NOTA) (42 U.S.C. § 274e) and state and territorial equivalents nationwide, and at the least in the States of Florida and Ohio where this action will commence as well as the States and Territories governed by the Religious Freedom and

Restoration Act (RFRA – 42 U.S.C. § 2000bb through 42 U.S.C. § 2000bb-4) or equivalents;

4. Hospital is willing to provide an incentive payment to the Donor contingent upon the successful outcome of the aforementioned legal action;

5. The parties desire to set forth their agreement regarding the terms and conditions of such an incentive payment;

6. Hospital accepts and agrees to support that the Donor files and brings said litigation in a Federal District Court located within the State of Florida, close to the Donor's residence, with the legal jurisdiction and capacity to issue cross-state or nationwide injunctive and declaratory judgment and relief applicable to University Hospitals Cleveland and all other United States organ transplant centers.

7. The Donor agrees to proceed with all possible due haste to complete all necessary medical evaluations, testing, and clearance procedures required to be approved as a living kidney and/or liver donor and to schedule and complete the donation surgery at the earliest feasible opportunity, without awaiting the final determination of the Courts on the legal permissibility of the agreed "sterically hindering" incentive payment under the RFRA, the 5th Amendment's Takings Clause, or Citizens United v. Federal Election Commission, 558 U.S. 310 (2010) and subsequent law.

**II. Incentive Compensation**

- The currency unit of CALM is synonymous throughout and 1:1 with the US Dollar (USD). CALM doubles as a backronym with a plurality of beautifully diverse and resonant 1st Amendment meanings reflecting the moral sentiments that underpin this exchange, including the following suggestions in <u>this particular context</u>:

    *<u>C</u>entury <u>A</u>ssuring <u>L</u>ife <u>M</u>echanisms*

    *Covenant Altaring Liquidity Measures*

    *Constitutionally Adjusted Lifeline Measures*

    *Community Allies Leveraging Mercy*

*Childhood Allegiance to Lifesaving Matching*

*Calmunity Agreed Lifelong Mutuality*

*Coordinated Allocation for Lifesaving Matching*

*Community Action for Liver & Kidney Matching*

*Comprehensive Access to Lifesaving Medicine*

*Championing Altruistic Living Miracles*

*Change through Altruistic Lifesaving Monies (Change through ALMs)*

*Coordinated American Life Months, Moments, Minutes, Megaseconds, Millenia*

The Donor strongly prefers that this proposed incentives payment be labeled synonymously in the morally retitled (by national renaming contest) backronymed interactive currency unit of ☑CALM or ☑QALM, which the Donor asserts more closely matches and reflects the aim and nature of basically priceless lifesaving donor exchange.

- The Hospital agrees to compensate the Donor in an amount <u>up to</u> **$60,250 CALM (again, synonymous 1:1 with USD)** (or alternatively **$54,000 CALM**—three times the previously proposed **$18,000 CALM**) as a financial incentive for the successful completion of either donation procedure.

- This maximal possible amount is derived from the *American Journal of Transplantation* article previously enclosed "A Cost-Benefit Analysis of Government Compensation of Kidney Donors" (August 2015) using the **United States Consumer Price Index for all Urban Consumers (CPI-U)** to reflect fair market value as of **February 02025**. Adjusted for inflation, $60,250 CALM in February 02025 is roughly equivalent to $45,000 CALM market price proposed in August 02015.

- The minimal amount sought by the Donor is $18,000 CALM, although the Donor feels religiously compelled under strict civic and sectarian religion to donate kidney or liver for even less, even as little as $0 CALM, in order to preserve human life.

- The final agreed on sum between the parties to this Contract is $_____ CALM (USD).

- The Donor acknowledges that this request for a higher sum than $18,000 CALM is **not made out of personal financial necessity or avaricious desire or greed**, but rather to **establish a precedent and strong market incentives signal that achieves a market-clearing rate for ethical living organ donation that ethically- and religiously-driven economists have faith in serving to clear and reverse the kidney and liver recipient waiting list.**

**II. Conditions Precedent to Payment:** The Incentive Payment shall only be due and payable if:

a. Donor successfully undergoes and completes the living kidney and/or liver donation surgery at Hospital;

b. Donor initiates and successfully litigates a case in Federal Court resulting in a final, non-appealable judicial order or ruling suspending or invalidating the blanket prohibition on financial incentives for organ donation, thereby legalizing the payment of such incentives;

c. The ruling explicitly permits payment from private institutions, including hospitals, to living organ and tissue donors in exchange for organ or tissue donation;

d. The ruling is applicable to the jurisdiction under which Hospital operates, allowing it to lawfully execute the payment without legal repercussions;

e. Donor seeks and secures legal permission for Hospital to seek reimbursement for or direct payment of the Incentive Payment from payers such as insurance companies, donor advocacy organizations, or government entities.

### III. Payment Terms

III.1. **Timing of Payment:** Upon satisfaction of all conditions in Section II, Hospital shall remit the Incentive Payment to Donor within thirty (30) days of the final legal determination.

III.2. **Method of Payment:** Payment shall be made via certified check, direct deposit, or any other mutually agreed-upon electronic method, recognizing that the Donor can not religiously accept cash payment.

