David Morris Clayman, Harmless Hands, Pro se

UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

FILED BY [signature] D.C.
APR 17 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

| | |
|---|---|
| David Clayman, Harmless Hands,<br><br>Plaintiffs,<br><br>vs.<br><br>United States, Defendant | **CASE 25-CV-60447-DSL**<br><br>**MOTION TO ADAPT INCENTIVES CONTRACT AROUND THE REINTRODUCED END KIDNEY DEATHS ACT CONTINGENCY** |

# MOTION TO ADAPT PROPOSED INCENTIVES CONTRACT AROUND THE REINTRODUCED END KIDNEY DEATHS ACT CONTINGENCY

To recap, Plaintiffs DAVID MORRIS CLAYMAN and HARMLESS HANDS wish to seek a universal injunction permitting potential altruistic living kidney donors, both undirected and even directed, to negotiate for or accept under Court supervision significant and salient financial incentives for donating liver segments or kidney, and also for still-living deceased donors and families of potential deceased donors to negotiate under Court supervision for modest financial incentives to donate tissue, even if doing so religiously, under civic or sectarian religious belief, contravenes the antiquated and dysfunctional terms of Title III of the National Organ Transplant Act.

Plaintiff Clayman only became fully aware recently of the *End Kidney Deaths Act* introduced by Congresswoman Nicole Malliotakis and reintroduced by Malliotakis and Congressman Josh Harder. The Plaintiff's Congressman Jared Moskowitz (FL-23) is a civic religious supporter of the bill and is likely, given the health-oriented altruistic Jewish faith Jared Moscowitz shares with the Plaintiff, motivated by similar sectarian religious thought as well.

The *End Kidney Deaths Act* would sets up a refundable tax credit of $10,000 USD (CALM) per year for five years from the tax year (starting in 02027) in which a living donor completes an altruistic undirected donation to a stranger on the kidney waiting list, for a total of $50,000 of after-tax compensation released over a five-year timeframe. The reintroduced Act does not cover kidney transplants in 02025 or 02026, it does not address liver segment altruistic undirected donation, and the Act has not been passed by Congress yet, and maybe will not be passed at all. Notably, the total incentive of $50,000 USD (CALM) **after-tax** (free and clear of taxes) very closely mirrors the Plaintiff's demand for negotiating freedom up to $60,250 **pretax** (subject to withholding or end-of-year taxation), and the fact that a collection of Congressional Representatives are pushing for this in Congress should help serve as very strong, compelling evidence that the Plaintiff's civic (and sectarian) religious beliefs on this policy question are well-grounded in contemporaneous, active capitalistic civic religion (let alone sectarian religion) adequate in this context to allow individuals to trigger such rights and freedoms in the alternative through the *Religious Freedom and Restoration Act* in Court.

If the *End Kidney Deaths Act* eventually passes, and if it is rewritten before Passage to retroactively cover the Plaintiff's donation and the donations of other altruistic undirected living kidney donors in 02025 and 02026, the Plaintiff will be happy to drop part of this case on the kidney front, and would subrogate seeking incentives payment from potential transplant centers, payors' or patient community organizations for payment from the monopsony of the federal government. But even if the End Kidney Deaths Act passes with revisions covering 02025 and

02026 donations, which is a very big if, **the Plaintiffs can not drop any part of their case on the living altruistic liver donor front,** as the End Kidney Deaths Act doesn't at all handle the question of altruistic liver donation.

With all that said, the Plaintiff asks the Court to make decisions on incentives negotiation working on the worst case scenario assumption that the *End Kidney Deaths Act (EKDA)* will not pass, or will not be revised to cover 02025 and 02026 donations, or will pass Congress more slowly than the Courts can deliver substantive and lasting relief. Even if the EKDA is unrevised or fails, this case should be enough to anchor into place negotiation for similar financial incentives for all those living donors who are immediately willing to follow this Court's legal guidance on how to freely and ethically negotiate for donor incentives and with whom.

