David Clayman, *Pro se*

FILED BY_____ D.C.

JUN 13 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## UNITED STATES COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DAVID CLAYMAN, HARMLESS HANDS, AND HEALTHY CONSENT, PBC<br><br>David the Plaintiff,<br>vs.<br><br>UNITED STATES, STATUS QUO<br>Goliath the Defendant | CASE NO.<br>0:25-CV-60447-ROSENBERG<br><br>HEARING REQUESTED<br><br>RESPONSE TO DEFENDANT'S MOTION TO DISMISS |

## *HEARING REQUESTED*

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS COMPLAINT

**COMES NOW** the Plaintiff, David Clayman, representing himself, the nascent political party Harmless Hands and its related Commander (in Chief), Presidential, and Precedential campaign, as well as the public benefit corporation Healthy Consent, PBC. Jointly, the Plaintiffs respectfully request that this Honorable Court deny the Defendant's Motion to Dismiss, hold a hearing on the merits, and allow this case to proceed to a decision on the merits. This case is incredibly urgent. North of 13 people die every day needlessly in the United States for lack of an adequate, well-incentivized double-sided living donor and binding, ironclad, unconditional deceased organ donor markets guaranteed by contract. As background, the *End Kidney Deaths Act* (H.R. 2687) is languishing in committee in Congress, as it is clearly empirically not an Executive or Legislative emergency or high priority of the current Commander-in-Chief and President or major parties, who at least so far prioritize debate for perennial, recurrent partisan tax cut battles over fast-tracking living donor recruitment preserving human life for nearly 100,000 dialytically-dying Americans. This court case is, the Plaintiff credibly believes, the best hope organ recipients,

organ donors, and the employers and political candidates who support the cause have for immediate schismatic positive change in the double-sided organ donor-recipient matching market.

Please intercede at the earliest chance, and please revive the TRO and Preliminary Injunction.

# I. GOVERNMENTAL MISUSE AND ABUSE OF DISMISSAL WITH PREJUDICE

First and foremost, Plaintiff lodges a formal, general, and universal complaint with this Court on behalf of all pro se litigants in the United States, regarding the recurring practice by Assistant U.S. Attorneys (AUSAs) and U.S. Attorneys of immediately seeking dismissal with prejudice of genuine pro se pleadings, often without allowing for substantive engagement, discussion, or a hearing.

This practice transforms the judicial process into an unnecessarily adversarial and inaccessible system by expecting pro se litigants to meet professional legal standards on their first filing, without benefit of feedback or formal legal education. Most pro se Plaintiffs, including Plaintiff himself, were never taught legal writing or structure in public high schools, nor were we afforded the opportunity to attend law school. Yet the Government now demands near-perfect legal drafting—without error, digression, or structural deviation—as a prerequisite for having our grievances heard.

The courts and the attorneys who represent the Government before them must take a more open, constructive, and tolerant approach toward pro se filings. No motion to dismiss with prejudice should be entertained until it is clear that no plausible amendment or re-filing could cure the pleading's deficiencies. As the Supreme Court held in Haines v. Kerner, 404 U.S. 519, 520 (1972), courts must hold pro se pleadings "to less stringent standards than formal pleadings

drafted by lawyers."

The First Amendment does not place an arbitrary ceiling on the number of reasonable attempts a citizen may make to bring a grievance before their Government. Many of the cases that pro ses may bring are "wicked social problems" (https://en.wikipedia.org/wiki/Wicked_problem) that justifiably require multiple attempts to arrive at the correct pleading solution. The overuse or premature use of dismissal with prejudice against pro ses constitutes not only a violation of this constitutional right but also an abdication of the Government's duty to preserve liberty in a fair and accessible judicial system. See NAACP v. Button, 371 U.S. 415, 429 (1963) (First Amendment protects vigorous advocacy against governmental intrusion).

## II. A NASCENT ENTITY SHOULD BE ABLE TO PLEAD PRO SE

### A. Introduction

A newly-formed entity—especially one organized for political, public benefit, or constitutional advocacy—should not be barred from pleading pro se at its inception. Doing so would effectively deny that entity any access to the courts at all due to funding barriers before a repeatable, scalable business or donor model is discovered to secure adequate cashflow to enlist the typically-quite-expensive services of members of the Bar trade guild, violating that entity's First Amendment right to petition the government and its Fourteenth Amendment right to due process and equal protection.

### B. The Constitution Guarantees a Right of Access to the Courts

The Supreme Court has long recognized that all persons—whether incarcerated or free, whether represented or not—have a fundamental constitutional right of access to the courts. In Bounds v. Smith, 430 U.S. 817, 821 (1977), the Court affirmed "the fundamental constitutional right of

access to the courts," a principle rooted in both the First Amendment right to petition and the Fourteenth Amendment's due process clause. This principle was earlier stated in Ex parte Hull, 312 U.S. 546, 549 (1941), which held that "the State and its officers may not abridge or impair [a person's] right to apply to a federal court for a writ of habeas corpus."

Federal statute likewise provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel." 28 U.S.C. § 1654. While courts have interpreted this statute to generally apply only to natural persons and not artificial entities, see Rowland v. California Men's Colony, 506 U.S. 194, 202–03 (1993), that interpretation must be flexible enough to avoid unconstitutional outcomes—such as completely barring a fledgling public interest organization from court solely for lack of counsel.

## C. The Rule Requiring Counsel for Entities Is Obsolete in Light of Modern Legal Tools

The traditional rule that artificial entities must appear through licensed attorneys developed at a time when only trained lawyers could reasonably produce legible pleadings, understand legal standards, or navigate complex procedural rules. See Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1308 (2d Cir. 1991). That world no longer exists.

On November 30, 2022, the ChatGPT 3.5 Large Language Model (LLM) was released to the public, rapidly shocking the world with its wide-ranging capabilities. In the present era, Large Language Models such as OpenAI's ChatGPT, Google's Gemini, Anthropic's Claude, Meta's Llama, China's DeepSeek, and more have shown themselves to be extremely high-performing in generating language, empowering nonlawyers—particularly educated founders of social ventures and political organizations—to produce legally coherent documents, cite appropriate case law, and organize arguments consistent with court rules.

This case further illustrates how the rule requiring artificial entities to appear only through counsel can strangle early-stage public benefit corporations before they can meaningfully operate. In this filing, Plaintiff adds Healthy Consent, PBC to the list of Plaintiffs—a Delaware C-Corporation founded by the undersigned on April 7, 2025, and structured as a Public Benefit Corporation. The purpose of Healthy Consent, PBC is the development and nationwide deployment of patent-licensed mobile and web software designed to prevent sexual assault and reduce a wide spectrum of sexual harms.

Courts have occasionally allowed limited leeway for representation by officers or members in similar circumstances. See Church of the New Testament v. United States, 783 F.2d 771, 773 (9th Cir. 1986) (noting that churches, while considered entities, may have different practical considerations); see also U.S. v. Onan, 190 F.2d 1, 6 (8th Cir. 1951) (discussing the special role of parties advancing constitutional or governmental claims).

## III. PLAINTIFF HAS STANDING TO BRING THIS ACTION

### A. Introduction

The Defendant argues that Plaintiff lacks Article III standing to challenge the National Organ Transplant Act (NOTA). But unlike in Bellocchio v. Garland, 614 F. Supp. 3d 11 (S.D.N.Y. 2022)—where the plaintiff alleged mere ideological opposition to NOTA without concrete plans or preparatory acts—here, Plaintiff has taken numerous specific, documented steps toward the sale of a second kidney or a segment of his liver, and thus satisfies all three constitutional requirements for standing. Plaintiff respectfully requests that the Court deny the Motion to Dismiss and allow the case to proceed on the merits.

### B. Plaintiff Has Suffered or Faces Imminent Injury in Fact

To establish standing, a plaintiff must show an "injury in fact"—a legally cognizable injury that is concrete, particularized, and actual or imminent. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Where a plaintiff's conduct is "arguably proscribed by statute," and he faces a "credible threat of prosecution," that threat itself is an Article III injury. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014).

Unlike the plaintiff in Bellocchio, Plaintiff here has already taken substantial concrete steps toward the sale of non-vital organs, including:

1. Contact with multiple transplant centers across state lines, including Ohio, and locally here in Florida as well, clearly implicating interstate commerce while retaining jurisdiction locally under the more numerous contacts with Florida organ transplant centers;

2. Medical testing to evaluate candidacy for kidney donation, including and notably successful completion of a 24-hour urine collection test, demonstrating clinical eligibility for live organ donation;

3. Communications with transplant professionals in several states about facilitating donation upon legal clearance—including pursuit of contingent sale negotiations and the drafting and publication of a suggested contract, as revised, submitted to this Court for review and oversight.

These steps go far beyond hypothetical or ideological opposition. They constitute present-day, overt acts in pursuit of a course of conduct—organ sale—that is currently criminalized under 42 U.S.C. § 274e.

Moreover, Plaintiff's intention to proceed with this course of conduct upon favorable judicial determination is not speculative—it is explicit, documented, and continuous. And importantly, the risk of federal prosecution is not hypothetical: the Assistant and U.S. Attorney in their Motion to Dismiss have neither disavowed prosecution nor issued any policy guidance exempting

Plaintiff's contemplated conduct. The lack of such assurance when such assurance was obviously germane and immediately relevant to their argument supports the credible threat standard. See Holder v. Humanitarian Law Project, 561 U.S. 1, 16 (2010). The Plaintiff has attached an email pursuing such assurance sent to the Assistant US Attorney over the Memorial Day Weekend; the Plaintiff has not yet received any assuring response that criminal prosecution or civil penalty is not to occur if Plaintiff continues pursuing this.

Note that the Plaintiff is a prerevenue altruistic start-up founder and self-funded political candidate at present. The Plaintiff is living on savings and investments while building *Healthy Consent, Public Benefit Corporation* and *Harmless Hands*. As a sole founder without outside funding and without salary, there are no provable, non-artificial "lost wages" at present to compensate the Plaintiff to any degree when/if he succeeds at donating as a living donor, nor would there be for many walks of life, like full-time volunteers, students, retirees, full-time homemakers, and the unemployed. It is particularly deeply unfair and absurd under NOTA and prevailing legislative interpretation that people like us (ex: early-stage entrepreneurs, students, and stay-at-home moms and dads) who aren't actively earning hard-proven W-2 or 1099 income are prohibited from negotiating any meaningful fractional compensation at all for our numerous sacrifices, both in actual injury, statistical life loss, and downtime, pursuing and completing altruistic living organ donation. It's anti-family and arguably a form of illegal sex discrimination against over 10 million full-time homemakers, predominantly currently female and moms.

**Important Note**: Plaintiff has recently received confidential medical news that temporarily impairs his ability to donate organs himself over the next 6 months on the donor-side, and has disclosed that situation in more detail to the Court Ex Parte. If necessary to establish or perfect his personal standing as an organ donor to the satisfaction of the Court, the Plaintiff asks for a stay of proceedings on that particular basis of standing, which the Plaintiff believes is temporary.

However, as an employer, as detailed in the next section, the Plaintiff believes he still unquestionably has immediately actionable standing and injury-in-fact that is not affected by any temporary personal medical considerations.

## C. The Injury Is Fairly Traceable to the Defendant's Enforcement of NOTA

Plaintiff's constitutional and economic injury flows directly from enforcement of 42 U.S.C. § 274e, a criminal statute enforced by the Department of Justice. There is no doubt that if Plaintiff proceeds with the sale of his second kidney or a liver segment, the federal government has the authority and declared intention to prosecute under existing law. Thus, the causal chain is direct and unbroken. See Bennett v. Spear, 520 U.S. 154, 167 (1997) (traceability satisfied when injury flows from challenged action).

## D. The Injury Is Redressable by a Favorable Court Decision

Should this Court hold that 42 U.S.C. § 274e is unconstitutional or unenforceable as applied to Plaintiff's conduct, Plaintiff's injury would be fully redressed. He would be free to proceed with compensated organ donation without fear of federal prosecution. This satisfies the redressability requirement. See Susan B. Anthony List, 573 U.S. at 158–59.

## E. Bellocchio Is Distinguishable

The Defendant heavily relies on Bellocchio v. Garland, but that decision is easily distinguished. The Bellocchio court found the plaintiff lacked standing because he had taken no concrete steps toward the sale of an organ and did not allege a credible threat of prosecution. By contrast, Plaintiff here:

- Has undergone clinical screening and testing,
- Has communicated with transplant centers across multiple states,

- Has stated clear, transaction-contingent intentions to sell two specific, medically eligible organs, and

- Has received no assurance from federal authorities that prosecution would not occur if he proceeds.

As the Supreme Court held in Susan B. Anthony List, plaintiffs "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." 573 U.S. at 158.