## IV. NO GUARANTEE OR LIABILITY

IV.1. **Hospital Neutrality:** Hospital does not guarantee or take any position on the likelihood of legal success by Donor and shall not be held liable for any legal costs, damages, or consequences resulting from the litigation undertaken by Donor.

IV.2. **No Advance Payment:** Donor acknowledges and agrees that Hospital shall have no obligation to provide any portion of the Incentive Payment prior to the satisfaction of all conditions in Section II.

### IV. Ethical and Precedential Commitment

- Depending on how much is agreed to, the Donor affirms that **$18,000 USD of the incentive** will be specifically dedicated to **a campaign advocating for the recognition and broader implementation of ethical market-based organ donation policies**.

- The Donor affirms that a further $18,000 USD of the remaining incentive will be specifically dedicated to a Precedential Campaign for Harmless Hands Project 02029, to push forward healthy policy and social contract precedents that the longstanding duopoly parties can't, won't, or wouldn't tackle and handle on their own.

- Any remainder of this incentive will be used **to support causes the Donor believes in**, including building up his work on Healthy Consent™ via social entrepreneurship, reinforcing the societal and ethical good of living organ donation cross-fertilizing other rewarding fields of ethical endeavor.

### V. Qualification for Maximum Ethical Incentive

- The Donor attests that their net worth qualifies them for **the highest tier of incentive payment**, ensuring that this contractual arrangement aligns with the principles of voluntary,

Motion

10

ethical, and justifiable financial support for living donors. Proof of the Donor's net worth and liquidity is available on request. Even at the highest requested amount of $60,250 CALM, the incentive would not exceed 4% of the Donor's net worth.

**VI. Legal Compliance and Oversight**

- VI.1. **Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts of law principles. This agreement shall be subject to all applicable laws and judicial oversight to ensure compliance with ethical standards and transparency.
- VI.2. **Entire Agreement:** This Agreement constitutes the entire understanding between the parties and supersedes any prior or contemporaneous agreements, written or oral, regarding the subject matter herein.
- VI.3. **Severability:** If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall continue in full force and effect except for the required bundled satisfaction of all conditions in Section 1.2 precedent to payment which must be completed for the agreed incentive payment in this Agreement to be valid and enforceable.
- VI.4. **Amendments:** No modification or amendment to this Agreement shall be valid unless in writing and signed by both parties.

**VII. Execution in Counterparts**

- This contract may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement.
- A signed copy of this agreement transmitted via **email or electronic means** shall be deemed to have the same legal effect as an original signed copy.

**VIII. Conclusion**

This contract aims to set a **new ethical and market-driven standard** for living organ donation while upholding the principles of voluntary exchange, moral agency, and economic rationality. The Donor and the Hospital agree that the terms outlined herein shall serve as a foundation for

advancing life-saving transplant policies in a manner that reflects both empirical economic reasoning and ethical imperatives.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**DONOR:**

Signature: _____

Printed Name: **David Morris Clayman**

Title: Human Being / Triple Citizen / Harmless Hands Test Case Precedent

Date: _15 March 02025 CE_

**Donor Notarization**

DANIEL LEE
Notary Public-State of Florida
Commission # HH175463
My Commission Expires
October 29, 2025

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me by means of [✓] physical presence or [ ] online notarization this 15 day of March, 2025 by David Clayman.

_____ - Notary Public
Personally Known ___ OR Produced Identification ✓
Type of Identification Produced: FL Drivers Lic

**UNIVERSITY HOSPITALS OF CLEVELAND:**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

**Hospital Notarization**



From: David Clayman/Harmless Hands
7930 Palacio Del Mar Dr
Boca Raton, FL 33433-4148

To: US District Court for the Southern District of Florida
Clerk of Courts
299 E. Broward Blvd, Suite 108
Fort Lauderdale, FL 33301

USPS CERTIFIED MAIL
MAR 15, 2025
$18.55
RDC 03
9589 0710 5270 2006 1432 14

ReadyPost Document Mailer

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   US District Court for the Southern District of FL
   Clerk of Courts
   299 E. Broward Blvd, Suite 108
   Fort Lauderdale, FL 33301

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
   X _____  ☐ Agent
                          ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
   ☐ Adult Signature
   ☐ Adult Signature Restricted Delivery
   ☐ Certified Mail®
   ☐ Certified Mail Restricted Delivery
   ☐ Collect on Delivery
   ☐ Collect on Delivery Restricted Delivery
   ☐ Insured Mail
   ☐ Insured Mail Restricted Delivery (over $500)

   ☐ Priority Mail Express®
   ☐ Registered Mail™
   ☐ Registered Mail Restricted Delivery
   ☐ Signature Confirmation™
   ☐ Signature Confirmation Restricted Delivery

2. Article Number (Transfer from service label)
   9589 0710 5270 2006 1432 14

9590 9402 8586 3244 4413 24

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

U.S. POSTAGE PAID
Retail
PM
BOCA RATON, FL

1PJE2150 · AIC-093
Product Code 93300006
www.usps.com
A product of the United States Postal Service®
MADE IN THE U.S.A.