The Plaintiff also needs to disclose to this Court that the hospital system the Plaintiff initially thought he would work with, University Hospitals of Cleveland, denied the Plaintiff's initiative to seek incentives from them or their coalition of payors. The denial was communicated to the Plaintiff through a call from a Chair of Transplant Medicine. The Plaintiff gathers and speculates that the reason for the refusal to negotiate is that University Hospitals does not want any risk of any liability under Title III of the National Organ Transplant Act, and doesn't feel brave enough to stick its neck out and be a trendsetter, or even a conditional trendsetter, in the religiopolitical world of donor incentives ethics. The Plaintiffs have refocused their search for a willing conditional incentives partner to other kidney and liver transplant centers in the region of Florida, where the Plaintiff now lives, and in the region of Chicago, Illinois, where one of the Plaintiff's siblings has a home, and has prepared a new, more generically-addressed sample Incentives Contract (attached Appendix C) that is better informed by and also conditionally adjusted to the possibility of passage of the EKDA. Please see that updated revised incentives contract for Court consideration and review.

With that said, if the Plaintiff can not find a system willing to negotiate incentives with him in a reasonable period of time, the Plaintiff will move forward reluctantly and resignedly with communistic, incentiveless donation, as well as hope that the End Kidney Deaths Act passes Congress quickly and is amended and accelerated to cover kidney donations like his that occur in the years 02025 and 02026. Currently, the EKDA is written to only cover kidney transplants that take place *after* 31 December 02026, and would not cover any living kidney donors with financial incentives who answer the religious call to act in this emergency for more than the next year and a half. The Plaintiff hopes that this outcome of being forced to give kidney or liver without incentive doesn't happen, as it will imperil thousands of further persons waiting on the kidney and liver transplant list for lack of a more rapidly assembled religious market for organ donors.

Please note that the goal of this case is mostly unchanged even after learning fully of the introduced and reintroduced *EKDA*. It now is to secure meaningful financial incentives for any living liver donor (liver donation is uncovered by *EKDA*), any still-living deceased donor or the family of an already-deceased donor (deceased donation is uncovered by *EKDA*), any living kidney donor if the *EKDA* moves more slowly than this case or fails to pass (justice delayed is justice denied), all living kidney donors until the EKDA terms become effective (currently any kidney donor who donates before 1 January 02027), and all directed living kidney donors (where the donor already knows the intended recipient) even if the *EKDA* passes (directed kidney donors are currently still wholly excluded from any *EKDA* programmatic financial incentives coverage).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Adapt Incentives Contract around End Kidney Deaths Act Contingency was sent out to the following parties in accordance

with Rule 5 of the Federal Rules of Civil Procedure on Tuesday (Tiw's Day), 15 April 02025.:

- United States Attorney for the Southern District of Florida via certified mail.
- Attorney General of the United States via certified mail.

Harmlessly,

s/Plaintiff David Clayman
Currently still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@harmlesshands.org

## APPENDIX C

## CONTRACT PROPOSAL FOR LIVING ORGAN DONOR INCENTIVE CONTINGENT UPON LEGAL SUCCESS

**v0.3.0**

**This Agreement** is made and entered into this ____ day of __________, 02025 CE (the "Effective Date"), by and between **David Morris Clayman** ("Donor"), formerly named **Adam David Clayman,** an individual residing at 7930 Palacio Del Mar Drive, Boca Raton, FL 33433-4148, and ____________________________________________ ("Hospital"), a medical institution located at ___________________________________________________________.

**I. Purpose**

This agreement establishes the terms of a financial incentive for the Donor's voluntary and ethical contribution **as a live donor of a kidney or a significant potentially life-saving portion of the Donor's liver** under the framework of an incentive-based living donor model that aligns with empirical economic assessments and religious principles valuing regulated free exchange.