## IV. PLAINTIFF HAS INDEPENDENT STANDING AS AN EMPLOYER

### A. Introduction: Employer-Based Standing

Separate and apart from Plaintiff's personal standing as a prospective organ donor, Plaintiff has independent Article III standing as the founder and CEO of Healthy Consent, PBC—a Delaware Public Benefit Corporation seeking to implement an employee wellness program that would provide a $3,600 bonus to employees who complete living kidney or liver donation.

While Plaintiff is currently the sole employee of this early-stage startup, he has concrete plans to hire additional employees before the end of 2025. The rapid advancement of AI tools has enabled Plaintiff to build the foundational technology and business infrastructure single-handedly, but the gap between what one person can accomplish with AI assistance versus what a growing team can achieve is widening. As Healthy Consent, PBC scales its mission to prevent sexual assault through technology deployment, additional human talent will become essential for customer support, partnership development, clinical validation, and market expansion.

This employer-based standing is particularly robust because it demonstrates: (1) a concrete business injury from NOTA's prohibition on compensation that affects both current operations and imminent hiring decisions, (2) a specific programmatic initiative ready for implementation

that would influence recruiting and retention, and (3) harm to both the corporation's mission and its ability to attract mission-aligned talent in a competitive startup environment.

## B. The Proposed Employee Organ Donation Incentive Program

Healthy Consent, PBC seeks to implement the following employee benefit program, applicable to all employees including the founder-CEO:

- A $3,600 bonus payment to any employee who successfully completes a living kidney or partial liver donation to any qualified recipient
- Full paid medical leave for the donation and recovery period
- Guaranteed job protection during the donation process
- Coverage of any uncovered medical expenses related to the donation.

This program serves multiple legitimate business purposes:

1. **Mission Alignment**: As a Public Benefit Corporation focused on preventing sexual assault and reducing preventable harms, incentivizing lifesaving organ donation directly advances the company's core mission of harm reduction

2. **Competitive Advantage in Hiring**: As a prerevenue startup competing against well-funded companies for talent, offering unique, mission-aligned benefits helps attract employees who might otherwise choose higher-paying opportunities

3. **Founder Commitment**: By making himself eligible for the same program, Plaintiff demonstrates authentic commitment to the company's values—a critical factor in early-stage hiring

4. **Corporate Social Responsibility**: Establishing corporate leadership in addressing the organ shortage crisis from day one, even as a single-employee company

5. **Employee Wellness**: Supporting employees who wish to engage in meaningful, lifesaving

activities that provide documented psychological benefits to donors

## C. NOTA Criminalizes This Employee Benefit Program

Under 42 U.S.C. § 274e, Healthy Consent, PBC's proposed bonus program is a federal crime punishable by up to five years in prison. The statute criminalizes anyone who "knowingly acquire[s], receive[s], or otherwise transfer[s] any human organ for valuable consideration for use in human transplantation."

Courts have interpreted "valuable consideration" broadly to include any form of compensation beyond reimbursement of direct expenses. See, e.g., United States v. Rosenbaum, 908 F. Supp. 2d 491 (D.N.J. 2012). A $3,600 employee bonus for completed organ donation falls squarely within this prohibition.

This creates immediate, concrete injuries to Healthy Consent, PBC:

- The company cannot implement a benefit program it needs to attract mission-aligned talent in 2025
- The company cannot differentiate itself in the competitive startup hiring market
- The company cannot compensate its founder-CEO (Plaintiff) for his own organ donation despite his 100% ownership
- The prohibition affects current recruiting conversations and benefit package design
- Both the company and its CEO face criminal prosecution if they proceed

The injury is not speculative simply because the company currently has one employee. Startups must design their benefit packages before hiring to attract talent, and candidates regularly ask about company values and unique benefits during the interview process. The inability to truthfully say "we offer a $3,600 bonus for lifesaving organ donation" materially impacts

recruiting today, even before the first hire is made. See Blum v. Yaretsky, 457 U.S. 991, 1000 (1982) (injury-in-fact requires invasion of legally protected interest).

## D. This Prohibition Violates Equal Protection and Substantive Due Process

The criminalization of employer organ donation incentives is constitutionally infirm for several reasons:

**Arbitrary Discrimination Among Employer Wellness Programs**: Employers—including single-employee startups—routinely and legally offer bonuses for various health-related activities:

- Bonuses for smoking cessation
- Incentives for weight loss
- Payments for participating in wellness screenings
- Rewards for blood donation (which is legal to compensate)
- Bonuses for participating in clinical trials
- Even hazard pay for dangerous occupations that statistically reduce lifespan

Yet uniquely, employers face federal criminal sanctions for incentivizing the most altruistic and lifesaving act an employee can perform: organ donation. This arbitrary distinction lacks any rational basis, let alone the compelling justification required when criminal penalties attach. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (Equal Protection requires rational basis for distinctions).

## E. The Americans with Disabilities Act Does Not Prohibit Organ Donation Incentives

Plaintiff respectfully requests that this Court also rule that offering employment bonuses

specifically for completed living organ donation does not violate the Americans with Disabilities Act (ADA) for the following reasons:

**Voluntary Participation**: The proposed program is entirely voluntary. No employee—current or future—would be required or pressured to donate. This distinguishes it from discriminatory practices that exclude or penalize employees based on disability status.

**Reasonable Accommodation Remains Available**: Employees who cannot donate due to medical conditions remain entitled to all ADA protections and reasonable accommodations. The existence of a voluntary bonus program for those who can and choose to donate does not diminish these protections. Healthy Consent, PBC is committed to providing equivalent alternative bonuses for employees who demonstrate similar altruistic commitment through other means due to medical inability to donate organs.

**Analogous Programs Are Permitted**: Employers routinely offer wellness programs with incentives that some employees cannot participate in due to disabilities (e.g., step challenges, marathon participation bonuses). The Equal Employment Opportunity Commission (EEOC) has provided guidance allowing such programs when voluntary and when reasonable alternative means of participation are available. See EEOC Technical Assistance on the ADA and Employer Wellness Programs (2016).

**Bona Fide Benefit Plan**: Under 42 U.S.C. § 12201(c), the ADA explicitly permits "bona fide benefit plans" that are based on underwriting risks, classifying risks, or administering such risks, provided they are not used as a subterfuge to evade the purposes of the ADA. An organ donation incentive program that is uniformly offered to all employees, based on the completion of a specific voluntary act, not used as pretext for disability discrimination, and accompanied by alternative means of earning similar bonuses falls within this safe harbor.

## F. Political Campaign and Commander-in-Chief Standing

In addition to his standing as a corporate employer, Plaintiff has concrete plans to run for Commander-in-Chief in the 2028 presidential election and intends to make organ donation incentives a centerpiece of both his campaign structure and his proposed policies as President. This creates multiple additional sources of Article III injury:

**Campaign Staff Incentives**: As Plaintiff's principal focus shifts from Healthy Consent, PBC to Harmless Hands political activities in 2026 and 2027, he intends to offer the same $3,600 organ donation incentive to committed campaign staff and volunteers, within the limits of the campaign's income and budget. The Plaintiff has already offered $3,600 to opposing counsel, Darcie Thompson of the US Attorney's Office, to complete kidney or liver donation before the end of 2025, under Court supervision, as detailed in the attached email exchange. I would like Darcie and many of the other members of the US Attorney's Office to become employees of mine, or more specifically the Presidential Lifesavers Trinity / Triumvirate Committee I'm building up toward, after this upcoming 2028 Election settles. Political campaigns routinely offer various benefits and incentives to attract and retain dedicated staff like Darcie. However, NOTA criminalizes what would be a powerful demonstration of the campaign's commitment to addressing the organ shortage crisis—offering meaningful compensation to campaign workers, employees, job candidates, and select members of the public who choose to save lives through organ donation.

**Presidential Policy Platform**: As a candidate for Commander-in-Chief, Plaintiff intends to campaign on an insurgent altruistic platform that includes offering significant federal incentives for both military personnel and civilians to become living kidney or liver donors, or to register as ironclad deceased donors. Such a policy proposal is not merely theoretical—it would be a concrete campaign promise demonstrating how a future administration would address the organ

shortage crisis that claims over 13 lives daily.

**Military Personnel Incentives**: Service members routinely receive hazard pay and special compensation for undertaking dangerous assignments that risk life and limb. Yet under current law, a Commander-in-Chief would face criminal prosecution for offering similar compensation to soldiers who volunteer to save lives through organ donation—an act statistically safer than many military operations. This prohibition undermines both military morale and the Commander-in-Chief's authority to recognize and reward lifesaving service by those under his command.

**Political Speech Burden**: NOTA effectively criminalizes a core component of Plaintiff's political platform. While candidates can promise virtually any other policy change—from tax cuts to healthcare reform—Plaintiff cannot even truthfully promise to implement organ donation incentives without risking federal prosecution for solicitation or conspiracy. This directly burdens his First Amendment rights to political speech and to petition the government for redress of grievances through the electoral process. See Brown v. Hartlage, 456 U.S. 45, 52 (1982) (First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office).

**Chilling Effect on Political Innovation**: The threat of prosecution for even discussing or promising organ donation incentives chills innovative policy proposals that could save thousands of lives. A presidential candidate should be free to propose bold solutions to public health crises without fear of criminal sanctions. The current state of the law forces Plaintiff to either abandon a central policy proposal or risk federal charges—an unconstitutional condition on his right to seek public office in a David and Goliath campaign. See Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971) (constitutional guarantee has its fullest and most urgent application precisely to the

conduct of campaigns for political office).

This political dimension of Plaintiff's standing is neither speculative nor distant—campaign planning for 2028 begins now, and the inability to incorporate organ donation incentives into campaign structure and platform causes present injury to Plaintiff's ability to differentiate his David and Goliath candidacy and attract mission-aligned supporters. The Court's ruling would directly enable or prohibit a significant component of Plaintiff's political activities over the next three years.

## V. THE COMPLAINT PROPERLY ALLEGES CONSTITUTIONAL VIOLATIONS

### A. The Fifth Amendment Takings Clause

Plaintiff is not alleging that the Government is literally mandating organ donation. Rather, the Plaintiff argues that the Government is creating a system of moral and structural compulsion: one in which citizens like Plaintiff, motivated by religious and ethical convictions, feel a binding duty to donate a second kidney or liver segment to save the lives of others. In this environment, the Government actively relies on the moral force of voluntary donation while simultaneously stripping the market of any legal channel for reciprocal compensation.

This is a regulatory taking not because Plaintiff is being forcibly harvested, but because the Government is suppressing only one half of a double-sided market—refusing to allow even modest, life-value-aligned compensation for donors while permitting payment for other bodily services like sperm donation or compensated surrogacy, which involves gestating and delivering an entire baby, composed of a full set of organs. This selective prohibition distorts the ethical economy and denies Plaintiff the right to bargain for fair recompense in a system that depends on his sacrifice.

The harm is not hypothetical. The British Medical Journal study already submitted and reattached to this Response ("Lifetime risks of kidney donation: a medical decision analysis") shows an average lifespan reduction of 0.5 to 1 year for living kidney donors. See Kiberd BA, Tennankore KK. Lifetime risks of kidney donation: a medical decision analysis. BMJ Open. 2017 Sep 1;7(8):e016490. The U.S. Government internally values a Quality Adjusted Life Year (QALY) between $100,000 and $150,000. See U.S. Department of Health & Human Services, Guidelines for Regulatory Impact Analysis (2016), Table VII-1. Denying compensation for this sacrifice, while extracting life-preserving benefits for society, constitutes a constructive taking under modern Fifth Amendment principles. See Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).

## B. The First Amendment Free Speech Clause

The Assistant U.S. Attorney's argument misapprehends the nature of expressive conduct and the scope of First Amendment protections. To assert that there is "no commonality" between cash used to promote political speech and cash used to promote ethical, lifesaving organ donation is to ignore the very logic that underpinned Citizens United v. Federal Election Commission, 558 U.S. 310 (2010)—that money enables and amplifies protected speech, whether sect-religious, civic religious, or political.

Plaintiff does not contend that selling an organ is itself "speech" in the abstract. Rather, the crux of the argument is that a ban on all financial incentives for living organ donation silences and suppresses a specific form of advocacy: namely, regulated and ethical appeals that combine speech with meaningful incentive to inspire difficult, altruistic, lifesaving action. Without the ability to offer financial recognition, we are left shouting into the wind with our indoor voices, while the true scale of the organ shortage demands a bullhorn.

Prohibiting all forms of compensation—even by regulated nonprofit intermediaries—handicaps expressive activity that seeks not personal profit, but the salvation of lives. Advocacy organizations cannot fully inform or persuade potential donors if they are denied the tools proven to work—tools used, for example, in every other domain of social coordination, including blood donation, military service recruitment, and charitable giving. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976) (commercial speech entitled to First Amendment protection).