**WHEREAS:**

1. The Donor wishes to voluntarily undergo a non-directed, altruistic living kidney and/or liver donation procedure at Hospital, as religiously compelled by his understanding of American civic religion and Jewish sectarian religion in the presence of the current deadly organ donor shortage;
2. Hospital recognizes the life-saving impact of living kidney and living liver donations and acknowledges the potential benefit of incentives to increase donation rates;
3. The Donor has initiated legal action in *Clayman v United States (S. District of Florida,* 25-CV-60447-DSL*)* to seek a declaratory judgment and injunctive relief from the United States Federal Courts to suspend and invalidate any and all blanket prohibitions on financial incentives for organ donation, including but not limited to provisions of the National Organ Transplant Act (NOTA) (42 U.S.C. § 274e) and state and territorial equivalents nationwide, and at the least in the States of Florida and Ohio where this action will commence as well as the States and Territories governed by the Religious Freedom and Restoration Act (RFRA – 42 U.S.C. § 2000bb through 42 U.S.C. § 2000bb-4) or equivalents;

4. Hospital is willing to provide an incentive payment to the Donor contingent upon the successful outcome of the aforementioned legal action;

5. The parties desire to set forth their agreement regarding the terms and conditions of such an incentive payment;

6. Hospital accepts and agrees to support that the Donor files and brings said litigation in a Federal District Court located within the State of Florida, close to the Donor's residence, with the legal jurisdiction and capacity to issue cross-state or nationwide injunctive and declaratory judgment and relief applicable to University Hospitals Cleveland and all other United States organ transplant centers.

7. The Donor agrees to proceed with all possible due haste to complete all necessary medical evaluations, testing, and clearance procedures required to be approved as a living kidney and/or liver donor and to schedule and complete the donation surgery at the earliest feasible opportunity, without awaiting the final determination of the Courts on the legal permissibility of the agreed "sterically hindering" incentive payment under the RFRA, the 5th Amendment's Takings Clause, or Citizens United v. Federal Election Commission, 558 U.S. 310 (2010) and subsequent law.

**II. Incentive Compensation**

- The currency unit of CALM is synonymous throughout and 1:1 with the US Dollar (USD).

CALM doubles as a backronym with a plurality of beautifully diverse and resonant 1st Amendment meanings reflecting the moral sentiments that underpin this exchange, including the following suggestions in this particular context:

*Century Assuring Life Mechanisms*

*Covenant Altaring Liquidity Measures*

*Constitutionally Adjusted Lifeline Measures*

*Community Allies Leveraging Mercy*

*Childhood Allegiance to Lifesaving Matching*

*Calmunity Agreed Lifelong Mutuality*

*Coordinated Allocation for Lifesaving Matching*

*Community Action for Liver & Kidney Matching*

*Comprehensive Access to Lifesaving Medicine*

*Championing Altruistic Living Miracles*

*Change through Altruistic Lifesaving Monies (Change through ALMs)*

*Coordinated American Life Months, Moments, Minutes, Megaseconds, Millenia*

The Donor strongly prefers that this proposed incentives payment be labeled synonymously in the morally retitled (by national renaming contest) backronymed interactive currency unit of ☑CALM or ☑QALM, which the Donor asserts more closely matches and reflects the aim and nature of basically priceless lifesaving donor exchange.

- The Hospital agrees to compensate the Donor in an amount up to **$60,250 CALM (again, synonymous 1:1 with USD)** (or alternatively **$54,000 CALM**—three times the previously proposed **$18,000 CALM**) as a financial incentive for the successful completion of either donation procedure.

- This maximal possible amount is derived from the *American Journal of Transplantation* article previously enclosed "A Cost-Benefit Analysis of Government Compensation of Kidney Donors" (August 2015) using the **United States Consumer Price Index for all Urban Consumers (CPI-U)** to reflect fair market value as of **February 02025**. Adjusted for inflation, $60,250 CALM in February 02025 is roughly equivalent to $45,000 CALM market price proposed in August 02015.

- The minimal amount sought by the Donor is $18,000 CALM, although the Donor feels religiously compelled under strict civic and sectarian religion to donate kidney or liver for even less, even as little as $0 CALM, in order to preserve human life.

- The final agreed on sum between the parties to this Contract is $________________ CALM (USD).