## C. The Religious Freedom Restoration Act (RFRA)

The Government's RFRA argument fails because it misunderstands both the religious nature of the Plaintiff's conduct and the real-world structure of religious service. Plaintiff, a religiously observant American and a religiously observant Jew, believes that preserving and extending the life of another person—particularly through non-lethal or reasonably safe sacrifice—is a sacred act of religious devotion. In both sectarian religious doctrine (Judaism) and broader American civic religion, the willful undertaking of risk to preserve life is an act with civic *and* sectarian religious weight, comparable to Sabbath observance or charitable giving. For Plaintiff, the act of preparing to donate and supporting donations of a non-vital organ is not just spiritual—it is religious service.

The Government argues that since donation is still allowed though not for sale, RFRA is not triggered. But this is no different than passing a law or allowing a preexisting law to survive that permits clergy to pray, but criminalizes any compensation for prayer services at five years in prison. Just as such a law would functionally destroy the ability of rabbis, priests, or imams to deliver routine prayer leadership for their communities—by removing the economic infrastructure that supports their livelihoods—NOTA substantially burdens Plaintiff's religious exercise by criminalizing the very form of reciprocity that allows such life-saving organ donor

action to be planned, routinized, and sustained at a scale that has a much more plausible likelihood of saving the lives of those on the transplant recipient list. See Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) (RFRA requires strict scrutiny for substantial burdens on religious exercise).

Religious practice is not limited to sectarian religion or unstructured moments of spiritual impulse. It includes institutionalized religious sacrifice, civic too, often coordinated, predictable, and enabled by payment and contracts for specific performance in exchange for valuable consideration. Payment does not profane a religious act—it can support and secure it, just as it does in surrogacy, which involves the compensated bearing of a full set of organs and tissues into the world for the benefit of another family. For the Government to allow compensation for sperm, eggs, and surrogacy—but prohibit it only for life-saving kidney or liver segments—creates a selective, discriminatory burden on a specific form of religiously motivated, altruistic bodily sacrifice. That is a substantial burden, and it is neither narrowly tailored nor consistent with RFRA. See Gonzales v. O Centro Espirita Beneficente União do Vegetal, 546 U.S. 418 (2006).

Please also note the Government has made no attempt in its Motion to plead any compelling Governmental justification for stripping altruistic living and deceased organ donors of more complete, reasonable, and fair negotiated compensation, in line with, for instance, the End Kidney Deaths Act legislation proposed in Congress (H.R. 9275), which the current Trump administration, as far as I know, has yet to take a definitive and meaningful public position on.

## VI. THE COMPLAINT IS NOT A "SHOTGUN PLEADING"

Defendant argues, or the Court may sua sponte consider, whether the Complaint constitutes an impermissible "shotgun pleading." However, that term is a narrow and disfavored basis for dismissal unless a pleading is so defective that the defendant literally cannot respond to it. That is

not the case here.

The Eleventh Circuit recognizes four types of "shotgun pleadings," including complaints that (1) contain multiple counts each incorporating all previous allegations, (2) are replete with conclusory, vague, and immaterial facts, (3) fail to separate different causes of action into separate counts, or (4) assert multiple claims against multiple defendants without specifying which applies to whom. See Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313, 1322–23 (11th Cir. 2015).

Plaintiff's Complaint does not fall into any of these categories. It contains detailed factual allegations, names a single defendant (the United States), identifies specific legal claims (e.g., constitutional challenges to 42 U.S.C. § 274e), and is presented in a good-faith, coherent narrative form.

But even if the Court concludes that any portion of the Complaint needs clarification or reorganization, dismissal is not the proper remedy. The Eleventh Circuit has made clear that when a pro se complaint is not "so vague or ambiguous that the defendant cannot respond," the correct path is not dismissal with prejudice but rather an order to amend. See Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018) ("When a litigant files a shotgun pleading, the district court should strike the pleading and instruct the litigant to replead.").

Furthermore, in the world of 2025, it is no longer reasonable to treat pro se pleadings as permanently disadvantaged when effective legal restructuring can now be cheaply and collaboratively achieved with Large Language Models (LLMs). As early as April 2023, leading LLMs surpassed the performance of the vast majority of new lawyers on the Uniform Bar Exam. This Court could be more future-forward and actively contribute to the pro se public's ability to file well-structured claims by providing guidance on proper structure rather than seeking

dismissal.

# VII. THE COURT SHOULD INTERPRET NOTA TO PERMIT VQALY-BASED COMPENSATION

Even if this Court is reluctant to find NOTA unconstitutional, it should interpret Title III of the National Organ Transplant Act to permit compensation for living donors based on their documented statistical loss of Value of Quality Adjusted Life Years (VQALY). Such an interpretation would harmonize NOTA with established federal policy recognizing the economic value of statistical health and life impacts.

On February 13, 2025, the Trump Administration's Department of Health and Human Services published official guidance establishing monetary values for Quality Adjusted Life Years. See HHS-ASPE, "Valuing Health Outcomes: Standard Values for Use in Federal Regulatory and Health Impact Analyses" (Feb. 13, 2025). This guidance provides authoritative federal valuations directly from the Trump administration itself.

For a 40-year-old donor like Plaintiff (currently age 39.2), the Trump administration's own tables establish these values at a 3% discount rate:

**Value per Statistical Life Year (VSLY) for 40-year-old:**

- Low Estimate: $282,000

**Value per Quality-Adjusted Life Year (VQALY) for 40-year-old:**

- Low Estimate: $335,000

These are the Trump administration's own extremely conservative "Low Estimate" valuations.

Given that peer-reviewed medical literature documents an average statistical reduction of 0.5-1 year in life expectancy for living kidney donors (Kiberd & Tennankore, BMJ Open 2017), even using these most conservative Trump administration figures, the statistical economic loss to a 40-year-old donor ranges from $141,000-$282,000 using VSLY, or $167,500-$335,000 using VQALY measurements.

NOTA prohibits "valuable consideration" but does not define this term. 42 U.S.C. § 274e. Courts should interpret this ambiguity to exclude compensation that merely offsets documented statistical medical losses—just as NOTA already permits reimbursement for lost wages and medical expenses.

Plaintiff seeks $54,000 in compensation—triple chai (חי), where chai represents the Hebrew numerical value of 18 symbolizing life. This amount represents merely 19% of the lowest possible statistical loss ($282,000 VSLY) and just 16% of the VQALY loss ($335,000), using the Trump administration's own most conservative estimates. When a donor sacrifices $141,000-$335,000 in statistical life value according to the Trump administration's calculations, compensating them at $54,000 represents partial loss mitigation, not profit.

This interpretation would:

   1.  Align NOTA with the Trump administration's own federal health policy valuing statistical life impacts

   2.  Recognize donors' quantifiable statistical sacrifices using the government's own conservative metrics

   3.  Permit modest compensation up to 50% of actual statistical losses—ensuring donors never profit while bearing meaningful uncompensated sacrifice for society's benefit

   4.  Honor the religious and cultural significance of preserving life (chai) while maintaining

NOTA's core purposes

5.  Create a bright-line rule allowing compensation up to a reasonable percentage of documented VQALY losses

Even compensation at 50% of statistical losses would leave donors bearing substantial uncompensated sacrifice. This ensures no profit motive while providing meaningful recognition of their statistical life-year sacrifice. The Court need not invalidate NOTA to provide relief—it need only recognize that compensation proportional to documented statistical VQALY losses, particularly when using the Trump administration's own valuations and when compensation remains at or below 50% of those losses, falls outside "valuable consideration" as Congress intended that term.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Deny the Defendant's Motion to Dismiss;

2.  Hold a hearing on the merits of this case;

3.  Recognize an exception to the general bar on pro se entity pleading for nascent public interest organizations;

4.  Find that Plaintiff has standing both as a prospective organ donor (or grant a stay if needed on this basis) and as an employer and political candidate seeking to implement an imminent and immediate organ donation incentive program;

5.  Rule that employer organ donation incentive programs do not violate the ADA when properly structured;

6.  Allow amendment if needed rather than dismissal with prejudice;

7.  Proceed to address the constitutional and statutory claims on their merits.

8.  Revive and apply the TRO and Preliminary Injunction now that the Court has been initially briefed by the Government on its first reaction to this proceeding.

I failed here slightly to conform to the presumptive 20 page limit, but I ask that any draconian page limit rule be reviewed under the "strict scrutiny" strictures of the Religious Freedom and Restoration Act. My RFRA-related life-preserving claims, American civil religion-fronted and Jewish sectarian-backed, that suffuse this claim are the difference between staying within the Local Rule page limit and being 3 pages over, and I plead with the Court for some leniency – this is a complex, detailed set of arguments that doesn't simply fit in the Procrustean 20 page limit, even with some AI drafting help.

Harmlessly,

s/Plaintiff David Clayman
Currently still *Pro se*
For the Proposed Center Forward Party of
Harmless Hands, aka the Miracle Berries
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@harmlesshands.org

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response to the Motion to Dismiss was sent out to the United States Attorney for the Southern District of Florida via electronic mail on the deadline date of Tuesday, June 10, 2025, and mailed via certified mail to the Court on the same day.

Harmlessly,

s/Plaintiff David Clayman
Currently still *Pro se*
7930 Palacio Del Mar Drive
Boca Raton, FL 33433-4148
+1 (321) 252 - 9626
david@harmlesshands.org

## APPENDICES

I.    May 25, 2025 Memorial Weekend email to Assistant US Attorney Darcie Thompson and her response, pushing the burden of proof back on her and her office in seeking to ascertain from her office with conclusory finality whether Plaintiff or anyone similarly situated is or is not under actual and real imminent threat of prosecution by this US Attorney, any other US Attorney, or the Attorney General and any deputies of the same under any federal law, or whether Title III of the National Organ Transplant Act and all related criminal and civil penalty statutes can be stricken down and removed immediately from the US Code as unenforced and unenforceable.

II.    June 10, 2025 Update and emailed organ donor incentive offers to Assistant US Attorney Darcie Thompson.

III.    March 28, 2025 Comment in the online edition of the Journal of the American Medical Association. Clayman, David. "Are the authors living donors or armchair dining philosophers? What exactly qualifies them to hold these oppositions?" In response to the authors' article, "The End Kidney Deaths Act Risks Irreversible Harm to Organ Donation". Compares the organ donor shortage quantitatively to the September 11th World Trade Center disasters and crises. In this case, we need not invade Afghanistan (or Iraq) to preserve a high quotient of life at an acceptable loss of volunteer life. We just need to unleash reasonable, well-regulated market forces.

IV.    Kiberd BA, Tennankore KK. Lifetime risks of kidney donation: a medical decision analysis. British Medical Journal (BMJ) Open. 2017 Sep 1;7(8):e016490. doi: 10.1136/bmjopen-2017-016490. PMID: 28864484; PMCID: PMC5588992. Reattached for the third time.

V.    U.S. Department of Health and Human Services. Office of the Assistant Secretary for Planning and Evaluation. (2025). *Standard RIA values for regulatory analysis* (Publication No.

ASPE-2025).



David Clayman <david@clayman.org>

## Urgent question A, re: Response to Motion to Dismiss

David Clayman <david@clayman.org>
To: "Thompson, Darcie (USAFLS)" <Darcie.Thompson@usdoj.gov>

Tue, May 27, 2025 at 10:31 AM

Hi Darcie,

Thanks, it was a good weekend overall.

Thanks for agreeing to the extension.

Just, can you please explain why "it would not be proper for us to discuss" whether I'm under credible threat of prosecution from your Office? What makes that discussion improper?

If you won't explain it to me directly, would you at least commit to explaining your Office's position on prosecuting or not prosecuting Title III of NOTA to the Court on a timely basis? As an entity, you can't reasonably have it both ways: when convenient for a case dismissal on standing grounds raising doubts about whether someone like me could be prosecuted while simultaneously being the entity ultimately in charge of all decisions on those same prosecutions. I really do think your Office needs to pick a lane about whether you're enforcing Title III of NOTA or not and needs to disclose that to the Court and me rather than trying to profit legally on both sides of prosecutorial ambiguity.

Hope to hear from you soon.

All the best,
David

On Tue, May 27, 2025 at 9:51 AM Thompson, Darcie (USAFLS) <Darcie.Thompson@usdoj.gov> wrote:

Dear David:

Thank you for your email, and I hope you had a nice weekend.

We agree to a one-week extension on your response to the Motion to Dismiss.

As far as your remaining questions and issues, it would not be proper for us to discuss those.

Sincerely,

**Darcie A. Thompson**

Assistant United States Attorney

Southern District of Florida

500 S. Australian Avenue, Suite 400

West Palm Beach, Florida 33401

Direct: (561) 209-1010

Email: darcie.thompson@usdoj.gov

**From:** David Clayman <david@clayman.org>
**Sent:** Sunday, May 25, 2025 12:12 PM
**To:** Thompson, Darcie (USAFLS) <Darcie.Thompson@usdoj.gov>
**Subject:** [EXTERNAL] Urgent question A, re: Response to Motion to Dismiss

Dear Darcie,

I'm working on a response to your Motion to Dismiss right now over the Memorial Day Weekend. I have some urgent questions about it that, if possible, I'd love to have an answer or preliminary reaction to before I send in my response.