- The Donor acknowledges that this request for a higher sum than $18,000 CALM is **not made out of personal financial necessity or avaricious desire or greed**, but rather to **establish a precedent and strong market incentives signal that achieves a market-clearing**

**rate for ethical living organ donation that ethically- and religiously-driven economists have faith in serving to clear and reverse the kidney and liver recipient waiting list.**

**II. Conditions Precedent to Payment:** The Incentive Payment shall only be due and payable if:

a. Donor successfully undergoes and completes the living kidney and/or liver donation surgery at Hospital;

b. Donor initiates and successfully litigates a case in Federal Court resulting in a final, non-appealable judicial order or ruling suspending or invalidating the blanket prohibition on financial incentives for organ donation, thereby legalizing the payment of such incentives;

c. The Donor complies assiduously with all terms, conditions, rules, procedures, and oversight of the Federal Court considering this precedential case.

d. The ruling explicitly permits payment from private institutions, including hospitals, to living organ and tissue donors in exchange for organ or tissue donation;

e. The ruling is applicable to the jurisdiction under which Hospital operates, allowing it to lawfully execute the payment without legal repercussions;

f. Donor seeks and secures legal permission for Hospital to seek reimbursement for or direct payment of the Incentive Payment from payers such as insurance companies, donor advocacy organizations, or government entities.

g. No legislation is passed by Congress that offers significant salient financial incentives for living kidney or living liver donors within the period of time that this incentives contract covers. If such an Act of Congress is passed after the organ donation and covers the Donor with substantial or sufficient payment, the Donor will return any incentives monies he received from the Hospital or its affiliated payors as soon as he can collect on any incentive monies due and payable to the Donor from the Government under such a Congressional Act.

**III. Payment Terms**

III.1. **Timing of Payment:** Upon satisfaction of all conditions in Section II, Hospital shall remit the Incentive Payment to Donor within thirty (30) days of the final legal determination.

III.2. **Method of Payment:** Payment shall be made via certified check, direct deposit, or any other mutually agreed-upon electronic method, recognizing that the Donor can not religiously accept cash payment.

## IV. NO GUARANTEE OR LIABILITY

IV.1. **Hospital Neutrality:** Hospital does not guarantee or take any position on the likelihood of legal success by Donor and shall not be held liable for any legal costs, damages, or consequences resulting from the litigation undertaken by Donor.

IV.2. **No Advance Payment:** Donor acknowledges and agrees that Hospital shall have no obligation to provide any portion of the Incentive Payment prior to the satisfaction of all conditions in Section II.

### IV. Ethical and Precedential Commitment

- Depending on how much is agreed to, the Donor affirms that **$18,000 USD of the incentive** will be specifically dedicated to **a campaign advocating or lobbying for the recognition and broader implementation of ethical market-based organ donation policies, if still not fully achieved by coordinated private action or public action by Act of Congress**.
- The Donor affirms that a further $18,000 USD of the remaining incentive will be specifically dedicated to a Precedential Campaign for Harmless Hands Project 02029, to push forward healthy policy and social contract precedents that the longstanding duopoly parties can't, won't, or wouldn't tackle and handle on their own.
- Any remainder of this incentive will be used **to support causes the Donor believes in or support the Donor's living expenses**.

### V. Qualification for Maximum Ethical Incentive

- The Donor attests that their net worth qualifies them for **the highest tier of incentive payment**, ensuring that this contractual arrangement aligns with the principles of voluntary, ethical, and justifiable financial support for living donors. Proof of the Donor's net worth and liquidity is available on request. Even at the highest requested amount of $60,250 CALM, the incentive would not exceed 4% of the Donor's net worth.

**VI. Legal Compliance and Oversight**

- VI.1. **Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the State of ________________, without regard to conflicts of law principles. This agreement shall be subject to all applicable laws and judicial oversight to ensure compliance with ethical standards and transparency.
- VI.2. **Entire Agreement:** This Agreement constitutes the entire understanding between the parties and supersedes any prior or contemporaneous agreements, written or oral, regarding the subject matter herein.
- VI.3. **Severability:** If any provision of this Agreement is found to be invalid or unenforceable, the remaining provisions shall continue in full force and effect except for the required bundled satisfaction of all conditions in Section 1.2 precedent to payment which must be completed for the agreed incentive payment in this Agreement to be valid and enforceable.
- VI.4. **Amendments:** No modification or amendment to this Agreement shall be valid unless in writing and signed by both parties.

**VII. Execution in Counterparts**

- This contract may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same agreement.
- A signed copy of this agreement transmitted via **email or electronic means** shall be deemed to have the same legal effect as an original signed copy.