<u>If you'd be willing to agree to a week-long Extension of Time on this Response to the Motion to Dismiss, I would appreciate that as well, as it would afford me enough time to get more of my ducks in a clearly-explainable row on this and other legal questions that bear on my suitability for living organ donation.</u>

First, calling this Urgent Question A, you point to the *Bellocchio v Garland* case which suggests, in part, that I might need to establish a credible threat of prosecution for putting my kidney or part of my liver up for sale, as I can show I've already taken steps to do in negotiations with organ transplant centers I've contacted.

Would your US Attorney's Office be willing to issue an official, immediate, blanket, irrevocable, cross-jurisdiction federal **Non-Prosecution Agreement Letter** to me and others like me and any potential buyers I or others like me may ever find related to any violation of Title III of the National Organ Transplant Act prohibiting the sale of organs and tissues? Or is the threat of prosecution still something that hangs over me and others like me from the US Attorney's Office like a Damocletian sword if I/we proceed with attempting to effectuate a sale of my kidney or liver segment/gallbladder?

This is a question you should be uniquely suited to answer, given your close proximity to and membership within the organizational hierarchy of the civil and criminal prosecutorial authority of these United States. I don't have the same contacts you do, and if I openly inquire about my intent to sell my organs outside the context of this Court pleading for permission to do the same I have credible fear that I might be immediately arrested and arraigned. I've been arrested on lesser grounds before; I don't want to get arrested again on yet another poorly-motivated misunderstanding. To put it blankly, I'd rather handle this in civil court rather than calling around to prosecutors announcing my motive and intentions to verify or test their eagerness to prosecute, exposing myself to arrest and forcing myself to plead this in criminal court under much deeper legal jeopardy.

Can you please speak with your leadership quickly and clarify, for the record, whether I'm as a matter of absolute fact now or ever under threat of prosecution or not for violations of NOTA? For I think you're in a better position to clarify that question, and while you had an opportunity to in your Motion to Dismiss, you failed to come forward and plead facts or commit to a position to neuter or moot my criminal liability under Title III of NOTA. It really should be for you, not me, to establish as an undisputed, testable fact whether that threat of prosecution under NOTA is real or not under Attorney General Bondi, US Attorney Hayden O'Byrne, or any future Attorney General or US Attorney, or an unenforced and unenforceable section of law that the Courts or Congress have a duty to immediately remove from the statutory text so as not to chill such vital lifesaving market coordination and religious exchange.

If you want to provide me with a phone number or email address I can quickly reach out to to rapidly adjudicate the question of whether I suffer under threat of criminal liability. I'd be happy to send a letter or make a call to any prosecutor who can rapidly make that judgment in the circumstances I and others like me with concrete plans to sell their non-vital organs may be in. I'll be open with them about my concrete intentions to sell my kidney or a large chunk of my liver to bring a recipient or even several recipients back from the brink of imminent death, suffering some long-term but significantly lesser damage to my own health and likely lifespan in the process.

Please note that my second kidney, a large part of my liver (which is regenerable), and my gallbladder are **credibly non-vital right now**, not vital. Most medical science points to the operating assumption that I can live and survive without them, though I'll suffer and be injured without them, and I'll probably have a marginally shortened lifespan (the BMJ article I produced for the Court shows that my lifespan will statistically be anywhere from a half year to a full year shorter on average, with of course a lot of stochastic variability). I've gone through preliminary testing successfully for kidney donation including a 24 hour urine test; further testing may show otherwise, but as of right now these organs are and appear **non-vital to me but absolutely vital to the ultimate recipient.**

If you don't respond to this message, either in time for my response on the Tuesday, May 27th unextended deadline or soon thereafter with a responsive Court filing, I think that should be taken as "facial evidence" that the US Attorney's Office in the Southern District of Florida, and presumptively anywhere else in the United States, *do intend to or would credibly threaten to* prosecute me or others like me, or any potential buyers under the penalties of NOTA Title III, which include a fine of up to $50,000 USD and/or five years imprisonment, chilling any effectual real possibility of brokering a successful bilateral or multilateral sale and exchange of my presently non-vital organs to someone for whom they are immediately vital and lifesaving, through established and reputable institutions. (Official Note: I do not and never have had any intent to sell any of my presently non-vital organs on the black market or outside of the supervision of these United States.)

I'll include this email message as an Exhibit to my filing, especially if I don't receive a complete response in time for Tuesday's filing or at minimum a timely agreement on an extension of time so that we can have more time to confer and I can have more time to get more of my ducks in a row.

I may have other urgent questions as I continue working through the rest of this Motion to Dismiss. If so, I'll label them under separate cover as Urgent Question B, etc.

Sincerely,

David Clayman
Harmless Hands / Healthy Consent, PBC



David Clayman <david@clayman.org>

## Response to Motion to Dismiss

David Clayman <david@clayman.org>                                    Tue, Jun 10, 2025 at 1:14 PM
To: Darcie Thompson <darcie.thompson@usdoj.gov>

Quick correction: I'll offer you and any of my future employees $3,600 USD for kidney or liver living organ donation as detailed before. That's a more religiously salient, significant, and symbolic number tied to the core urgent mission: preserving life compassionately and cost-effectively at an acceptable level of religious and economic sacrifice.

On Tue, Jun 10, 2025 at 1:08 PM David Clayman <david@clayman.org> wrote:
Dear Darcie,

I hope you had a great weekend

I just finished drafting a response to your Motion to Dismiss in the Living and Deceased Organ donor incentives case. Here's what I currently believe I'll be sending off to the Court today via certified mail. If I notice any defects between now and my drive home or make any further changes before printing and sending at the post office, I'll let you know and send an updated file.

For convenience, you can find the 2016 HHS governmental guidelines on the Value of a Quality Adjusted Life Year here: https://aspe.hhs.gov/sites/default/files/migrated_legacy_files/171981/HHS_RIAGuidance.pdf

Reviewing those 2016 guidelines, given that I'm only seeking $54,000 (triple chai) for an expected loss of a QALY half-year or QALY full year, I appear to be objectively selling my statistical lifespan significantly below the government's Health & Human Services prevailing market rate, at any VSL (Value of Statistical Life) common denominator. As the most major market payor, if you'd like the Government to offer altruistic injury-compensation closer to (at less of a shortfall from) the market value of the QALYs that I and other aspiring living donors are open to sacrificing to extend fellow Americans' lives, I'm / we're rational enough to be open to that, subject to Court and/or Congressional supervision, and I personally would plow any such income directly into civic religious causes. Until we actually seek and/or receive compensation *beyond* QALY injury compensation, it's hard to say that we're "selling" our organs. It's only correct to say that we're donating them at a loss. Until we reach and exceed our value of QALY loss, we remain non-profit altruistic donors rather than profiting sellers. Please don't cast us otherwise. I don't think there's anything to be ashamed about in honorably profiting modestly from living or deceased organ donation action, but even at a $54,000 USD exchange price we're still deep in the territory of the religiously altruistic civic and/or sectarian donation market

I would also personally extend an irreversible incentive bonus offer to you, Darcie, as an individual, of $3,000 USD if you follow-through with and effectuate donating a major segment of your liver or your second kidney (assuming you still carry two) by the end of this year, 2025 AD/CE, subject to Court supervision, medical qualification, and judgment that such an offer is legal and constitutionally protected, and not in violation of any other law like the ADA. We can work out the nitty-gritty details if you're interested and the Court allows such an offer to proceed. Obviously, further exploring and accepting such an offer must be accompanied by a clear agreement from the US Attorney's Office not to prosecute me or anyone like me for making such offers to you or any others residing in the United States in the future.

Looking forward to your eventual reply and the Judge's decision.

All the best,
David

Journal of the American Medical Association of the conference
https://jamanetwork.com/journals/jama/fullarticle/2832002

r Response to the article    The End Review Disabled Antibody Unveiling A Threat to
Organ Donation"

March 28, 2025

**Comment 1: Are the authors living donors or armchair dining philosophers? What exactly qualifies them to hold these oppositions?**
**David Clayman, BS, BA** | Harmless Hands (Nascent Political Party)
Dear JAMA Community.

I have several comments to make but this will be the last.

I would appreciate it if the authors (Muntza  Malankas, Dane vitch, and Nagral) were to declare and explain their personal effort and journey to being living organ donors themselves.

If they've donated kidney themselves I would applaud them for being part of the solution rather than part of the problem  and I'd have an easier time believing that these arguments are being made in good faith.

If they haven't donated kidney themselves I would be very interested to know their reasons why they haven't  is it because they were medically disqualified  or was it because the "neutral" incentives made it economical those  who are more right concern about the health risks and personal tradeoff  organ donation

The authors clearly explain what qualifies them to lead on  this position and criticize incentives  This article in JAMA was  created after my meeting  Vice President Transplant Surgery at a University I was seeking immunological support to help my effort at negotiation over living donor incentives, something I've been seeking under the laws enabling religious freedom in United States

Dylan Mathews wrote an excellent response to this article  [The Moral Case for Paying Kidney
Donors](https://www.vox.com/future-perfect/13/724/ Meet a kidney-mouths act kidney-dono
-tax-credit) that I would recommend  use all readers  anyone  more  sober about  and unlike
what I suspect is the case with the  authors, Dylan Mathews actually gave a kidney to
someone dying in need rather than standing on the sidelines  as these authors do

sniping at any algorithmic possibil... of the donor ... ... ... do their
utmost to take to the field and give in this immoral emergency.

Let's put this problem into very rough perspective and profit... that ... ug World Trade
Center Attack (911) units. If 47,00... ... are dying each year... if ... ... prematurely
we're talking about the loss of ... 000 years of human year. With average lifespan at
about 78.4 in United States, that's roughly 6,000 full lifespans that we're losing every
year, which we could reverse at the cost of maybe 60,000 ... ... ... ... 0.1 ...
donor lives on average per year. Save or ... ... ... ... ... at the scale of the
911 attack every year, and we can stop it at the cost of altruistic lifesavers lives.

And these authors want all the potential lifesavers to urgently breach and risk
death to stop these 2 911 attacks per ye... ... ... ... ... meaningful
incentives for their moderately dangerous highly altruistic labour.

Perhaps these authors think that his First Responder ... ... ... ... on 11
September 02011 should have been a simply unincentiv... ... ... giving force
operating on altruism and idealist ... to help the mourning strong ... of the people of
New York. Surely some firefighters would sign up for that, like Evan Mathews ... and like
me (if need be). But would the authors sign on for long enough ... ... without
adequate hygiene factor incentives? I have tra ...

I'd very much like to read their response on that. And again, I'd be chuffed and so
pleased if they've given anything more than lip service to this vigorous and
a most unqualified non-expert ... ... ... ... ... robust approach
that's failed abjectly for decades reflects a deeper and quantitatively unrealistic personal
cynicism about the necessary role of living donors.

Authors, please come forward and ... ... what ... ... ... ... ... to donate
kidney yourselves

CONFLICT OF INTEREST: As an aspiring living altruistic undirected kidney and liver
donor, I may directly benefit from any ... trans... of organs ... ... ... ... the living or
deceased kidney or liver donations.

Open Access

Research

# BMJ Open Lifetime risks of kidney donation: a medical decision analysis

Bryce A Kiberd, Karthik K Tennankore

**To cite:** Kiberd BA, Tennankore KK. Lifetime risks of kidney donation: a medical decision analysis. *BMJ Open* 2017;7:e016490. doi:10.1136/bmjopen-2017-016490).

► Prepublication history and additional material for this paper are available online. To view please visit the journal (http://dx.doi.org/10.1136/bmjopen-2017-016490).

Received 17 February 2017
Revised 25 July 2017
Accepted 27 July 2017

## ABSTRACT

**Objective** This study estimated the potential loss of life and the lifetime cumulative risk of end-stage renal disease (ESRD) from live kidney donation.

**Design** Markov medical decision analysis.

**Setting** USA.

**Participants** 40-year-old live kidney donors of both sexes and black/white race.

**Intervention** Live donor nephrectomy.

**Main outcome and measures** Potential remaining life years lost, quality-adjusted life years (QALYs) lost and added lifetime cumulative risk of ESRD from donation.

**Results** Overall 0.532–0.884 remaining life years were lost from donating a kidney. This was equivalent to 1.20%–2.34% of remaining life years (or 0.76%–1.51% remaining QALYs). The risk was higher in male and black individuals. The study showed that 1%–5% of average-age current live kidney donors might develop ESRD as a result of nephrectomy. The added risk of ESRD resulted in a loss of only 0.126–0.344 remaining life years. Most of the loss of life was predicted to be associated with chronic kidney disease (CKD) not ESRD. Most events occurred 25 or more years after donation. Reducing the increased risk of death associated with CKD had a modest overall effect on the per cent loss of remaining life years (0.72%–1.9%) and QALYs (0.58%–1.33%). Smoking and obesity reduced life expectancy and increased overall lifetime risks of ESRD in non-donors. However the percentage loss of remaining life years from donation was not very different in those with or without these risk factors.