**VIII. Conclusion**

This contract aims to set a **new ethical and market-driven standard** for living organ donation while upholding the principles of voluntary exchange, moral agency, and economic rationality.

The Donor and the Hospital agree that the terms outlined herein shall serve as a foundation for advancing life-saving transplant policies in a manner that reflects both empirical economic reasoning and ethical imperatives.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**DONOR:**

Signature: ______________________________

Printed Name: **David Morris Clayman**

Title: Human Being / Triple Citizen / Harmless Hands Test Case Precedent

Date: _____________________

**Donor Notarization**

____________________________________________ **("HOSPITAL"):**

Signature: ______________________________

Printed Name: ___________________________

Title: __________________________________

Date: _____________________

**Hospital Notarization**

[118H9275]

.....................................................................
(Original Signature of Member)

119TH CONGRESS
1ST SESSION

# H. R. ______

To amend the Internal Revenue Code of 1986 to provide a refundable tax credit for non-directed living kidney donations.

---

IN THE HOUSE OF REPRESENTATIVES

Ms. MALLIOTAKIS introduced the following bill; which was referred to the Committee on ______________________

---

# A BILL

To amend the Internal Revenue Code of 1986 to provide a refundable tax credit for non-directed living kidney donations.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "End Kidney Deaths Act".

**SEC. 2. CREDIT FOR NON-DIRECTED LIVING KIDNEY DONATIONS.**

(a) IN GENERAL.—Subpart C of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 is amended by inserting after section 36B the following new section:

**"SEC. 36C. CREDIT FOR NON-DIRECTED LIVING KIDNEY DONATIONS.**

"(a) IN GENERAL.—In the case of an individual who makes a qualified non-directed living kidney donation during any taxable year, there shall be allowed as a credit against the tax imposed by this subtitle an amount equal to $10,000 for such taxable year and each of the 4 succeeding taxable years.

"(b) QUALIFIED NON-DIRECTED LIVING KIDNEY DONATION.—For purposes of this section, the term 'qualified non-directed living kidney donation' means, with respect to any individual, the donation of a kidney of such individual for the purpose of transplanting such kidney into another individual if—

"(1) the removal of kidney from such individual is during the life of such individual, and

"(2) such individual does not know (at the time of such removal) the identity of—

"(A) the individual into whom such kidney is to be transplanted, or

"(B) any other individual into whom any organ will be transplanted in connection with the donation of such kidney.

"(c) SPECIAL RULES.—

"(1) ACCELERATION OF CREDIT IN CASE OF DEATH.—In the case of the death of any individual during a taxable year for which a credit is allowed under subsection (a) to such individual, the amount of such credit for such taxable year shall be equal to the excess of $50,000 over the aggregate amount of credits allowed to such individual under this section for all prior taxable years.

"(2) DETERMINATION OF DATE OF DONATION.—For purposes of this section, a qualified non-directed living kidney donation shall be treated as made on the date on which the kidney is removed from the individual making such donation.

"(d) TERMINATION.—No credit shall be allowed under this section with respect to any qualified non-directed living kidney donation after December 31, 2036.".

(b) CONFORMING AMENDMENTS.—

(1) Section 6211(b)(4)(A) of the Internal Revenue Code of 1986 is amended by inserting "36C," after "36B,".

(2) Paragraph (2) of section 1324(b) of title 31, United States Code, is amended by inserting "36C," after "36B,".

(3) The table of sections for subpart C of part IV of subchapter A of chapter 1 of the Internal Revenue Code of 1986 is amended by inserting after the item relating to section 36B the following new item:

"Sec. 36C. Credit for non-directed living kidney donations.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to kidneys removed after December 31, 2026.

(d) COORDINATION WITH PROHIBITION ON ORGAN PURCHASES.—Section 301 of the National Organ Transplant Act (42 U.S.C. 274(e)) is amended by adding at the end the following new subsection:

"(d) TREATMENT OF TAX CREDIT FOR NON-DIRECTED LIVING KIDNEY DONATIONS.—The credit allowed under section 36C of the Internal Revenue Code of 1986 (relating to credit for non-directed living kidney donations) shall not be treated as valuable consideration for purposes of this section.".