**Conclusion** Live kidney donation may reduce life expectancy by 0.5–1 year in most donors. The development of ESRD in donors may not be the only measure of risk as most of the predicted loss of life predates ESRD. The study identifies the potential importance of following donors and treating risk factors aggressively to prevent ESRD and to improve donor survival.

## Strengths and limitations of this study

► The study projects the long-term risk of donating a kidney, including loss of life and the added risk of end-stage renal failure.

► These findings help quantify and communicate risk to potential donors and convey the importance of lifelong follow-up in actual donors.

► The study uses evidence of over 15 years of follow-up in actual live kidney donors and healthy controls.

► The ability to predict lifetime outcomes from 15-year follow-up in donors of all ages and medical conditions is a limitation.

risks are also presumed to be small especially in low-risk donors who are adequately screened. Recent reports however show that there is some increase in risk of end-stage renal disease (ESRD) from donation and possibly an increase in cardiovascular mortality.[5][6] Patients who donate a kidney may be at greater risk of developing chronic kidney disease (CKD) as defined by a low glomerular filtration rate (GFR) of <60 mL/min/1.73 m$^2$ or proteinuria.[7] Furthermore, some donors will develop diabetes mellitus at a later date despite being screened and may be at higher risk of developing hypertension.[8][9] These conditions could accelerate the loss of kidney function and increase the risk of ESRD. CKD is associated with an increase in risk of progression to ESRD and an increase in predialysis mortality.[10]

A recent report projected the 15-year and lifetime risk of ESRD in potential non-donors to assist in counselling patients who are considering donation.[11] Those with minor medical abnormalities, men and individuals of black race had greater 15-year and lifetime risks of ESRD. Although this study also projected 15-year risks of ESRD in average donors, the effect on lifetime ESRD risk and reduced life expectancy was not calculated. Knowing the overall effect of donation on remaining life years and remaining quality-adjusted life years (QALYs) is important if risk is to be put into context with other behaviours and environmental exposures. Therefore, the

## INTRODUCTION

Nearly 30 000 live donor kidney transplant surgeries are performed throughout the world each year.[1] The benefits to the recipients are substantial in terms of improved life expectancy and quality of life compared with dialysis or deceased donor transplantation.[2] The risks to the donors are generally felt to be small to modest, with a low postoperative mortality (approximately 3.1 deaths per 10 000 operations).[3][4] The long-term



Department of Medicine, Dalhousie University, Halifax, Nova Scotia, Canada

**Correspondence to**
Dr Bryce A Kiberd;
bryce.kiberd@nshealth.ca

BMJ Open: first published as 10.1136/bmjopen-2017-016490 on... Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Open Access



**Figure 1** Markov model. CKD, chronic kidney disease; DM, diabetes mellitus; ESRD, end-stage renal disease; HTN, hypertension; P, proteinuria.

objectives of this study were to estimate the potential loss of life as well as the added lifetime risk of ESRD in average-age-risk kidney donors.

## METHODS
### Model description
A USA-based Markov model was used to examine the risk of ESRD in a population of non-donors and donors. The transition from the normal health state through other health states is shown in figure 1.

The following are the key assumptions for the model:

▶ ESRD rates are increased in donors compared with non-donors.[11]
▶ ESRD in both donors and non-donors will be associated with high mortality rates.
▶ Donor and non-donors transition through a CKD state for at least 1 year before developing ESRD.
▶ Since ESRD rates are increased in donors compared with non-donors, we assumed there must have been an increase in the rate of transition to and time spent in CKD states.
▶ Nephrectomy in donors will quantitatively reduce overall patient kidney function. Given that kidney function declines over time in most individuals, donors will have a greater risk of falling below a GFR threshold of 60 mL/min/1.73 m² compared with non-donors.
▶ Cohorts are assumed to be free of hypertension, diabetes mellitus and proteinuria at donation. However they are at risk of developing these conditions whether they donate or not, and these will impact patient survival and loss of kidney function in both donors

and non-donors. Given that some individuals may be at higher or lower risks of diabetes mellitus and proteinuria, smoke or are obese, we examined these in additional sensitivity analyses. Diabetes mellitus in non-donors would follow the same pattern (increasing rates with age) as in the general population even though absolute rates might be lower (if initially screened to be negative).

▶ CKD states will be associated with higher mortality rates as in the general population, but the magnitude of this effect was examined in additional sensitivity analyses.
▶ Model transition rates from normal to CKD states could be empirically derived (by working backwards) to reproduce observed 15-year cumulative incidence rates for ESRD in donors and non-donors and can be used to subsequently project lifetime cumulative risks of ESRD. CKD in non-donors would follow the same pattern (increasing rates with age) as in the general population but at overall lower rates.

A previously published model was updated to include current general population and ESRD vital statistics, and current cumulative risks of diabetes mellitus, CKD and ESRD from published sources[12–15] (online supplementary material). The model was developed using TreeAge Pro 2015 (TreeAge Software, Williamstown, Massachusetts, USA). Given that this is a theoretical model that uses published population data, ethics approval was not required.

### Patient involvement in study design
The study design, development and research question did not involve patient input, nor were outcomes measured

BMJ Open: first published as 10.1136/bmjopen-2017-016490 on ... Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Open Access

by patient priorities. There was no patient recruitment or participation in this study but rather the study relied on prior published analyses.

## Target population

The base case cohorts were 40-year-old patients of both sexes and white/black race from the USA. This is the mean age of live donors (median age 38) and for whom there are recent published estimates of 15-year cumulative risks of ESRD in non-donors and donors.[5][11][16]

## Main outcome measures

The health outcome of interest was remaining years of life (undiscounted). Since quality of life is reduced in patients with ESRD and other related health states, and that these events are downstream, life years were scaled by measures of quality and discounted at a 3% rate of time preference to calculate QALYs. Lifetime cumulative incidence of ESRD was also calculated.

## Intervention effects

Donors in the study underwent unilateral nephrectomy. It is assumed that the nephrectomy results in a loss of GFR, and this loss of function would increase the probability of transitioning from a normal (GFR $\geq$60 mL/min/1.73 m²) kidney function health state to CKD.

## Time horizon

The time horizon for remaining life years and QALYS was lifetime. However, for ESRD, the cumulative incidence was truncated at age 90 in keeping with other studies.[11]

## Analysis, design and outcomes

All analyses compared outcomes of the same population of healthy potential donors and modelled the effects if all donated. Primary outcomes were the net difference in remaining life years, QALYs and development of ESRD. In addition we examined the loss of life attributed to ESRD by eliminating the ESRD health state in both donors and non-donors and assumed all remained in CKD until death. In the base case analysis, age, sex and black/white race annual transition rates for proteinuria, diabetes mellitus and hypertension were empirically derived from population studies assuming that donors were initially disease-free but could subsequently develop these conditions at rates seen in the general population. Transition rates from normal to CKD stage 3 and higher were derived from a previous study.[14] The cycle length was 1 year. These rates were multiplied by an empirically derived coefficient that was lower in non-donors and higher in donors to reproduce the 15-year cumulative risk of ESRD in average-age non-donors and donors.[11] Non-donors were assumed to have 15-year cumulative ESRD risks of 0.067%, 0.015%, 0.21% and 0.12% for white male, white female, black male and black female, respectively. Donors were assumed to have 15-year cumulative ESRD risks of 0.34%, 0.15%, 0.96% and 0.59% for white male, white female, black male and black female, respectively.

## Uncertainty and sensitivity analyses

We assumed that many future risks that can impact on life expectancy and ESRD such as cancer, obesity, smoking and so on were not influenced by the act of kidney donation. The lifetime estimates of ESRD were found to be higher in non-donors than published estimates, in part since this model incorporated the possibility that some participants could develop diabetes mellitus and proteinuria.[11] In a sensitivity analysis a lower risk 'ideal' cohort was examined. These 'ideal' non-donors were assigned lower incidence rates of diabetes mellitus, proteinuria and rates of transition to CKD to match projected lifetime ESRD risks[11] rather than calibrating to 15-year ESRD risks. Non-donors were assumed to have lifetime cumulative ESRD risks of 0.13% (95% CI 0.19 to 0.58), 0.29% (95% CI 0.13 to 0.17), 1.00% (95% CI 0.19 to 1.37) and 0.85% (95% CI 0.37 to 1.35) for white male, white female, black male and black female, respectively.[11] To evaluate a more conservative and more liberal estimate of remaining life years, lost life years postdonation, remaining QALYs and lost QALYS postdonation, we used higher and lower transition rates from normal to CKD states that corresponded to the upper and lower bound of the 95% CI of the projected cumulative risk of ESRD from a study by Grams *et al*.[11]

Given that the increase in mortality associated with CKD is an important driver of life years lost, one sensitivity analysis we assumed that the added time spent in isolated CKD (no proteinuria nor diabetes mellitus) in donors compared with non-donors was not associated with an increase in mortality. In other sensitivity analyses age at donation, smoking status, higher body mass index, new-onset diabetes mellitus and biological relationship to recipient were explored. A supplement is provided with additional details of the analysis.

## RESULTS

### Baseline analysis

The projected survival of average-age donors and non-donors is shown in figures 2–5. Differences in survival between the cohorts became apparent after 20 years or more after donation. As shown in table 1, the remaining life years lost from donation ranged between 0.53 years for white female and 0.884 years for black female donors. The per cent loss of life was highest in black male donors. The per cent loss of life varied from 1.20% for white female to 2.34% for black male. The per cent loss of total QALYs varied from 0.76% for white female to 1.53% for black male.

Live kidney donation was associated with an added risk of ESRD especially among those of male sex and black race. The added lifetime cumulative risk of ESRD varied from 1.135% in white female to 4.645% in black male (table 1). This translated to one added ESRD event for every 88 white female donors or one added ESRD event for every 22 black male donors. More than 50% of all ESRD events in donors occurred 25 years or more after donation. The added ESRD events tended to occur

BMJ Open: first published as 10.1136/bmjopen-2017-016490 on ... Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Open Access



**Figure 2** Overall survival for donor and non-donor: average white male.



**Figure 4** Overall survival for donor and non-donor: average black male.

carlier in black male compared with white male. The per cent loss of life attributed to ESRD in relation to total remaining years of life varied between 0.20% for white female and 0.88% for black male (table 1).

In a sensitivity analysis, the added cumulative risks of developing ESRD were projected to be lower in the 'ideal' cohort especially for white male (1 in 63) and female (1 in 155) compared with the base case analysis (table 2). Despite differences in the absolute rates of ESRD in both donors and non-donors, the absolute and per cent loss of life years and QALYs from donation were only modestly lower compared with the base case analysis (table 1).

Donors were projected to spend 50%–85% more time with an isolated low glomerular filtration rate CKD (CKD not associated with diabetes mellitus or proteinuria) compared with non-donors. Assuming the added proportion of time spent with isolated low glomerular filtration rate CKD had no increase in all-cause mortality rate, the loss of remaining life years was 0.551, 0.316, 0.682 and

0.721 for white male, white female, black male and black female, respectively. This corresponded to an overall per cent loss of remaining life years of 1.38%, 0.79%, 1.9% and 1.74% for white male, white female, black male and black female, respectively.

In a variety of subgroup analyses (table 3) younger patients lost more potential years of life and had potentially greater risks of ESRD given longer exposure to reduced kidney function. However on a percentage basis, loss of life was greater in older compared with younger donors. Life expectancies were markedly reduced and lifetime risks of ESRD increased for cohorts who were smokers or had diabetes mellitus. Obese patients were also at increased risk but less so compared with smokers and those with diabetes mellitus. Surprisingly the absolute loss of life years was slightly less in donors who were obese or smoked compared with donors without these conditions. Donors with diabetes mellitus suffered the greatest loss of life years and increased risk of ESRD. Non-biological relationship to the recipient was associated with much lower loss of life years and risk of ESRD compared with those who were biologically related.



**Figure 3** Overall survival for donor and non-donor: average white female.



**Figure 5** Overall survival for donor and non-donor: average black female.

Kiberd BA, Tennankore KK. BMJ Open 2017;7:e016490. doi:10.1136/bmjopen-2017-016490

BMJ Open: first published as 10.1136/bmjopen-2017-016490 on ... Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Open Access

**Table 1** Net effect of donation on survival and ESRD in current donors assuming average future population risks

| Outcome | White male | White female | Black male | Black female |
|---|---|---|---|---|
| Remaining life years, non-donor | 39.578 years (39.513 to 39.819)* | 43.992 years (43.872 to 44.46) | 35.945 years (35.768 to 36.112) | 41.551 years (41.249 to 41.803) |
| Lost life years (%) postdonation | −0.767 (1.94%) (−0.702 to −1.008) | −0.532 (1.2%) (−0.412 to −0.804) | −0.841 (2.34%) (−0.664 to −1.008) | −0.884 (2.13%) (−0.582 to −1.136) |
| Remaining QALYs, non-donor | 21.871 QALYs (21.849 to 21.951) | 23.256 QALYs (23.218 to 23.338) | 20.419 QALYs (20.358 to 20.476) | 22.151 QALYs (22.058 to 22.223) |
| Lost QALYs (%) postdonation | −0.272 (1.24%) (−0.250 to −0.352) | −0.177 (0.76%) (−0.139 to −0.259) | −0.308 (1.51%) (−0.247 to −0.365) | −0.293 (1.29%) (−0.190 to −0.355) |
| Cumulative lifetime ESRD, non-donor % | 1.118% (0.568 to 1.397) | 0.535% (0.254 to 0.713) | 1.257% (0.731 to 1.974) | 1.157% (0.621 to 2.106) |
| Added cumulative ESRD % postdonation | +3.858% (1/26) (1/23 to 1/28) | +1.135% (1/88) (1/71 to 1/100) | +4.645% (1/22) (1/19 to 1/25) | +3.741% (1/27) (1/23 to 1/33) |
| Loss from ESRD | | | | |
| Life years (%) | −0.292 (0.74%) | −0.126 (0.29%) | −0.344 (0.88%) | −0.297 (0.71%) |
| QALYs (%) | −0.094 (0.43%) | −0.039 (0.17%) | −0.128 (0.62%) | −0.090 (0.41%) |

*Values in parentheses represent the impact of higher and lower cumulative risks of ESRD taken from the upper and lower bounds of the 95% CIs for 15-year cumulative risk of ESRD (online supplementary ref 11).
ESRD, end-stage renal disease; QALYs, quality-adjusted life years.

## DISCUSSION

Knowing the long-term risks associated with kidney donation is important to potential donors and their providers. The focus of existing studies has been on the increase in ESRD risk resulting from kidney donation. In this study we show that donation potentially shortens life in average-age donors by about 1%–2%. This analysis shows that short-term studies (<20 years) even with appropriate normal controls are not likely to detect an adverse effect on survival. Although ESRD is associated with very high mortality rates, a significant per cent of the loss of life was associated with CKD not ESRD. The study also explored risk factors that can be associated with higher rates of death and ESRD such as smoking, obesity and biological relationship to the recipient.

Death during the CKD health state accounted for most of the projected increase in mortality and reduction in QALYs. Intuitively this makes some sense given that the transition from CKD to ESRD can be over many years and that progressive kidney disease is associated with graded increases in mortality.[10] The mechanism by which low glomerular filtration rate CKD is associated with an increase in cardiovascular and all-cause mortality rate is not completely known. Based on current literature it is unclear whether there is a significant risk of death from donation, but studies have had relatively small numbers,

**Table 2** Sensitivity analysis: net effect of donation on survival and ESRD in 40-year-old ideal donors assuming reduced future population risks

| Donation effects | White male | White female | Black male | Black female |
|---|---|---|---|---|
| Remaining life years, non-donor | 41.100 years (41.017 to 41.298)* | 45.571 years (45.397 to 45.810) | 37.236 years (37.006 to 37.317) | 43.352 years (43.142 to 43.655) |
| Lost life years (%) postdonation | −0.572 (1.39%) (−0.489 to −0.770) | −0.462 (1.0%) (−0.162 to −0.575) | −0.799 (2.1%) (−0.699 to −1.011) | −0.824 (1.9%) (−0.614 to −1.127) |
| Remaining QALYs, non-donor | 22.431 QALYs (22.404 to 22.492) | 23.765 QALYs (23.712 to 23.834) | 20.954 QALYs (20.918 to 21.022) | 22.806 QALYs (22.743 to 22.890) |
| Lost QALYs (%) postdonation | −0.191 (0.85%) (−0.164 to −0.252) | −0.143 (0.62%) (−0.049 to −0.171) | −0.292 (1.39%) (−0.257 to −0.360) | −0.260 (1.14%) (−0.197 to −0.344) |
| Cumulative ESRD, non-donor % | 0.43% (0.185 to 0.584) | 0.29% (0.133 to 0.469) | 1.00% (0.487 to 1.374) | 0.851% (0.371 to 1.354) |
| Added cumulative ESRD % postdonation | +1.59 (1/63) (1/54 to 1/69) | +0.643% (1/155) (1/100 to 1/324) | +3.80% (1/26) (1/23 to 1/28) | +2.85% (1/35) (1/30 to 1/39) |

*Values in parentheses represent the impact of higher and lower cumulative risks of ESRD taken from the upper and lower bounds of the 95% CIs for lifetime cumulative risk of ESRD (online supplementary ref 11).
ESRD, end-stage renal disease; QALYs, quality-adjusted life years.

BMJ Open: first published ... Protected by copyright, including for uses related to text and data mining, AI training, and similar technologies.

Open Access

**Table 3** Sensitivity analysis: effect of age, obesity, smoking, diabetes mellitus and biological relationship in an otherwise ideal non-donor on outcomes with and without donation

|  | White male | White female | Black male | Black female |
|---|---|---|---|---|
| **Age 20** |  |  |  |  |
| Life expectancy | 59.535 years | 64.760 years | 55.130 years | 62.076 years |
| Cumulative ESRD% | 0.583 | 0.352 | 1.628 | 1.227 |
| Lost with donation, years | −0.734 (1.2%) | −0.471 (0.7%) | −1.003 (1.8%) | −0.958 (1.5%) |
| Added ESRD% | +2.173 (1/46) | +0.777 (1/129) | +5.43 (1/18) | +3.878 (1/26) |
| **Age 60** |  |  |  |  |
| Life expectancy | 23.933 | 27.752 | 21.560 | 26.767 |
| Cumulative ESRD% | 0.26 | 0.15 | 0.489 | 0.312 |
| Lost with donation, years | −0.518 (2.2%) | −0.332 (1.1%) | −0.590 (2.7%) | −0.626 (2.3%) |
| Added ESRD% | +0.954 (1/105) | +0.302 (1/331) | +1.945 (1/51) | +1.094 (1/91) |
| **Age 40** |  |  |  |  |
| Life expectancy | 41.1 | 45.571 | 37.236 | 43.352 |
| Cumulative ESRD% | 0.43 | 0.29 | 1.00 | 0.851 |
| Lost with donation, years | −0.572 (1.4%) | −0.462 (1.0%) | −0.799 (2.1%) | −0.824 (1.9%) |
| Added ESRD% | +1.59 (1/63) | +0.643 (1/155) | +3.80 (1/26) | +2.85% (1/35) |
| **Age 40 smoker** |  |  |  |  |
| Life expectancy | 34.027 | 38.701 | 28.927 | 35.677 |
| Cumulative ESRD% | 0.786 | 0.654 | 1.77 | 1.566 |
| Lost with donation, years | −0.496 (1.5%) | −0.395 (1.0%) | −0.636 (2.2%) | −0.718 (2.0%) |
| Added ESRD% | +2.75 (1/36) | +1.405 (1/71) | +4.51 (1/22) | +4.924 (1/20) |
| **Age 40, BMI 30–35** |  |  |  |  |
| Life expectancy | 38.925 | 43.243 | 33.130 | 40.885 |
| Cumulative ESRD% | 0.497 | 0.356 | 1.29 | 0.994 |
| Lost with donation, years | −0.545 (1.4%) | −0.418 (0.97%) | −0.716 (2.2%) | −0.758 (1.9%) |
| Added ESRD% | +1.80 (1/56) | +0.786 (1/127) | +4.736 (1/21) | +3.28 (1/30) |
| **Age 40, biological** |  |  |  |  |
| Life expectancy | 40.992 | 45.435 | 37.127 | 43.191 |
| Cumulative ESRD% | 0.634 | 0.424 | 1.399 | 1.222 |
| Lost with donation, years | −0.655 (1.6%) | −0.504 (1.1%) | −0.944 (2.5%) | −0.940 (2.2%) |
| Added ESRD% | +2.22% (1/45) | 0.927% (1/107) | +5.07 (1/20) | +3.91 (1/26) |
| **Age 40, non-biological** |  |  |  |  |
| Life expectancy | 41.361 | 45.913 | 37.525 | 43.749 |
| Cumulative ESRD% | 0.131 | 0.09 | 0.319 | 0.27 |
| Lost with donation, years | −0.378 (0.9%) | −0.354 (0.78%) | −0.488 (1.3%) | −0.583 (1.3%) |
| Added ESRD% | +0.522 (1/191) | +0.21 (1/476) | +1.46 (1/69) | +1.02 (1/98) |
| **Age 40, diabetes mellitus** |  |  |  |  |
| Life expectancy | 35.051 | 38.395 | 31.258 | 37.431 |
| Cumulative ESRD% | 1.331 | 1.46 | 2.61 | 2.24 |
| Lost with donation, years | −0.889 (2.5%) | −0.764 (2.0%) | −1.162 (3.7%) | −1.239 (3.3%) |
| Added ESRD% | +4.48 (1/22) | +3.01 (1/33) | +8.45 (1/12) | +6.666 (1/15) |

BMI, body mass index; ESRD, end-stage renal disease.

have lacked highly scrutinised controls and have only been of relatively short-term (<30 years) follow-up. Therefore an important mortality signal could have easily been missed.[1 17 18] This is further highlighted in our study. The per cent of patients modelled to be alive at 20 years post nephrectomy for an average-age white male donor was

Gaed BA, Tennankore KK. BMJ Open 2017;7:e016490. doi:10.1136/bmjopen-2017-016490

Open Access

only 0.2% lower than a non-donor (figure 2). Greater differences were seen later when the cumulative effects of CKD were more evident. It is possible that the lower glomerular filtration rate CKD as a result of donating a kidney in an ideal donor may well be different from CKD that is associated with proteinuria or diabetes mellitus. However, lower mortality risks associated with CKD were explored in the model and the results showed only a modest reduction in the percentage of total life years and QALYS projected to be lost. Although loss of life from CKD was higher compared with life lost from the ESRD health state, there were differences based on race and sex. About 78% of the loss of all QALYS from donation was associated with CKD in white female, whereas the loss was 58% in black male. Given these findings, risk factor detection (hypertension, diabetes mellitus and so on) and prompt intervention could help prevent ESRD and improve donor survival.

This model incorporated the probability that some donors will develop diabetes mellitus, hypertension and proteinuria at a later date, and these would impact on health (overall survival and progression to ESRD) as they do in the general population. The model could have been simplified if these risk factors for CKD and ESRD were not included in the model, but this would not reflect reality. Recent longer term observational studies have found that some donors develop diabetes mellitus and hypertension, despite being absent at the time of donation and that these factors are subsequently responsible for ESRD.[19 20] As a result, when adjusted to replicate 15-year follow cumulative ESRD rates non-donors, the model overestimated the lifetime ESRD predictions in non-donors based on results from a recently published study.[11] This study also explored a healthier 'ideal' cohort with a reduced risk of developing diabetes mellitus, proteinuria or kidney function decline over time. Although the lifetime added risk of ESRD was lower, the overall predicted absolute loss of life was not very different.

The baseline analysis also showed that white males suffer greater added long-term ESRD risks from donation than would be anticipated. For white male the added risk of an ESRD event was 1 for every 28 donors. For black male the risk was 1 in 22. One would have expected the added risk of ESRD in white male to be less than half the added risk in black male from what is known in the general population.[5 10] This risk appeared to accelerate in white male after 25–30 years of follow-up. Part of the increased risk is associated with longer life expectancies in white male. Another potential explanation is that criteria of acceptance of white male may be more lenient than black male, where the long-term impact of this practice may take several decades to fully appreciate. In the sensitivity analysis 'ideal' white male had much lower cumulative risks of ESRD; however, the absolute loss of life years and QALYS were not very different between the analyses.

The relationship between loss of remaining life years (and QALYS) and added risk of ESRD in donors is not straightforward. For example, although nearly 3.5% of white male donors are predicted to develop ESRD as a result of donation, only 0.091 QALYS or 0.13% of total remaining QALYS are lost as a result of ESRD. Calculating loss of remaining life years and QALYS helps put the risk of donation into context with other activities. The loss of life from live kidney donation is projected to be far less than smoking or mild obesity (table 3). Despite the higher initial perioperative mortality, live partial liver donation may be less risky over the long run compared with live kidney donation. Live liver donation is reported to have a perioperative death rate of 1.7 deaths per 1000 operations, but no long-term consequences,[21] In comparison, live kidney donation is much lower at 0.3 in 1000.[4] Despite a higher postoperative mortality with partial live liver donation, kidney donation results in more loss of life when adding in the long-term impact. A recent study calculating the benefits of colorectal cancer screening found that screening saved 244–270 years of life per 1000 people screened (0.244–0.27 years of life saved per person) depending on the method used.[22] This analysis would suggest the life years lost from donation is greater than the life years gained from colorectal cancer screening in an average-risk person. It is important to point out that the overall loss of life is averaged over the entire population. There will be some patients who develop ESRD who are relatively young, and these will have large reductions in the remaining life years compared with those who develop ESRD at a later age and those who never develop ESRD.

Ideally a prediction equation could be developed as was recently published for the incidence of ESRD in non-donors with differing baseline characteristics.[11] However it was not the purpose or ability of this study to give a precise estimate of lifetime ESRD for individual donors with multiple conditions. The analysis shows that younger donors have greater added risks of ESRD and potential life years lost; however, the percentage loss of life was somewhat less compared with older donors. The effect of smoking and diabetes mellitus had large effects on overall survival and in lifetime risk of ESRD in donors and non-donors. The effects were less in obese donors compared with donors who were smoking or had diabetes mellitus. The incremental effects with donation in subjects with and without obesity and smoking varied slightly by sex and race but overall were not very different (table 3). The analysis suggests that counselling and/or interventions to reduce weight and smoking cessation, etc. are important to both donor and non-donor and is not an argument to deny donation. Having a non-biological relationship to the recipient was associated with less risk; however, the majority of donors are related.[5] Donors with diabetes mellitus were at very high added risk of ESRD and death. It is interesting to point out that an obese and white female with diabetes mellitus, who is otherwise well, was about the same added risk of ESRD and average loss of life years as a current ideal 40-year-old white male donor.

**Open Access**

There are limitations to modelling future events. We rely on the observed rates of ESRD over 15 years in actual donors and a theoretical matched cohort to calculate lifetime outcomes.[11] Life expectancy and the cumulative incidences of diabetes mellitus and ESRD are increasing. Using historic mortality and disease incidence rates to make accurate future lifetime projections is a significant limitation; however, similar modelling studies are used to inform current practice.[22] The study was an analysis of US donors, whereas the non-donor control population included US and international populations. The results may not be generalised to live kidney donors from other countries where population ESRD rates are much lower.[6] There are many variables and transition rates included in this model and addressing uncertainty in each or combinations of variables would require a much longer paper. The key uncertainties explored were the cumulative risks of developing ESRD and the increased mortality associated with CKD states. Lower risks of developing diabetes mellitus and proteinuria were also explored in ideal donors.

The model did not include multiple stages of CKD. A more complex model could have been generated to differential stages 3a, 3b, 4 and 5 multiplied by three levels of proteinuria. However, this would complicate the model and we do not have enough patient-level data to examine this in detail. Adding these states would be the ideal and would be a suitable project at a later date once the information becomes available. Since donors eventually have a greater risk of entering into a more advanced CKD state, this analysis may have underestimated the overall net loss of life years from nephrectomy. We also used a uniform cohort of 40-year-old individuals in the baseline analysis, whereas the information available is from a cohort of donors with a wide range of ages.[11] Although the numbers vary by race, sex, age and uncertainty in the relative mortality risks associated with CKD, the overall estimates of life loss associated with donation are between 0.5 and 1 year. There however appear to be some paradoxes in the analysis. As noted the absolute loss of life was higher in younger donors but a greater percentage of loss of life in older donors. These result from a fixed relative risk of death associated with CKD multiplied by low baseline death rates in the young compared with higher death rates in older subjects along with differences in exposure. The risks of death associated with CKD may be less in older adults.[23] However incorporating a lower relative risk of death associated with CKD at older ages did not change the results significantly (see online supplementary material). The absolute loss of life years was less in obese and smoking donors than in otherwise ideal donors largely because the overall remaining life years were much shorter in donors with these risks. We do not have data on family history of ESRD in the non-biological-related donors. There may be some non-biological-related donors with a family history of kidney disease, which would put them at higher risk. In addition we assumed that the relative risks

between white and black of both sexes with a biological relationship were the same.

More information was required before we can fully estimate the impact of live kidney donation. Given the need for large numbers of patients and controls and a long-term follow-up, this risk may never be accurately measured for all age, race, sex and those with minor medical or abnormalities. Given the above, estimating lifetime ESRD rates in non-donors may not be the best or only metric to inform the risk of donation.[11] Greater efforts to put this into context for potential donors in the face of uncertainty for any one individual donor. Asking donors whether they may be willing to give up between 0.5 and 1 year of life may be a better way to convey risk than giving them an estimate of their lifetime risk of ESRD. In addition, the study identifies the potential importance of screening donors and treating risk factors aggressively to prevent ESRD and to improve donor survival. Acknowledging that many of these risk factors develop years after donation, short-term follow-up of kidney donors may be inadequate. Given that obesity and smoking are risk factors that might develop after donation, encouraging a healthy lifestyle at donor evaluation and postdonation is also important.

**Contributors** BAK is the guarantor of the study. BAK affirms that the manuscript is an honest, accurate and transparent account of the study. Both BA and [...] were involved with the study design, assumed data inputs, sensitivity analysis, writing and final approval of the paper.

**Competing interests** None declared.

**Provenance and peer review** Not commissioned; externally peer reviewed.

**Data sharing statement** The data are incorporated in TreeAge software. Anyone who tested would need this program.

**Open Access** This is an Open Access article distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See http://creativecommons.org/licenses/by-nc/4.0/

© Article authors (or their employer) unless otherwise stated in the text of the article. 2017. All rights reserved. No commercial use is permitted unless otherwise expressly granted.

**REFERENCES**

1. Horvat LD, Shariff SZ, Garg AX. Global trends in the rates of living kidney donation. *Kidney Int* 2009;75:1088–98.
2. Segev YS, Weiss AS, Garg A. Non-directed donor kidney transplants: a review of the associated survival benefit. *Transplantation* 2009;87:317–8.
3. Lentine KL, Lam NN, Axelrod D, et al. Perioperative Complications after Living Kidney Donation: A National Study. *Am J Transplant* 2013;16:1848–57.
4. Segev DL, Muzaale AD, Caffo BS, et al. Perioperative mortality and long-term survival following live kidney donation. *JAMA* 2010;303:959–66.
5. Muzaale AD, Massie AB, Wang MC, et al. Risk of end-stage renal disease following live kidney donation. *JAMA* 2014;311:579–86.
6. Mjøen G, Hallan S, Hartmann A, et al. Long-term risks for kidney donors. *Kidney Int* 2014;86:162–7.
7. Garg AX, Muirhead N, Knoll G, et al. Donor Nephrectomy Outcomes Research (DONOR) Network. Proteinuria and reduced kidney function in living kidney donors: a systematic review, meta-analysis, and meta-regression. *Kidney Int* 2006;70:1801–10.
8. Young A, Storsley L, Garg AX, et al. Donor Nephrectomy Outcomes Research (DONOR) Network. Meta-analysis of ...

Bieber BA, Tennankore KK. *BMJ Open* 2017;7:e016490. doi:10.1136/bmjopen-2017-016490

**Open Access**

for hypertension in living kidney donors. *Ann Intern Med* 2006;145:185–96.

9. Lentine KL, Schnitzler MA, Xiao H, *et al*. Racial variation in medical outcomes among living kidney donors. *N Engl J Med* 2010;363:724–32.

10. Matsushita K, van der Velde M, Astor BC, *et al*. Association of estimated glomerular filtration rate and albuminuria with all-cause and cardiovascular mortality in general population cohorts: a collaborative meta-analysis. *Lancet* 2010;375:2073–81.

11. Grams ME, Sang Y, Levey AS, *et al*. Kidney-failure risk projection for the living kidney-donor candidate. *N Engl J Med* 2016;374:411–21.

12. Kiberd BA. Estimating the long term impact of kidney donation on life expectancy and end stage renal disease. *Transplant Res* 2013; 2:2.

13. Gregg EW, Zhuo X, Cheng YJ, *et al*. Trends in lifetime risk and years of life lost due to diabetes in the USA, 1985–2011: a modelling study. *Lancet Diabetes Endocrinol* 2014;2:867–74.

14. Grams ME, Chow EK, Segev DL, *et al*. Lifetime incidence of CKD stages 3–5 in the United States. *Am J Kidney Dis* 2013;62:245–52.

15. United States Renal Data System. 2015 USRDS annual data report: Epidemiology of Kidney Disease in the United States. Bethesda (MD) National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases; 2015.

16. Cherikh WS, Young CJ, Kramer BF, *et al*. Ethnic and racial differences in the risk of end stage renal disease after living kidney donation. *Am J Transplant* 2011;11:1650–5.

17. Ibrahim HN, Foley R, Tan L, *et al*. Long-term consequences of kidney donation. *N Engl J Med* 2009;360:459–69.

18. Garg AX, Meirambayeva A, Huang A, *et al*. Cardiovascular disease in kidney donors: matched cohort study. *BMJ* 2012;344:e1203.

19. Anjum S, Muzaale AD, Massie AB, *et al*. Patterns of end-stage renal disease caused by diabetes, hypertension, and glomerulonephritis in live kidney donors. *Am J Transplant* 2016;16:3540–7.

20. Ibrahim HN, Foley RN, Reule SA, *et al*. Renal function profile in white kidney donors: the first 4 decades. *J Am Soc Nephrol* 2016;27:2885–93.

21. Muzaale AD, Dagher NN, Montgomery RA, *et al*. Estimates of early death, acute liver failure, and long-term mortality among live liver donors. *Gastroenterology* 2012;142:273–80.

22. Knudsen AB, Zauber AG, Rutter CM, *et al*. Estimation of benefits, burden, and harms of colorectal cancer screening strategies: modeling study for the US Preventive Services Task Force. *JAMA* 2016;315:2595–609.

23. O'Hare AM, Bertenthal D, Covinsky KE, *et al*. Mortality risk stratification in chronic kidney disease: one size for all ages? *J Am Soc Nephrol* 2006;17:846–53.



# DATA POINT

February 13, 2025

# HHS Standard Values for Regulatory Analysis, 2025

Aaron Kearsley

## Key Points

- This Data Point updates several standard monetary values used in regulatory impact analyses developed by the U.S. Department of Health and Human Services. All estimates are reported in constant 2024 dollars unless otherwise noted.
- HHS's current central estimate of the value per statistical life is $13.6 million.
- This Data Point also reports HHS's full range of current and future estimates of the value per statistical life and related estimates including the value per statistical life year and value per quality-adjusted life year.
- HHS's current default estimate of the hourly value of time for unpaid activities is $19.75.
- The current monetary threshold associated with the requirements of the Unfunded Mandates Reform Act is about $187 million.
- This Data Point and its recommendations will be updated annually or in response to any revisions to guidance on regulatory analysis.

## Background

The U.S. Department of Health and Human Services (HHS) analyzes the benefits, costs, and other impacts of significant proposed and final rulemakings, consistent with the requirements of several executive orders and statutes.[1] HHS develops these analyses according to technical guidance published by the U.S. Office of Management and Budget (OMB)[2] covering all Federal agencies and HHS *Guidelines* developed and maintained by the Office of the Assistant Secretary for Planning and Evaluation (ASPE).[3]

Each year, ASPE updates its default recommendations for several key inputs commonly used in HHS regulatory impact analyses (RIAs). This Data Point updates and reports HHS's estimates of the value per statistical life (VSL), other values derived from the VSL estimates, and an estimate of the hourly value of time for unpaid activities. This Data Point also updates the monetary threshold used for determinations related to the Unfunded Mandates Reform Act of 1995. All estimates are reported in constant 2024 dollars unless otherwise noted. Unrounded estimates are available in a supplemental table to this Data Point.[4]

---

[1] This Data Point focuses on the analytic requirements of Executive Order 12866 on Regulatory Planning and Review, Executive Order 13563 on Improving Regulation and Regulatory Review, Executive Order 14192 on Unleashing Prosperity Through Deregulation, and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104-4).

[2] U.S. Office of Management and Budget. 2003. Circular A-4, Regulatory Analysis

[3] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation. 2016. Guidelines for Regulatory Impact Analysis

[4] Please refer to the landing page of this Data Point for a link to the most current version of the supplementary table. Kearsley, A. HHS Standard Values for Regulatory Analysis, 2025. Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. February 2025.

## Estimates of the Value per Statistical Life

The HHS *Guidelines* discuss an approach to valuing mortality risk reductions based on estimates of individual willingness to pay, commonly referred to as the value per statistical life. HHS's VSL estimates are based on a criteria-driven literature review commissioned by ASPE to identify values that are suitable for use in its regulatory impact analyses.[5] The *Guidelines* and an appendix published subsequently[6] provide background information on the VSL estimates, including technical guidance on applying the estimates and the process for updating these values.

The VSL estimates reported in the literature review correspond to a 2013 base year. We update these values to a 2024 base year by adjusting for inflation[8] and changes in real income.[9] These adjustments increase the VSL estimates in nominal terms by about 49% compared to 2013. From the 2024 base-year VSL estimates, we report estimates for 2025 and future years. The VSL estimates increase over time in real terms, consistent with a long-term annual growth rate for real earnings of 1.1%[10] and an assumption that the VSL income elasticity is 1.0. For mortality risk changes occurring in 2025, we adopt $6.3 million, $13.6 million, and $20.7 million for the low, central, and high estimates of VSL, respectively. For impacts in other years, including the base year, please refer to Table 1 or the unrounded estimates available in a supplemental table to this Data Point.

Table 1. VSL Estimates by Year (constant 2024 dollars)

| Year | Low Estimate | Central Estimate | High Estimate |
|---|---|---|---|
| 2024 (base year) | $6.3 million | $13.4 million | $20.4 million |
| 2025 | $6.3 million | $13.6 million | $20.7 million |
| 2026 | $6.4 million | $13.7 million | $20.9 million |
| 2027 | $6.5 million | $13.9 million | $21.2 million |
| 2028 | $6.5 million | $14.0 million | $21.4 million |
| 2029 | $6.6 million | $14.2 million | $21.6 million |
| 2030 | $6.7 million | $14.3 million | $21.9 million |
| 2031 | $6.8 million | $14.5 million | $22.1 million |
| 2032 | $6.8 million | $14.7 million | $22.3 million |
| 2033 | $6.9 million | $14.8 million | $22.6 million |
| 2034 | $7.0 million | $15.0 million | $22.9 million |

[5] Robinson, L.A. and Hammitt, J.K., 2016. Valuing reductions in fatal illness risks: Implications of recent research. *Health Economics*, 25(8), pp. 1039-1052.

[6] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation, 2024. **Appendix D: Updating Value per Statistical Life (VSL) Estimates for Inflation and Changes in Real Income**

[7] The literature review provided population-averaged values in 2013 dollars (at 2013 income levels), which range from $4.2 million to $13.7 million with a mid-point of $9.0 million. HHS uses these values as the midpoint of its low, high and central VSL estimates respectively.

[8] U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average, series ID: CUUR0000SA0. Annual figures for 2013 to 2024.

[9] U.S. Bureau of Labor Statistics, Weekly and hourly earnings data from the Current Population Survey, Not Seasonally Adjusted, series ID: LEU0252881600. Annual figures for 2013 to 2024.

[10] Congressional Budget Office, March 2024. **The Long-Term Budget Outlook: 2024 to 2054**, Table 3: Average Annual Values for Additional Economic Variables That Underlie CBO's Extended Baseline Projections, Growth of Real Earnings per Worker, Covers 2024-2054.

## Estimates Derived from the Value Per Statistical Life

### Value per Statistical Life Year

The HHS *Guidelines* outline HHS's approach to estimating the Value per Statistical Life Year (VSLY), which is used in analyses that monetize changes to life expectancy measured in years. This approach is designed to be consistent with the VSL estimates, life expectancy data, and the approach to discounting used in regulatory analysis. HHS computes VSLY by dividing VSL by an estimate of discounted future life years. For the denominator, we calculate the expected present value of remaining life years for an individual 40 years of age, consistent with the average age reported in the literature review of VSL studies, accounting for age-specific survival probabilities. According to the most recent life expectancy data,[11] an individual 40 years of age has a remaining life expectancy of 39.3 years. When applying a 3% discount rate, the present value of remaining life expectancy is 22.5 years, and for a 7% discount rate, 13.5 years. Table 2, below, reports the intermediate calculation of expected life years (LY), and Table 3 reports the range of VSLY estimates, which apply the measure of expected LYs to the full range of VSL estimates.[12] For impacts occurring in 2025 that will result in changes to life expectancy measured in years, we adopt $804,000 as the central estimate of VSLY for analyses using a 3% discount rate, and $1,005,000 for analyses using a 7% discount rate.

### Value per Quality-Adjusted Life Year

The HHS *Guidelines* discuss several approaches to valuing morbidity risk reductions. One approach uses quality-adjusted life years (QALYs), a nonmonetary measure that integrates the duration and severity of illness. QALYs are derived by multiplying the amount of time an individual spends in a health state by a measure of the health-related quality of life associated with that state. To quantify benefits using this approach, analysts multiply estimates of the change in QALYs by a monetary value per QALY (VQALY). HHS computes VQALY similar to VSLY, except this metric incorporates measurements of age-varying, but otherwise population-average, health-related quality-of-life scores.[13] Based on these scores and the data and other assumptions used to compute remaining life expectancy, we calculate that an individual 40 years of age has an expected 32.2 remaining QALYs. When applying 3% and 7% discount rates, this is a present value of 18.9 QALYs and 11.6 QALYs, respectively. Table 2, below, reports the intermediate calculation of future QALYs, and Table 3 reports the range of VQALY estimates, which apply the measure of future QALYs to the full range of VSL estimates. For morbidity risk or other health-related quality-of-life changes occurring in 2025, we adopt $717,000 as the central estimate of VQALY for analyses using a 3% discount rate, and $2,175,000 for analyses using a 7% discount rate.

### Summary of Estimates and Sensitivity Analyses of Alternative Discount Rates

Table 3 presents estimates of the range of VQALY and VSLY estimates for impacts occurring in 2024 under 3% and 7% discount rates. For impacts in future years, analysts should adjust these estimates by 1.1% per year, consistent with projected real earnings,[14] or apply the unrounded estimates available in a supplemental table to this Data Point.

[11] Centers for Disease Control and Prevention. November 2021. *United States Life Tables, 2021.* National Vital Statistics Reports, Vol. 72, No. 12. Table 1. Life table for the total population of the United States.

[12] As one example calculation, $513,000 x 22.5 = $11.5 million. For instance, for a VSL of $13 million in 2025 and a 3% discount rate, the expected present value of remaining life years is 22.5 years.

[13] Hanmer, J., W.F. Lawrence, J.P. Anderson, R.M. Kaplan, and D.G. Fryback. 2006. Report of Nationally Representative Values for the Noninstitutionalized US Adult Population for Health-Related Quality-of-Life Scores. *Medical Decision Making* 26(4): pp. 391–400.

[14] For example, VQALY_2024 x VQALY_2025 = 1.011 x $2,000. For instance, a VQALY estimate of $5.8 million.

*Table 2. Expected Present Value (PV) of LYs and QALYs at Age 40*

| Discount Rate | PV LY | PV QALY |
|---|---|---|
| Undiscounted | 38.8 | 22.2 |
| 3% | 22.5 | 18.9 |
| 7% | 13.5 | 11.6 |

*Table 3. VSLY and VQALY Estimates for 2025 (constant 2024 dollars)*

| Estimate | VSLY | | VQALY | |
|---|---|---|---|---|
| Discount Rate | 3% | 7% | 3% | 7% |
| Low | $282,000 | $469,000 | $335,000 | $549,000 |
| Central | $604,000 | $1,006,000 | $717,000 | $1,175,000 |
| High | $920,000 | $1,531,000 | $1,091,000 | $1,789,000 |

## Estimates of the Value of Time

While developing the HHS *Guidelines*, ASPE commissioned research on methods for valuing time in HHS RIAs. One outcome of this effort was a report that examined the conceptual framework and general approach for monetization, considered contemporaneously available research and methods used by other U.S. regulatory agencies, and refined the approach for valuing changes in time use discussed in the HHS *Guidelines*.[15] The report recommends applying a value of time based on compensation-based measures such as hourly wages or annual salaries, with default assumptions for adjustments to those measures that vary depending on whether the impacts affect time spent on paid activities or unpaid activities.

### Value of Time, Paid Activities

Many regulatory actions impose or alleviate costs on regulated entities that can be quantified using estimates of the incremental time spent on regulatory activities, such as reviewing the new regulations, developing protocols for compliance, collecting and reporting data, and training staff on implementation. When valuing changes in time use for on-the-job activities, the HHS *Guidelines* recommend applying compensation-based measures that account for taxes and benefits, as well as indirect costs not associated with production of a particular good or provision of a specific service. These indirect costs include overhead costs such as space rental and utilities, and other costs such as office supplies and administrative oversight. As a default assumption when industry- or program-specific data are not readily available, analysts may assume that the sum of these additional costs are equal to pre-tax wages, and calculate a fully loaded wage rate by multiplying measurements of pre-tax wages by 2. For example, if a regulatory action will result in additional time spent drafting legal documents, an analyst might identify a median pre-tax hourly wage for lawyers of $72.19,[16] double this value to produce a fully loaded wage rate of $144.38 per hour, and monetize the impact by multiplying the fully loaded wage rate by the hours spent on these activities. For rules requiring substantial amounts of labor, such as the hiring of additional employees, analysts might instead estimate the number of new employees needed and perform a similar calculation using annual salaries instead of hourly wages.

[15] U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation. (2016). Valuing Time in U.S. Department of Health and Human Services Regulatory Impact Analyses: Conceptual Framework and Best Practices

[16] Bureau of Labor Statistics. Occupational Employment and Wage Statistics. Occupational Employment and Wages, May 2023, 23-1011 Lawyers. $70.08 hourly wage converted to 2024 constant dollars using the Gross Domestic Product: Implicit Price Deflator. The unrounded inflation-adjusted hourly wage used in the subsequent calculation is $72.19.

## Value of Time, Unpaid Activities

Regulatory actions can also increase or decrease the time spent on certain activities by the general public outside of a work setting. For example, a regulatory action could affect the amount of time individuals spend filling out forms to receive government benefits, or the time consumers spend reading information contained on product labels. Such impacts can be quantified in regulatory impact analyses using a value of time that is based on the opportunity cost of foregone leisure. The HHS *Guidelines* recommend an hourly value of time based on after-tax wages to monetize changes in time use for unpaid activities. For this calculation, we start with median pre-tax hourly wage, measured across all occupations, of $23.79.[17] We adjust this hourly rate downwards by an estimate of the effective tax rate for median income households of about 17%, resulting in a post-tax hourly wage rate of $19.75, and adopt this as our default estimate of the hourly value of time for changes in time use for unpaid activities.

## Unfunded Mandates Reform Act Threshold

The Unfunded Mandates Reform Act of 1995 (UMRA) "generally requires that each agency conduct a cost-benefit analysis; identify and consider a reasonable number of regulatory alternatives; and select the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule (or explain why it does not do so) before promulgating any proposed or final rule that includes a Federal mandate that may result in expenditures of more than $100 million (approximately $200 million with the inflation adjustment) in at least one year by State, local, and Tribal governments, in the aggregate, or by the private sector. Each agency issuing a rule with relevant effects over that threshold must also seek input from State, local, and Tribal governments."[18] Every year, HHS updates the UMRA monetary threshold for inflation using the gross domestic product implicit price deflator. We compare the index values for the most recent full year of data (2024) to the index for 1995.[19] The index values used are 125.220 for 2024 and 66.939 for 1995, from which we compute a multiplier of 1.87. This multiplier, combined with the base-year threshold of $100 million, results in an inflation-adjusted monetary threshold of $187 million, reported in 2024 dollars.

[17] Bureau of Labor Statistics. Occupational Employment and Wage Statistics. May 2023 National Occupational Employment and Wage Estimates. 00-0000 All Occupations. 1.73.1 hourly wage, median.

[18] U.S. Office of Management and Budget. Office of Information and Regulatory Affairs. Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act, FY 2023

[19] Bureau of Economic Analysis. National Income and Product Accounts. Table 1.1.9. Implicit Price Deflators for Gross Domestic Product. Accessed Thursday, January 30, 2025

# U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Assistant Secretary for Planning and Evaluation**

200 Independence Avenue SW, Mailstop 434E
Washington, D.C. 20201

For more ASPE briefs and other publications, visit:
aspe.hhs.gov/reports



**ABOUT THE AUTHOR**
*Aaron Kearsley* is a Senior Economist in the Office of Science and
Data Policy within the Office of the Assistant Secretary for
Planning and Evaluation.

**ACKNOWLEDGEMENTS**
This Data Point draws heavily from content appearing in the HHS
*Guidelines* and its appendices. The author of the Data Point
thanks Jennifer Baxter, Lisa A. Robinson, and HHS reviewers for
their helpful comments and suggestions.

**SUGGESTED CITATION**
Kearsley, A. "HHS Standard Values for Regulatory Analysis, 2025."
Office of the Assistant Secretary for Planning and Evaluation, U.S.
Department of Health and Human Services. February 2025.
https://aspe.hhs.gov/reports/standard-ria-values.

**COPYRIGHT INFORMATION**
All material appearing in this report is in the public domain and
may be reproduced or copied without permission; citation as to
source, however, is appreciated.

**DISCLOSURE**
This communication was printed, published, or produced and
disseminated at U.S. taxpayer expense.

For general questions or general
information about ASPE:
aspe.hhs.gov/about

FCM LG ENV
BOCA RATON, FL 33433
JUN 10, 2025

**$8.56**

S2324H503093-15

33301

RDC 99

UNITED STATES
POSTAL SERVICE

CERTIFIED MAIL

9589 0710 5270 3280 9551 97

US District Court for the Southern District of Florida
Clerk of Courts
299 E. Broward Blvd, Suite #108
Fort Lauderdale, FL 33301

Alicia Vel Haca
ton, FL 33433

**U.S. Marshal Service**

Contents **X-RAYED**
Post 1

Royal Palm RDC 330